IN THE UNITED STATES DISTRICT COURT   FILED
FOR THE DISTRICT OF NEW MEXICO

CHAVEZ PROPERTIES-AIRPORT PARKING
ALBUQUERQUE, LP, a Georgia limited partnership,
and PARKING COMPANY OF AMERICA, INC.,
a Georgia Corporation,

04 FEB 27  PM 3 44

           Plaintiffs,

vs.

NO. CIV 02-0145 JP/ACT (ACE)
(Consolidated)

JOHN LORENTZEN, individually, and PARK AND
SHUTTLE, INC., a New Mexico Corporation, and
WES GOLDEN, an individual.

      Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

COME NOW, the Defendants/Counterclaimants, John Lorentzen, individually

and Park & Shuttle, Inc. and Wes Golden, by and through their attorney, Michael L.

Danoff and for their Findings of Fact and Conclusions of Law state the following:

1.     John Lorentzen (hereinafter referred to as "Lorentzen") is a resident of the

City of Albuquerque, County of Bernalillo, and State of New Mexico and has been at all

times material to this action.

2.     Park & Shuttle, Inc. (hereinafter referred to as "P&S" is a New Mexico

corporation licensed and authorized to do business in the City of Albuquerque, County of

Bernalillo, and State of New Mexico.

3.     Wes Golden (hereinafter referred to as "Golden") is a resident of the City

of Albuquerque, County of Bernalillo, and State of New Mexico and has been at all times

material to this action.

4.      This action was initiated on February 8, 2002, when the Plaintiffs filed an action for a Temporary Restraining Order and Preliminary Injunction.

5.      Chavez Properties-Airport Parking Albuquerque, LP (hereinafter referred to as "CPAPA"), a Georgia limited partnership is an owner of a parking lot on 2801 Yale, S.E., known as Fast Park adjacent to that of P&S.

6.      Parking Company of America (hereinafter referred to as "PCA") is a corporation authorized to do business in New Mexico and primarily operates and manages parking lots under contract.

7.      Plaintiffs filed to obtain relief from a default declared by Defendants, which they believed had been properly obtained after failure to respond to warnings provided for in the contract.

8.      PCA improvidently obtained a Temporary Restraining Order depriving Lorentzen and P&S of their property for a period of 10 days and this Temporary Restraining Order was subsequently overturned, but it put P&S and Lorentzen out of business for a period of time.

9.      The Defendant P&S is the owner of a parking lot located on 2909 Yale, S.E. in the City of Albuquerque, County of Bernalillo and State of New Mexico.

10.     The parties have stipulated to the fact that CPAPA and P&S entered into a Joint Venture Agreement (hereinafter referred to as "JVA") effective January 1, 2000.

11.     As a part of the JVA the parties agreed to engage a management company, PCA, to operate the two adjacent parking lots as one, under a parallel contract, the Parking Management Agreement (hereinafter referred to as "PMA").

2

12.   Pursuant to paragraph 1.06 of the JVA both parties would have a voice in the selection of the manager for the parking lot, who had to be unanimously approved by all three managers listed in the PMA, one of which was Lorentzen.

13.   The JVA also provided that there must be unanimous agreement on all matters pertaining to monetary issues and management practices.

14. .   It was the spirit and intent of the parties in formulating this JVA to cut the costs of the parking lot operations and to make a more substantial profit by unifying the two parking lots.

15.   As a term of the JVA, the parties were to split the profits 57% to CPAPA and 43% to P&S based, on the number of parking spaces each party brought to the Joint Venture.

16.   It was understood that P&S would be kept apprised by the management company, PCA, as to all matters pertaining to the parking lot and in particular financial matters.

17.   Golden was employed by Parking Company of America, Inc. from approximately 1995 until January, 2001, and was its manager in Albuquerque for the last several years of his employment.

18.   Golden was an active party working for CPAPA at Fast Park and was the city manager in charge of its operation.

19.   Airport Shuttle, a business owned by Lorentzen, entered into a valid agreement with PCA as an arm's length transaction, but PCA thereafter unreasonably interfered with it.

3

20.     Golden was the parking operation site manager at Airport Fast Park prior to the Joint Venture's inception and then became the site manager for the combined lots for PCA, as manager of the Joint Venture.

21.     Golden was instrumental in the negotiations and the formulating of this JVA with Lorentzen on behalf of P&S.

22.     Golden is very familiar with this transaction and was integrally involved in the negotiations between CPAPA and P&S.

23.     Golden left PCA over ethical problems with PCA's deliberate mistreatment of Lorentzen and P&S.

24.     Shortly after his resignation from CPAPA Golden became an employee of P&S and has been its Albuquerque Operations Manager since that time.

25.     Golden was added to the lawsuit as a Defendant on grounds related to his departure from PCA and subsequent employment by P&S as its manager.

26.     At no time did Golden convert or embezzle any funds, or interfere with propriety information, or breach any fiduciary duty.

27.     PCA had a fiduciary duty as manager of the Joint Venture parking lots to CPAPA and an equal fiduciary duty to P&S.

28.     PCA and CPAPA had an ongoing and prior business relationship with each other for several years prior to the formation of the Joint Venture, and most of the principals in each are relatives.

29.     Prior to joining forces as a unified parking lot CPAPA through Fast Park, and P&S, doing business as Airport Park & Shuttle, were fierce competitors.

4

30.    At all times when Golden was negotiating this Joint Venture, he acted on behalf of CPAPA and Fast Park, and P&S's negotiations were being handled by Lorentzen.

31.    During the time that Golden was working for PCA as the manager of both parking lots, PCA did much better financially then after his departure.

32.    Shortly after Golden left PCA the profitability of the Joint Venture was reduced substantially.

33.    Lorentzen had a great deal of respect for Golden in the parking lot business and would not have entered the JVA if Golden had not been PCA's manager.

34.    The terms of the JVA provided for equal managers, Manual Chavez, Robert Chavez, and John Lorentzen and their decisions were required to be unanimous.

35.    The managers' duties to and on behalf of the JVA were specified in the JVA.

36.    Lorentzen wanted to maintain an active role and voice in the operation of the parking lot because it is a substantial investment to his family.

37.    P&S's operation of the parking lot at the airport had a long history, and Lorentzen's father helped start this business.

38.    P&S, Lorentzen, and his family owned and operated several unrelated businesses on the family property where the Joint Venture was also being conducted, and those entities were often adversely affected by the Joint Venture operation on their premise.

39.   On or about December 29, 2001, Lorentzen on behalf of P&S sent PCA a default letter outlining various issues where PCA was at fault, following termination provisions spelled out in paragraph 17 of the PMA.

40.   The default letter was not answered by PCA, nor were the issues addressed in the default notice cured within the prescribed period of time.

41.   Lorentzen terminated the PMA because he could tell the parking lots were being grossly mismanaged.

42.   . As a result of the problems of mismanagement and during the pendency of this litigation, Kenneth Hunt was appointed as an Arbiter by the Court to maintain the status quo and resolve disputes related to ongoing operations under the PMA during the litigation.

43.   All during this litigation there were many instructions by the Arbiter which CPAPA and PCA would not follow which included and were not limited to the following:

  i.   Advertising matters,

  ii.   Procurement of insurance, ·

  iii.   Dealing with advertising sign in the University of New Mexico basketball arena,

  iv.   Maintenance of the parking lot,

  v.   Providing financial information, data and reports,

  vi.   Paying Joint Venture bills, to the various creditors by making delinquent payments,

6

   vii. Paying legal fees for cases that were beneficial to the Joint

     Venture,

   viii. Charging P&S for CPAPA or Joint Venture expenses,

   ix. Obtaining uniforms for employees in which the advertising favored

     CPAPA.

44. Another issue crucial to this whole dispute was that often P&S and Lorentzen requested accountings of various financial documents which were not furnished, in violation of the JVA and PMA.

45. P&S never received a proper accounting, nor was it furnished financial information necessary to the operation of the business as requested from PCA, which was a breach of contract by PCA under the PMA.

46. PCA would not provide financial information to P&S when it was needed and requested, which was a breach of its fiduciary obligation as well.

47. The accounting issue was the issue over which Defendants elected to terminate the PMA and, if possible, the JVA.

48. Pursuant to paragraph 5 of the JVA a budget was to be prepared and followed.

49. Paragraph 5 of the JVA states: "At the first anniversary of this Agreement and on or before every January 1 thereafter during the term hereof, Manager shall prepare and submit to Owner an annual budget for the next calendar year, hereinafter referred to, after the approval thereof, as "Budget", for the operation of the parking facilities and all other responsibilities of Manager. Total annual expenditures under this Budget may not vary by more than ten (10%) per cent per year without written prior approval of Owners.

Owners shall have thirty (30) days to review and approve the proposed budget each year or request Manager to amend the same, whereupon Manager shall promptly amend said proposed budget and redeliver the same to Owner. In the event Owners fail to approve a proposed budget for any year during the term, the Budget for said year shall be the prior year's Budget increased by a factor of three per cent (3%) or the one-year increase in the Consumer Price Index (CPI), whichever is greater." PCA violated this paragraph.

50.    This budget was never prepared by PCA and sound business practices were not followed, in violation of the PMA, and to the financial detriment of P&S.

51.    The budget was to reflect enumerated expenses, and there was a formula for following this budget, as explained by Defendants' accounting expert Carl Alongi.

51.    Mr. Alongi will testify that there has been a loss in excess of $534,000 sustained by P&S as a result of PCA's mismanagement, breach of contract and breach of fiduciary duty.

52.    CPAPA and PCA have no expert to refute the testimony of Carl Alongi.

53.    Mismanagement of the Joint Venture on the part of PCA, which adversely affected the income of the Joint Venture, began early in its performance under the PMA and continued throughout the entire time that PCA was in charge.

54.    Defendants' economic expert, Carl Alongi, CPA, testified credibly that Defendants' damages were $535,000.00 as of August 2003 and have continued until the termination of the JVA on December 30, 2003.

55.    Golden, who is very familiar with the history of the Joint Venture, took the base year 2000 and graphically depicted the loss of revenue for each year thereafter.

8

for the term of the Joint Venture which reflected a loss in excess of $520,000.00 through October 2003.

56.   Lorentzen and his family invested all they could into this business.

57.   PCA unilaterally changed parking prices for the parking at the parking lot and issued various discount coupons, and did not first consult with P&S and Lorentzen in direct violation of the PMA which has caused damages and will continue to cause damages, as an adjustment of the pricing will take a great deal of time.

58.   PCA was improperly passing out pamphlets and coupons that bore the name of Star Parking, an entity, which had nothing to do with the JVA nor P&S, and this advertising did not help P&S in any way or further the interests of the Joint Venture.

59.   PCA advertised for Star Parking and P&S paid for this advertising, which was not helpful or beneficial to P&S.

60.   Lorentzen testified credibly as to damages continuing to accrue since he has taken over the business, and estimated that the recovery for proper pricing and charges for parking will take 18 months, and therefore P&S will be damaged in excess of $325,000 in additional damages.

61.   PCA's mismanagement also included improper advertising and advertising to the benefit of CPAPA and to the detriment of P&S, while pursuant to the JVA, P&S was charged for the proportional share of the advertising as though it were equally benefited.

62.   A sign in the University Arena in Albuquerque, New Mexico depicted Fast Park only, and the Joint Venture paid for this when it should have reflected P&S and Fast Park.

63.    Nothing was done to correct this sign at University Arena, and P&S is entitled to reimbursement of $13,000.00 as its share of the $30,000.00 cost of the sign.

64.    Lorentzen testified credibly that there were miscellaneous shortages from Qwest Dex in the approximate amount of $1,702.00.

65.    As a result of the actions taken by PCA there has been interference by PCA with third parties by virtue of their not paying bills to third party creditors so that P&S's credit reputation has been damaged and continues to be damaged.

66.    A principal source for effective advertising for the Joint Venture was the Premium Shopping Guide, and it was agreed that it would continue to be used, but this vendor was not paid by PCA and the relationship was damaged, and the credit reputation that was damaged was always in the name of P&S.

67.    There is presently a pending lawsuit, in the Second Judicial District Court, Cause No. CV-2003-05188, in which Premium Shopping Guide and its parent copy Sunquest Marketing, Inc. are Plaintiffs, and Lorentzen and P&S are Defendants. P&S then sued PCA and CPAPAP, in a Third Party Complaint for indemnification of $42,000.00 in damages asserted by Sunquest Marketing, Inc. The caption of the case is as follows:

**STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT**

**No. CV-2003-05188**

**SUNQUEST MARKETING, INC.,
a New Mexico corporation, d/b/a
PREMIUM SHOPPING GUIDE,
                                                Plaintiff,**

**v.**

JOHN LORENTZEN and
PARK & SHUTTLE, INC.,
a New Mexico corporation,
                              Defendants.
-----------------------------------------------------
JOHN LORENTZEN and
PARK & SHUTTLE, INC.,
a New Mexico corporation,
                              Third Party Plaintiffs,

v.

PARKING COMPANY OF AMERICA, INC.,
a foreign corporation, and
CHAVEZ PROPERTIES AIRPORT PARKING
OF ALBUQUERQUE,
                              Third Party Defendants.

68.   The actions of PCA in the non-payment and slow payment of bills towards
Lorentzen and P&S have jeopardized and harmed their credit and they have suffered
damages as a result, in many more instances than just the matter of the Premium
Shopping Guide.

69.   During the time that PCA managed the business it did not pay bills on
time, where P&S and Lorentzen had historically paid timely, knowing that this action
would cause a great deal of problems to the credit of Lorentzen and P&S, and impair
their ability to perform after the Joint Venture ended.

70.   Lorentzen will testify that there are unpaid reimbursements for items
which he was required to pay in furtherance of the daily operation of the Joint Venture
totaling in excess of $6,000.00.

71.   PCA also arranged van benefits to the JVA which Lorentzen had not
received in the sum of $4,380.00

72.     Defendants' witnesses credibly will testify that as a result of discretionary payments made by PCA for the benefit of CPAPA, P&S lost $56,120.00 in the year 2002 and $42,507.00 in the year 2003.

73.     Gail Bundy testified credibly as an expert witness regarding mismanagement and breach of fiduciary duty by PCA in procuring insurance.

74.     Mr. Bundy testified that he could have secured a lower rate for Joint Venture insurance coverage and could have saved in excess of $24,000.00 per year to the Joint Venture, and that PCA was delinquent in payment of past dealings with him relative to insurance.

75.     PCA did free shuttle service for the New Mexico Scorpions Minor Hockey League team without the permission of P&S.

76.     PCA cost the Joint Venture and P&S the sum of approximately $1,000.00 and the Joint Venture and P&S received no benefit for this.

77.     PCA in November of 2001 or shortly thereafter put in place security guards at $4,000.00 which was not a needed or necessary expense to the Joint Venture which constituted mismanagement.

78.     The Court appointed a Special Master, Woody Smith, a retired judge, who decided to defer to this Court the determination of the amount of money that P&S should receive for the Joint Venture property retained by CPAPA.

79.     There are certain offsets for personal property which is Joint Venture property that has been retained by CPAPA, and P&S is entitled to an offset in excess of $20,000.00.

80.    When the JVA was formed there was an ongoing lawsuit by P&S against the City of Albuquerque over rate charges in the airport's commercial lane, which it was agreed would continue with Joint Venture funding, but PCA failed to fund the litigation properly and Defendants had to make their own arrangements with counsel, at an expense in excess of $25,000.00. This lawsuit is presently in the New Mexico Supreme Court and would obviously aid CPAPA in the future if P&S prevails.

81.    Defendants are presently funding this lawsuit which will confer a potential benefit to CPAPA, and should receive reimbursement of attorney fees and costs to extent that PCA and CPAPA are in default of the payment duties of PCA under the PMA.

82.    On November 10, 2003, the parties entered into a stipulation whereby each of the parties would receive its respective parking lots as they were constituted before the formation of the Joint Venture.

83.    While operating under Court supervision, PCA continued to skew the allocation of costs and revenue arbitrarily so that P&S did not receive profits it should have received, and a couple of months received nothing at all.

84.    The only issues remaining open are the issues of damages for mismanagement, breach of fiduciary duty, and reputation damages to Defendants/Counterclaimants herein, along with Plaintiffs' claim for loss of the benefit of the bargain.

85.    The Plaintiffs offered no expert for their position on the claim of loss of the benefit of the bargain, and Plaintiffs' Exhibit 271 on damages should not be admitted into evidence.

86.   The Plaintiffs cannot corroborate or substantiate any damages for their alleged loss of the benefit of their bargain, and therefore, are not entitled to any damages.

87.   There was monetary compensation received for "special events" by P&S, but they were outside the contract and always recognized as such by the parties until after this action arose.

88.   PCA as the Parking Manager was to operate the lot, pay all expenses, collect all revenue, provide financial reports and make monthly profit distributions to the JV partners, and their duties were outlined in the PMA.

89.   P&S did special events which were outside and not a part of the JVA.

90.   P&S had appropriate licensing from the State of New Mexico to perform special events and use the vans away from the airport.

91.   Mismanagement throughout the Joint Venture period by PCA was detrimental to the best interests and welfare of P&S, while management decisions favored CPAPA.

92.   Various documents and witnesses corroborated the fact that bills were paid late and continued to be paid late by the Joint Venture even after P&S put them on notice of damage to Defendants' credit, yet PCA did nothing to remedy the situation.

93.   PCA in managing the property favored CPAPA in repairing its vans and doing other work on vehicles that were previously owned by CPAPA, and did not perform the same services on the vans owned by P&S.

94.   PCA tried to do everything it could to denigrate P&S and Lorentzen to various employees, vendors, and members of Defendants' business community.

95.   A representative of the Public Regulatory Commission will testify that in order to shuttle people you must have a charter warrant or private contract or convenience or Certificate of Necessity registered with the State of New Mexico.

96.   There was no contract between the Hyatt and PCA, for one year's parking services, but Defendants were charged for 43% of the loss on the contract, or about $50,000.00 or an amount to be proven at trial.

97.   PCA tried to pass on charges of the Hyatt contract to P&S when it did not include it initially in the Joint Venture, and only when it lost money did it become a Joint Venture activity on PCA's accounting reports.

98.   The contract with the Hyatt and PCA was never properly executed by all parties, and PCA still tried to charge P&S for losses on this contract.

99.   P&S was required to have all advertising approved by Lorentzen, but PCA refused to do this and unilaterally went ahead with advertising on a number of occasions, even after being chastised by the Arbiter for doing so.

100.   PCA advertised for the benefit of CPAPA and Fast Park and often left out P&S in its advertising.

101.   PCA did detrimental harm to the long-standing, good relationship between Southwest Airlines and P&S.

102.   PCA was resistant to the Arbiter's reasonable requirements.

## CONCLUSIONS OF LAW

1.   The Findings of Fact are adopted as part of the Conclusions of Law.

2.   By Stipulation of the parties entered into on January 1, 2000 as and between CPAPA and P&S was terminated effective December 1, 2003.

3.    By stipulation of the parties entered into on November 10, 2003, all disputes regarding damages will be determined by a bench trial and the Plaintiffs are entitled to a claim for their alleged loss of benefit of the bargain.

4.    Lorentzen on December 29, 2001, on behalf of P&S, wrote a letter outlining problems which, under paragraph 17 of the PMA, would result in termination of the contract if not cured.

5.    Plaintiffs entirely failed to respond properly to the termination warning or to cure the problems, although they made telephone calls, proposed meetings and took other steps which showed that they had received it.

6.    The contract was drafted by Plaintiffs, who were therefore aware of its provisions and the consequences of failure to respond to the December 29, 2001, demand.

7.    Lorentzen on behalf of P&S properly terminated the PMA on January 25, 2002, in a letter outlining the failures of PCA under the contract.

8.    The litigation commenced by Plaintiffs on February 8, 2002, was inappropriate, and while they made a prima facie case at the time that they were entitled to a Temporary Restraining Order and to the status quo under which they operated the Joint Venture for another 18 months, they have failed to prove their claims or justify any grant of relief from the termination of the contract for cause on January 25, 2002.

9.    Plaintiffs must disgorge any profits earned and pay restitution for any losses to Defendants resulting from (a) their mismanagement of the Joint Venture set out in the demand letter of December 29, 2001, (b) their mismanagement of the Joint Venture under the PMA between December 29, 2001 and February 8, 2002; and (c) their management or mismanagement of the Joint Venture under Court supervision from

February 8, 2002, until dissolution of the Joint Venture on November 30, 2003 which constitutes damages in an amount in excess of $1,000,000.00, or an amount to be proven at trial.

10.    This action was initiated in February 8, 2002 with the filing of a request for Preliminary Injunction by the Plaintiffs herein, which was denied.

11.    Plaintiffs received a Temporary Restraining Order which was subsequently dissolved by the Court, and Defendants prevailed on this issue.

12.    On motions that have been filed by the Plaintiffs herein, with the exception of a Motion for Summary Judgment, Defendants have prevailed.

13.    Plaintiffs breached the PMA by systematically refusing to account for revenue and expenses, distorting the financial allocations of the Joint Venture in favor of CPAPA over P&S, untimely and insufficient remittance of earnings, and failure to pay creditors who looked to Defendants for payment.

14.    Plaintiff PCA mismanaged the Joint Venture, and some of its acts were deliberate and with intent to harm Defendants.

15.    The actions of the Plaintiff PCA and CPAPA constituted tortuous interference with beneficial business relationships such that Defendants have been damaged.

16.    The actions of the Plaintiffs PCA and CPAPA have damaged the credit reputation of P&S and Lorentzen.

17.    The actions of Plaintiff CPAPA have been damaging to P&S and Lorentzen, who should recover compensable damages.

18.    The claim against Golden should be dismissed as unproven.

19.    Defendants should be awarded damages of $550,000.00, or an amount to be proven at trial, which are supported by expert testimony as having been incurred by P&S and Lorentzen due to mismanagement of the Joint Venture, breach of contract, breach of fiduciary duty, and other related claims.

20.    Defendants should be awarded future damages of $500,000.00, or an amount to be proven at trial as a result of the Plaintiffs' actions, which is based on the testimony of Lorentzen and corroborated by other witnesses that it will take 18 months to restore P&S to economic health after damage done to it by Plaintiffs.

21.    The Plaintiffs' actions were willful, wanton and reckless such that the Defendants should receive punitive damages to be proven at trial.

22.    The Defendants should be awarded attorney's fees and costs by virtue of having prevailed in almost all of the Pretrial Motions and for attorney's fees for the case in chief.

Respectfully submitted,

MICHAEL DANOFF & ASSOCIATES, P.C.

MICHAEL L. DANOFF
Attorney for Defendants
604 Chama NE
Albuquerque, New Mexico 87108
505-262-2383
505-266-4330 fax

I hereby certified that a copy of the foregoing pleading was mailed on this 27th day of February, 2004 to the

following:

Benjamin Silva, Jr., Esq.
SILVA & ASSOCIATES, P.C
Post Office Box 100
Albuquerque, NM 87103-0100

Christopher T. Saucedo, Esq.
PEIFER, HANSON & MULLINS, P.A.
Post Office Box 25245
Albuquerque, NM 87125-5245


MICHAEL L. DANOFF