# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHAVEZ PROPERTIES-AIRPORT
PARKING, ALBUQUERQUE, L.P.,
a Georgia limited partnership, and
PARKING COMPANY OF AMERICA,
INC., a Georgia Corporation,

               Plaintiffs,

vs.                                                                    No. CIV-02-0145 JP/ACT (ACE)

JOHN LORENTZEN, individually, and
PARK AND SHUTTLE, INC.,
a New Mexico Corporation, and
WES GOLDEN, individually,

               Defendants.

## CHAVEZ PROPERTIES-AIRPORT PARKING ALBUQUERQUE, L.P.'S AND PARKING COMPANY OF AMERICA, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Chavez Properties-Airport Parking Albuquerque, L.P. ("CPAPA") and Parking Company of America, Inc. ("PCA"), by and through their counsel of record, Silva & Associates, P.C. (Benjamin Silva, Jr.) and Peifer, Hanson & Mullins, P.A. (Christopher T. Saucedo), hereby submits the following proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

## BACKGROUND

1.      CPAPA and Park & Shuttle, Inc. ("P&S") entered into a Joint Venture Agreement ("JVA") for the purpose of conducting a commercial parking and shuttle operation on Joint Venture property, effective January 1, 2000.

2.      The JVA was not signed by CPAPA or P&S until March 2001.

3.     The Joint Venture property is located off of Yale Blvd., near the Albuquerque airport.

4.     Prior to signing the JVA, the parties exchanged financial information.

5.     CPAPA disclosed that it rented its vans and the rental expense would be transferred to the joint venture.

6.     The purpose of the Joint Venture was the continued operation of parking services for the Albuquerque airport by joining two competitors thus reducing overhead costs and increasing profits for the Joint Venture members.

7.     CPAPA invested approximately a quarter of a million dollars in capital improvements to facilitate and ease the merger of the two businesses into the Joint Venture.

8.     Proceeds from the Joint Venture were to be distributed 57% to CPAPA and 43% to P&S.

9.     The JVA states that it "shall terminate on December 31, 2009" and can be subject to renewal.  JVA ¶ 1.02.

10.    No other termination provisions are incorporated into the JVA.

11.    If the PMA is terminated, the JVA could nonetheless continue to exist without a parking manager until a new one is appointed and a new PMA entered into.

12.    CPAPA and P&S appointed PCA as the parking manger of the Joint Venture property.

13.    On January 1, 2000, CPAPA, P&S and PCA entered into a Parking Management Agreement ("PMA").

14.    Wesley Golden, who was PCA's lot manager since 1985 was assigned as manager of the joint venture lots.

2

15.    The PMA was entered into for a ten-year period and is also subject to renewal.

16.    In the Fall of 2001, PCA made the decision to transfer Wesley Golden from General Manager of the parking lot to a position in marketing.

17.    On December 29, 2001, Lorentzen, president of P&S, wrote to Robert Chavez, vice-president of PCA and general partner of CPAPA, that certain expenses incurred by PCA totaling $53,825 during the year 2000 and 2001 were not authorized by the JVA or the PMA.

18.    Lorentzen demanded that $23,144 (which is 43% of $53,825) be "paid on or before the 9th of January, 2002, or I shall consider our Management Agreement/Joint Venture null and void."

19.    Through several telephone conversations and messages, Robert Chavez responded to Lorentzen's demand.

20.    Robert Chavez justified all expenses and offered compromise in an effort to continue the successful operation of the Joint Venture.

21.    PCA removed over $20,000 of legitimate expenses from being charged to the Joint Venture even though the costs were regularly charged to managing operations.

22.    The costs were paid for entirely by CPAPA.

23.    On January 11, 2002 without any lawful authority Lorentzen removed the joint venture credit card machines and unbeknownst to PCA or CPAP replaced them with his credit card machines.

24.    Lorentzen diverted, through his credit card machines, approximately $70,000 from PCA and the joint venture.

25.    On January 15, 2001 unbeknownst to and without the authority of PCA, Defendant Wesley Golden, a PCA employee at that time, enters into a monthly rental

3

agreement with Airport Shuttle, a company owned by Defendant John Lorentzen, for 16 spaces at $20 per month, well below the amount charged to others.

26.     Wesley Golden did not have the authority to enter into the monthly rental agreement with Airport Shuttle.

27.     Using the monthly rental agreement for 16 spaces, Airport Shuttle, under the direction of Defendant Golden and Lorentzen, cordoned off 48 spaces of the Joint Venture property for use.

28.     The average monthly rental for a space of the Joint Venture was $80 per month.

29.     Airport Shuttle did not pay any rental fees to the joint venture for its 48 spaces rental from January 15, 2001 until November 31, 2003.

30.     On January 15, 2002 Martin Chavez comes to Albuquerque after being notified that funds are being diverted.

31.     Robert Chavez offered that Lorentzen meet with him at PCA's corporate office in Cincinnati, Ohio on January 25, 2002 to continue discussions on accounting issues.

32.     Lorentzen did not go to Cincinnati to discuss any disagreements as he had agreed and the joint venture had planned.

33.     Lorentzen wrote and then faxed a letter to Robert Chavez notifying him that he was terminating the JVA and PMA for PCA's "failure to pay monies due after giving notice to pay[.]"

34.     Golden terminated his employment with PCA.

35.     Lorentzen immediately hired Golden.

4

36.     Robert Chavez arrives in Albuquerque, New Mexico to discuss the situation with Lorentzen.

37.     The discussions are not fruitful and on January 29, 2002, Lorentzen request the removal of Robert Chavez and all other PCA employees from P&S property.

38.     Police officers arrive and escorts PCA off the property.

39.     PCA obtains a restraining order and returns to the property.

40.     PCA finds that databases and equipment crucial to the operations of the parking lot are missing.

41.     PCA operated the Joint Venture property until December 1, 2003.

42.     Lorentzen operated two other businesses on the property throughout the joint venture:  Southwest Realty and Airport Shuttle.

## DEFENDANT'S BREACH OF CONTRACT

### THE JOINT VENTURE AGREEMENT.

43.     The Joint Venture Agreement ("JVA") did not, by its own terms, terminate until December 2009.

44.     The JVA unambiguously provides for its termination in ¶ 4.01 of the JVA.

45.     The JVA is not so intrinsically intertwined with the PMA that the JVA would be absurd or meaningless without implying ¶ 17 of the PMA.

46.     This Court will not imply ¶17 of the PMA in the JVA.

### THE PARKING MANAGEMENT AGREEMENT.

47.     The Parking Management Agreement ("PMA") can only terminate in December 2009.

48.     The PMA does not provide for unilateral termination.

5

49.     On December 29, 2001, Lorentzen made a written demand upon PCA for money he claims was due.

50.     Lorentzen claimed that certain expenses were improperly charged to the JV.

51.     He calculated that he was owed 43% of the alleged unauthorized or improper expenses.

52.     Lorentzen demanded a total amount of $23,144.

53.     Lorentzen claims that according to the PMA, he was entitled to payment within ten days.

54.     Lorentzen claimed that the failure to pay within ten days would allow him to terminate the PMA.

55.     If PCA commenced compliance during the ten-day period the PMA was not subject to termination.

56.     Lorentzen's power to terminate the contract was conditional on his duty to cooperate with PCA with regard to how payment was to be settled.

57.     Lorentzen failed to cooperate.

58.     Paragraph 17 of the PMA gave Lorentzen the option to terminate the contract.

59.     PCA and CPAPA worked with Lorentzen on many items throughout the duration of the JV.

60.     CPAPA made concessions to and exceptions for Lorentzen that it does not make to other business partners.

61.     CPAPA -- as an act of good faith -- credited the Joint Venture well over $20,000 of the expenses objected to by Lorentzen in his December 29, 2001 letter.

62.     These expenses were charged to all other PCA on-site operations.

6

63.     CPAPA's and P&S's course of conduct was to discuss and negotiate disputes over revenues and expenses.

64.     Lorentzen's factual basis for attempting to terminate the PMA is not material to the PMA and can only be merely a technical breach, if it is considered a breach at all.

65.     An expense dispute of less than $20,000 does not so to the fundamental purpose of the JVA or PMA.

66.     There is no reasonable doubt that CPAPA and PCA would be dramatically harmed if the PMA or the joint venture were terminated.

67.     PCA acted in the utmost good faith.  In fact, PCA removed certain expenses charged to the JV in an attempt to continue operations.  The expense items removed were all appropriate expenses of the JV and similar expenses are charged to all PCA parking operations.

68.     The JVA states the following: "[T]he parties hereto covenant and agree that they shall cooperate and share with one another all business opportunities arising on or after the date hereof and . . . which may be directly competitive with the business operations of the Joint Venture Property."  JVA ¶ 3.02, of 3.

**AIRPORT SHUTTLE**

69.     Airport Shuttle is in the business of transporting travelers to and from the Albuquerque airport.

70.     Airport Shuttle's primary place of business is on JV property.

71.     John Lorentzen is the managing owner of Airport Shuttle.

72.     Lorentzen did not offer this business opportunity to CPAPA when he purchased Airport Shuttle.

73.    The contract that places Airport Shuttle on JV property was signed on January 15, 2002 by Wes Golden, as manager of PCA, and Jack Henderson, as manager for Airport Shuttle.

74.    The contract called for Airport Shuttle to occupy thirteen parking spaces on JV property at a rate of $20 per month.

75.    The contract also states that **only** Airport Shuttle may terminate the contract.

76.    Golden did not have the authority to commit PCA to a contract for services.

77.    At the time he signed the contract Golden knew that he was being transferred to a marketing position instead of management.

78.    Ten days after he signed the contract, Golden was working for Airport Shuttle and John Lorentzen.

79.    Airport Shuttle took over between 48 and 52 parking spaces.

80.    Airport Shuttle has paid nothing for the parking spaces that it occupied.

## DEFENDANTS' TORTIOUS INTERFERENCE WITH CONTRACT

81.    Defendants intentionally and improperly induced PCA employees to terminate their employment with PCA.

82.    Defendants intentionally and improperly pursued business accounts historically held by the PCA or the Joint Venture.

83.    Defendants intentionally and improperly induced PCA customers to unknowingly sign new contracts with P&S.

## SPECIAL EVENTS

84.    Golden and Lorentzen were operating Special Events throughout the joint venture.

8

85.     The Special Events should have been offered to CPAPA and/or PCA under the Joint Venture Agreement.

86.     The events were not offered to either CPAPA or PCA.

87.     Golden, personally, and Lorentzen kept the revenue from the Special Events.

88.     Golden used PCA employees and joint venture property to operate the Special Events.

**TEMPORARY RESTRAINING ORDER**

89.     On January 29, 2002 Lorentzen presented his property deed to the Albuquerque Police Department and requested that they escort CPAPA and PCA officers off the property -- the property that under the PMA PCA is required to manage.

90.     Lorentzen was in Florida at the time the TRO was secured.  Lorentzen's employees were given access to the property immediately.

91.     Lorentzen's counsel and Wes Golden appeared in court the day the TRO was issued.  They informed the Court of the operation of Airport Shuttle and Southwest Realty on the Joint Venture property.

92.     The Court granted the TRO.

93.     There is no evidence that Plaintiffs acted with malice or intent to injure Defendants.

**BENEFIT OF THE BARGAIN**

94.     Mr. Robert Chavez is Vice-President and Secretary of PCA and managing partner of CPAPA.

95.     Mr. Martin Chavez is the President of PCA and managing partner of CPAPA. He holds a Masters of Business Administration from the University of California at Berkley and is an experienced parking business and properly valuator.

96.     Mr. Dale Losey, CPA.  Mr. Losey is a certified public accountant and Chief Financial Officer for PCA.

97.     Prior to the joint venture beginning, CPAPA and P&S were both operating side by side, two 24-hour-a-day seven-day-a-week operations.  Transcript at 5:25 to 6:5.

98.     The number $1,683,544 on Exhibit 271 represents the total expenses prior to the joint venture for CPAPA and P&S combined for the year 1998.  Transcript at 6:2-5 ("[T]he cost of those operations as reflected in that figure, the total costs, [CPAPA's] operation and [P&S's] operation added together total the 1-6-8-3-5-4-4 for that year.").

99.     The monthly average expense was $140,295.34.  Transcript at 8:9-10.

100.     The actual expense for each year of the joint venture are as follows: $1,370,122 for 2000; $1,410,719 for 2001; $1,340,520 for 2002; and $1,144,876 for the first nine months of 2003.  Transcript at 8:7-17.

101.     The result is an average monthly expense of $117,027.54 for the period of the joint venture.  See Transcript at 8:18-24.

102.     The difference from the average monthly expense during the joint venture and the average monthly expense prior to the joint venture is $23,276.88.  See Transcript at 9:3.

103.     This translates to a difference of $279,313.56 yearly.  See Transcript at 9:5-6.

104.     CPAPA's average yearly expense savings as being a member of the joint venture is thus $159,151.73.  See Transcript at 9:7-13.

10

105.    Over the six years remaining on the joint venture, and CPAPA calculated lost expense savings of $954,910.38.  Transcript at 9:13.

106.    CPAPA and PCA also incurred additional costs as a result of the Defendants' breach of the joint venture agreement. See Transcript at 10:1-21.

107.    A proper estimated adjustment of $10,000 per month of exceptional expenses. Adding CPAPA's percentage share of these exceptional expenses totals $410,000.    See Transcript at 10:18-19.

108.    Robert Chavez is a competent witness to testify about damages.

109.    Dale Losey is a competent witness to testify about damages.

110.    Martin Chavez is a competent witness to testify about damages.

111.    Tim Chavez is a competent witness to testify about damages.

112.    CPAPA, thus, suffered $1,365,310 in lost expense savings as a result of the Defendants' breach of the joint venture agreement.

113.    The purpose of the joint venture was to decrease expenses and, thus, increase revenues and profits.

114.    Plaintiffs are entitled to recover "special" or consequential damages.

115.    Decreased fixed expenses, which directly result in increased profits, were the sole reason for the formation of the joint venture.

116.    The parties' intent at the time of contracting was to decrease expenses.

117.    Lost profits resulting from the breach of a contract may be based on historic revenues, profits or expenses.

118.    Here, profits were expected to be a direct result of consistent revenues and reduced fixed expenses.

11

119.    The revenue stream is consistent but overhead or fixed costs were drastically reduced during the joint venture -- thus the purpose of the joint venture.

120.    Lost profits are thus closely and directly tied to the savings on expenses.

121.    CPAPA will incur an operating profit decrease of $1,254,239.40 because of the breach of contract.

122.    The diminished value of CPAPA due to the dissolution of the joint venture may be used to calculate "benefit of the bargain" damages.

123.    The revenue stream is consistent because although there were additional revenues generated in the joint venture due to the additional parking spaces from the merger, CPAPA was only entitled to receive 57% of the profit from the merger.

124.    However, due to the reduced expenses, CPAPA made more in profits after the joint venture despite being compensated for only 57% of the spaces, which was a smaller percentage than CPAPA contributed to the joint venture (1700 CPAPA spaces of the total joint venture 2800 spaces is 60.71% of the total spaces).

125.    Defendants' breach of contract deprived the Plaintiffs of an "asset," i.e. the joint venture.

126.    Plaintiffs, thus, should be compensated for the value of such asset at the time of the breach.

127.    CPAPA suffered a decrease of business value of $2,200,420.00.

## CONCLUSIONS OF LAW

**I.    PLAINTIFFS ARE ENTITLED TO THEIR BENEFIT OF THE BARGAIN AND OTHER DAMAGES FOR DEFENDANTS BREACH OF CONTRACT WITH REGARD TO THE JVA AND THE PMA.**

**A.    DEFENDANTS PREMATURELY TERMINATED THE JVA.**

1.     The JVA unambiguously provides for its termination in ¶ 4.01 of the JVA.

2.     The JVA is not so intrinsically intertwined with the PMA that the JVA would be absurd or meaningless without implying ¶ 17 of the PMA.   Paragraph 17 of the PMA will not be imputed in the JVA.

3.     By its own terms, the JVA should not have been terminated until December 2009.

4.     P&S and Lorentzen breached the JVA by pre-maturely terminating it.

5.     CPAPA suffered damages as a result of P&S's breach of contract.

6.     P&S and Lorentzen breach was willful and wanton.

**B.     DEFENDANTS PREMATURELY TERMINATED THE PMA.**

7.     When a contract is entered into, a power of termination may be expressly reserved to either party, or to each of them.  13 A. L. Corbin, CORBIN ON CONTRACTS, § 1266, at 135 (Interim ed. 1979, 2002).

8.     In the present case, ¶ 17 of the PMA gave Lorentzen the power to terminate the contract on the failure of the manager to pay the net revenue in the manner specified under ¶ 6(c) of the Agreement.

9.     Accordingly, Lorentzen has the burden to show that PCA actually failed to pay the net revenue as required by the PMA and that expenses charged to the JV were improper.

10.    That failure must have been actual -- not imagined or alleged or contrived.

11.    Lorentzen has failed to show that expenses charged to the joint venture, and specifically the items listed in his letter of December 29, 2001, were improper.

13

12.    The charge for the van rental, as reflected in Lorentzen's letter of December 29, 2001, is not a material breach.

13.    The power to terminate is a conditional power. 13 A. L. Corbin, CORBIN ON CONTRACTS, § 1266, at 137 (Interim ed.1979, 2002).

14.    The power to terminate is conditional on the cooperation of the party who possesses that power. See also Vanadium Corp. v. Fidelity & Deposit Co., 159 F.2d 105, 108 (2nd Cir. 1947).

15.    Lorentzen failed to cooperate with CPAPA or PCA and, thus, had no power to terminate the PMA.

16.    Moreover, paragraph 17 of the PMA gave Lorentzen the option to terminate the contract.

17.    The rule is well settled that "when a contract gives one party an option respecting performance, the contract will be interpreted most strongly in favor of the other party and against the party holding the option." 11 Richard A. Lord, WILLISTON ON CONTRACTS, § 32:11, at 465 (Fourth ed.1999).

18.    Forfeitures are not favored in the law, and a contract will be construed, if possible, so as to avoid a forfeiture. See Davies v. Boyd, 73 N.M. 85, 89, 385 P.2d 950, 952 (1963)(Moise, J., concurring specially); Patten v. Santa Fe Nat'l Life Ins. Co., 47 N.M. 202, 207, 138 P.2d 1019, 1022 (1943).

19.    The parties' course of performance is an important aid in the construction of the contract.

20.    The term "course of performance" refers to statements made by the parties themselves or their conduct in rendering or in receiving performance under the contract. 5 M. Kniffin, CORBIN ON CONTRACTS, § 24:16, at 135-36 (Perillo Rev. Ed. 1998).

21.    Restatement (Second) Contracts, § 202(4) (1979) provides: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."

22.    New Mexico courts have cited § 202 of the Restatement as an authoritative source for contract interpretation. See Crow v. Capitol Bankers Life Ins. Co., 119 N.M. 452, 457, 891 P.2d 1206, 1211 (1995).

23.    The provisions of an agreement with respect to how payments are to be made and accounts settled may be construed in light of the parties' course of performance. See Zehnder v. Michaud, 145 F.2d 713 (8th Cir. 1944).

24.    CPAPA's and P&S's course of conduct allowed for intended payments and expenses to be settled without termination of the PMA.

25.    Practices that were engaged in prior to the signing of the agreement are binding on the parties.

26.    A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.

27.    A "material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the

15

contract." <u>Niblock v. Mereceds Benz Credit Corp.</u>, 1998 U.S. App. LEXIS 1185 (4th Cir. Jan. 27, 1998).

28.    A material breach "is one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." <u>Ervin Constr. Co. v. Van Orden</u>, 874 P.2d 506, 510 (Idaho 1993).

29.    New Mexico distinguishes between a "technical breach and one which goes to the substance of the agreement." <u>Yucca Mining & Petroleum Co. v. Howard C. Phillips Oil Co.</u>, 69 N.M. 281, 285, 365 P.2d 925, 927 (1961).

30.    The Restatement sets forth five factors that courts should consider when deciding the materiality of a breach of contract.  See Restatement, supra, § 241.

31.    The first factor to examine is the extent to which the injured party will be deprived of the benefit he or she reasonably expected to receive from the contract. The second factor considers the extent to which the breaching party will suffer forfeiture if the breach is deemed material.   Third, Courts should also explore whether the injured party can be adequately compensated in damages for the breach.   The fourth factor focuses on the likelihood that the breaching party will cure his or her failure to perform under the contract. The fifth factor evaluates whether the breaching party's conduct comported with the standards of good faith and fair dealing.  <u>Famiglietta v. Ivie-Miller Enters., Inc.</u>, 1998-NMCA-155, 126 N.M. 69, 966 P.2d 777.

32.    Applying the same test here, Defendants were not justified in terminating the contract.  First, an expense dispute of less than $20,000 does not so to the fundamental purpose of the JVA or PMA.  Second, CPAPA and PCA was dramatically harmed when the

PMA was terminated.  Third, PCA acted in the utmost good faith.  In fact, PCA removed certain expenses charged to the JV in an attempt to continue operations.

33.    The expense items removed were all appropriate expenses of the JV and similar expenses are charged to all PCA parking operations.

34.    Because Lorentzen could not prove a material or substantial breach of the PMA, the PMA should not have been terminated.

35.    The PMA could not be terminated until December 2009.

36.    P&S and Lorentzen breached the JVA by pre-maturely terminating it.

37.    P&S and Lorentzen's breach caused CPAPA and PCA to suffer damages.

38.    P&S and Lorentzen breach were willful and wanton.

## II.    DEFENDANTS ARE LIABLE FOR BREACH OF CONTRACT WITH REGARD TO THE AIRPORT SHUTTLE CONTRACT.

39.    The contract entered into by Wes Golden, on behalf of PCA, and Airport Shuttle is a bogus contract and is rescinded and declared null and void.

40.    This competitive business is in direct violation of the JVA.

41.    Golden signed the agreement in bad faith.

42.    Golden's actions were willful and wanton.

43.    The Plaintiffs were proximately harmed by the bogus contract and Golden's acts and are awarded damages for that harm.

## III.    DAMAGES FOR THE BENEFIT OF THE BARGAIN.

44.    Plaintiffs can present competent evidence to support an award of damages through its officers and partners.

45.     New Mexico has recognized the concept of consequential damages from breach of contract obligations as expressed in the seminal case of <u>Hadley v. Baxendale</u>, 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854).

46.     The amount of special damages is computed in the same manner regardless of the legal theory upon which it is based.  "The reason is that, in determining the amount of damages to be awarded, the focus shifts to the objective of such an award: to fully compensate the plaintiff and to put the plaintiff in as good as position as if the harm or injury had not occurred."  <u>Central & Alarm Co. v. Mehler</u>, 121 N.M. 840, 847, 918 P.2d 1340, 1347 (Ct. App. 1996).

47.     Plaintiffs are entitled to consequential damages based on two alternative calculations.

48.     In a claim for lost profits, the principle of compensatory damages requires that costs and expenses that the plaintiff would have incurred in making those profits be deducted from the amount of lost gross profit.  <u>See</u> <u>Central & Alarm Co. v. Mehler</u>, 121 N.M. 840, 918 P.2d 1340 (Ct. App. 1996).

49.     "If, however, the plaintiff proves that it could have earned the lost gross profit without incurring any additional costs or expenses, the plaintiff should be awarded the entire amount of lost gross profit."  <u>Id</u>. at 847, 918 P.2d at 1347.

50.     "When the plaintiff's overhead or expenses are fixed and no savings accrued to the plaintiff because of the defendant's breach, deducting a portion of these amounts to determine the plaintiff's award would not achieve the purpose of compensatory damages to place the plaintiff in as good a position as if there had been no breach."  <u>Id</u>.

51.     Plaintiffs are entitled to damages for their lost profit.

52.    Lost profits are the proper measure of benefit of the bargain damages when profits were the purpose of the contract, as they were here.

53.    Lost profits resulting from the breach of a contract may be based on historic revenues, profits or expenses.

54.    Plaintiffs are entitled to damages for the diminished value of CPAPA as a result of the loss of the joint venture business structure.

55.    The Federal Rules of Civil Procedure allow for laymen opinion testimony, including opinion testimony regarding damages to a business.

56.    An award for lost profits can be based solely or primarily on the testimony of officers or owners of the injured business.

57.    An award for the diminution in the value of a business can be based solely or primarily on the testimony of officers or owners of the injured business.

58.    Owners, officers, and partners are qualified as a matter of law to testify about lost profits, diminution in value and other business damages sustained by their business entities.

59.    The damages suffered by Plaintiffs for the lost benefit of the bargain have been proven by competent evidence.

60.    Punitive damages are available when one party breaches its fiduciary duty to another, if the breaching behavior so unreasonable that a jury could conclude the breaching party acted with a culpable mental state.  Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶¶ 56-57, 131 N.M. 544, 40 P.3d 449.

61.     Punitive damages are available in breach of contract cases when the breach shows a "wanton disregard for the nonbreaching party's rights or bad faith." See Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 212, 880 P.2d 300, 309 (1994).

62.     Punitive damages are appropriate against a defendant that knowingly refused to comply with the terms of its contract with the plaintiff.  Public Serv. Co. of N.M. v. Diamond D Constr. Co., 2001-NMCA-082, 131 N.M. 100, 33 P.3d 651.

63.     Plaintiffs, here, are entitled to an award of punitive damages based on the Defendants' willful breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duties and wanton disregard of Plaintiffs' rights.

## IV.    PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

64.     New Mexico describes interference with prospective contractual relations as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 453, 612 P.2d 241, 245 (Ct. App. 1980)(citations omitted).

65.     Defendants intentionally and improperly induced PCA employees to terminate their employment with PCA, pursued business accounts historically held by the PCA or the Joint Venture, and induced PCA customers to unknowingly sign new contracts with P&S.

## V.    PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS BREACHES OF FIDUCIARY DUTIES.

66.    "[P]artners occupy a fiduciary duty towards one another." <u>GCM, Inc. v.</u>
<u>Kentucky Central Life Ins. Co.</u>, 1997-NMSC-052, ¶ 21, 124 N.M. 186, 947 P.2d 143 (quoting
<u>Citizens Bank v. Williams</u>, 96 N.M. 373, 375, 630 P.2d 1228, 1230 (1981).

67.    That duty extends to partners in a joint venture. <u>Id.</u> (explaining that a joint
venture is a "partnership for a single transaction.")(citation omitted).

68.    The fiduciary duty is the duty of "utmost good faith and loyalty." <u>Walta v.</u>
<u>Gallegos Law Firm</u>, 2002-NMCA-015, ¶ 35, 131 N.M. 544, 40 P.3d 449 (citation omitted).

69.    Fiduciary duty is defined by "loyalty, good faith, inherent fairness, and the
obligation not to profit at the expense of the corporation." <u>Id.</u> ¶ 41.

70.    The employment relationship is one of trust and confidence; the employee is
bound to exercise the utmost good faith and loyalty in the performance of duty. <u>Las</u>
<u>Luminarias of New Mexico Council of the Blind v. Isengard</u>, 92 N.M. 297, 302, 587 P.2d
444, 449 (Ct. App. 1978).

71.    The Supreme Court of New Mexico specifically recognized a cause of action
for aiding and abetting a breach of fiduciary duty in <u>GCM, Inc. v. Kentucky Cent. Life Ins.</u>
<u>Co.</u>, 1997-NMSC-52, 124 N.M. 186, 947 P.2d 143.

72.    Lorentzen violated his fiduciary duties to his partners by taking actions to
terminate the Joint Venture.

73.    Lorentzen violated his fiduciary duties to his partners by taking actions to hurt
the management of PCA.

74.    Lorentzen violated his fiduciary duties to his partners by taking business away
from the Joint Venture and operating -- on Joint Venture property -- a competing business.

75.    Lorentzen breached his fiduciary duties to his partners by allowing databases and other information crucial to the joint venture to be taken or destroyed.

76.    Lorentzen breach of fiduciary duties was willful and wanton.

77.    As the PCA City Manager for over five years, Golden owed a fiduciary duty to PCA.

78.    Plaintiffs were proximately harmed by this breach.

79.    Golden breached his fiduciary duties as a supervisor/manager to his employer PCA.

80.    Golden's breach of fiduciary duties was willful and wanton.

81.    Lorentzen is jointly and severally liable for Golden's breach of fiduciary duty.

## VI.    PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS' CIVIL CONSPIRACY.

82.    To establish civil conspiracy, a plaintiff must demonstrate the following: "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." Ettenson v. Burke, 2001 NMCA-3, ¶ 12, 130 N.M. 67, 17 P.3d 440 (internal quotation marks and citation omitted).

83.    The specified wrong may be a breach of contract or action in tort, such as conversion. See id.

84.    The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members.  2001 NMCA-3, ¶ 12, 130 N.M. at 72, 17 P.3d at 445.

85.    A conspiracy existed between Lorentzen and Golden throughout 2001.

86.     Lorentzen and Golden carried out wrongful acts against Plaintiffs.

87.     The conspiracy proximately caused Plaintiff's damages.

## VII.   JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR ACTUAL OR CONSTRUCTIVE FRAUD AND CONSPIRACY TO DEFRAUD.

88.     The elements of the tort of fraud in New Mexico are: (i) a misrepresentation of fact; (ii) known by the maker to be false; (iii) made with the intent to deceive and to induce the other party to act in reliance; and (iv) actually relied upon the party to his detriment. See Lotspeich v. Golden Oil Company, 1998-NMCA-101, ¶ 9, 961 P.2d 790, 792 (citing Eoff v. Forrest, 109 N.M. 695, 699, 789 P.2d 1262, 1266 (1990).

89.     Each of these four elements is essential to a claim for fraud.

90.     Further, rule 9(b) requires the complaint to identify specifically which party made what statement. See DiVittorio v. Equidyne Extractive Indus. Inc., 822 F.2d 1242, 1247 (2nd Cir. 1987).

91.     Conspiracy to defraud is subject to rule 9(b) of the Federal Rules of Civil Procedure, which provides that "**all** averments of fraud . . . shall be stated with particularity."

92.     Lorentzen and P&S have failed to plead or prove conspiracy to defraud or conceal with the requisite specificity.

## VIII.   JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS.

93.     One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the

prospective relation or (b) preventing the other from acquiring or continuing the prospective relation. Section 766B of the Restatement (Second) Torts.

94.    Interference with prospective contractual relations requires intentional and improper interference. <u>Anderson v. Dairyland Insurance Co.</u>, 97 N.M. 155,159, 637 P.2d 837, 841 (1981).

95.    "[E]ither an improper motive (solely to harm plaintiff), or an improper means is required for liability." <u>Id</u>.

96.    Plaintiff's temporary restraining order against Defendants was for a proper motive and a proper means.

## IX.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR <u>BREACH OF FIDUCIARY DUTIES</u>.

97.    The traditional remedy for a breach of fiduciary duty is an action for accounting or dissolution, or both. <u>Fate v. Owens</u>, 2001-NMCA-040, ¶ 33, 130 N.M. 503, 27 P.3d 990.

98.    An action for accounting is an action in equity, not at law. <u>Id.</u> ¶ 36.  An action for dissolution is an action in equity. <u>Id.</u> ¶ 36.

99.    The claim for "waste and mismanagement" can only be heard as an action for accounting and dissolution, which are equitable claims.

100.    Defendants fail to prove their claim for accounting or for mismanagement.

## X.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR DIVERSION OR CONVERSION OF CORPORATE FUNDS AND <u>OPPORTUNITIES</u>.

101.    "Diversion" is not a recognized cause of action and "conversion" requires the unlawful dominion over personal property, not business opportunity.

102.    "Conversion is defined as the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." See Nosker v. Trinity Land Co., 107 N.M. 333, 337-38, 757 P.2d 803, 807-08 (Ct. App.), cert. denied, 107 N.M. 267, 755 P.2d 605 (1988).

103.    Defendants' ninth claim fails as a matter of law.

## XI.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR MALICIOUS ABUSE OF PROCESS IN OBTAINING A TEMPORARY RESTRAINING ORDER.

104.    The elements of the torts of abuse of process and malicious prosecution defined as follows: (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages. of Devaney v. Thriftway Mktg. Corp., 1998-NMSC-1, ¶ 17,124 N.M. 512, 518, 953 P.2d 277, 283.

105.    Plaintiffs had a legitimate and justified reason for securing a restraining order.

106.    Defendants suffered no damages as a result of the TRO.

107.    Defendants' claim for malicious abuse of process fails.

## XII.    NEW MEXICO DOES NOT RECOGNIZE A CAUSE OF ACTION FOR DAMAGE TO CREDIT REPUTATION.

108.    New Mexico does not recognize a cause of action for damage to credit reputation.

109.    New Mexico requires the following elements for a defamation action, including slander: (i) a defamatory communication by the defendant to a third person, (ii) of

an asserted fact, (iii) of and concerning the plaintiff, (iv) and proximately causing actual injury to the plaintiff. See Newberry v. Allied Stores, 108 N.M. 424, 429, 773 P.2d 1231, 1236 (1989).

110.    Defendants' claim fails as a matter of law and is not supported by the evidence.

## XIII.   JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM THEIR CLAIM FOR PRIMA FACIE TORT.

111.    The purpose of prima facie tort is to provide a remedy for intentional acts that "do not fit within the contours of accepted torts." Schmitz v. Smentowski, 109 N.M. 386, 396, 785 P.2d 726, 736 (1990).

112.    Prima facie tort should not be used to evade stringent requirements of other established doctrines of law. Yeitrakis v. Schering-Plough Corp., 804 F. Supp. 238, 249 (D.N.M. 1992).

113.    The conduct that Defendants allege both in Count XII and in the rest of the Complaint -- if actionable at all -- adequately and properly falls within the parameters of other doctrines.

## XIV.   NEW MEXICO DOES NOT RECOGNIZE A CAUSE OF ACTION FOR WASTE AND MISMANAGEMENT.

114.    New Mexico does not recognize an independent cause of action for "waste and mismanagement."

Respectfully submitted,

**PEIFER, HANSON & MULLINS, P.A.**

By: _____
Christopher T. Saucedo
20 First Plaza, Suite 725
Post Office Box 25245
Albuquerque, New Mexico 87125-5245
Telephone: (505) 247-4800
Facsimile: (505) 243-6458

--and--

**SILVA & ASSOCIATES, P.C.**

Benjamin Silva, Jr.
20 First Plaza, Suite 725
Post Office Box 100
Albuquerque, New Mexico 87103-0100
Telephone: (505) 246-8300
Facsimile: (505) 246-0707

**Attorneys for Plaintiffs Chavez-Properties-Airport Parking Albuquerque and Parking Company of America**

We hereby certify that a copy
of the foregoing was served
by first class mail to the following:

Michael L. Danoff, Esq.
604 Chama Road, NE
Albuquerque, NM 87108
Telephone: (505) 262-2383
Facsimile: (505) 266-4330

this 2nd day of March, 2004.

PEIFER, HANSON & MULLINS, P.A.

By: _____
Christopher T. Saucedo

27