# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHAVEZ PROPERTIES-AIRPORT
PARKING, ALBUQUERQUE, L.P.,
a Georgia limited partnership, and
PARKING COMPANY OF AMERICA,
INC., a Georgia Corporation,

                    Plaintiffs,

vs.

JOHN LORENTZEN, individually, and
PARK AND SHUTTLE, INC.,
a New Mexico Corporation, and
WES GOLDEN, individually,

                    Defendants.

No. CIV-02-0145 JP/ACT (ACE)

## CHAVEZ PROPERTIES-AIRPORT PARKING ALBUQUERQUE, L.P'S AND PARKING COMPANY OF AMERICA, INC.'S SECOND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Chavez Properties-Airport Parking Albuquerque, L.P. ("CPAPA") and Parking Company of America, Inc. ("PCA"), by and through their counsel of record, Silva & Associates, P.C. (Benjamin Silva, Jr.) and Peifer, Hanson & Mullins, P.A. (Christopher T. Saucedo), hereby submits the following second proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

### BACKGROUND

1.      CPAPA and Park & Shuttle, Inc. ("P&S" or "Park & Shuttle") entered into a Joint Venture Agreement ("JVA") for the purpose of conducting a commercial parking and shuttle operation on joint venture property, effective January 1, 2000.

2.      The joint venture property was located off of Yale Blvd., near the Albuquerque airport.

3.      The joint venture joins the Park & Shuttle parking lot, which has approximately 1250 parking spaces, and the Airport Fast Park parking lot, which has approximately 2000 parking spaces.  <u>See</u> Exhibit 224B.

**FORMATION OF THE JOINT VENTURE**

4.      CPAPA and Park & Shuttle began negotiations for the joint venture in 1998 and were negotiating in earnest in 1999.  <u>See</u> Transcript at 5:20-21.

5.      CPAPA and P&S jointly prepared the first draft of the JVA.  <u>See</u> Transcript at 5:22 to 6:7.

6.      CPAPA prepared the JVA with the assistance of its counsel David Cofrin.  <u>See</u> Transcript at 7:6-11.

7.      The agreement was given to P&S in 1999.

8.      John Lorentzen knew the parking lot business when he negotiated and entered into the JVA.

9.      Michael Peters, Esq., counsel for John Lorentzen and Park & Shuttle, reviewed and actively participated in the drafting of the JVA and PMA.  <u>See</u> Transcript at 689:14 to 690:8.

10.      The parties, through their attorneys, exchanged comments and revisions on the JVA throughout 1999.  <u>See</u> Transcript at 7:20-24.

11.      John Lorentzen, as a sophisticated and experienced businessman, actively participated in the negotiations and formation of the contracts.

2

12.   The inception of the joint venture was January 1, 2000, without a written agreement. See Transcript at 688:23 to 689:8.

13.   Wes Golden was the person for PCA locally responsible for negotiating and spearheading the negotiation of the joint venture with John Lorentzen and P&S. See Transcript at 210:8 to 211:4.

14.   "The basic premise of the joint venture was that both companies would merge together in a joint venture and that there would be a consolidation and savings to the bottom line which would be one work force, one set of vans, one set of mechanics, etc." See Transcript at 211:5-12.

15.   The parties exchanged financial information prior to Airport Fastpark and P&S operating as a joint venture. See Transcript at 682:22-25.

16.   The parties both exchanged their information for 1998 because financial information for 1999 was not complete at that time.

17.   The joint venture did not operate as a single parking lot in 2000.

18.   It was the justifiable business reason for Wes Golden and other members of PCA to not operate Airport Fast Park and Park & Shuttle together in 2000. See Transcript at 213:3-20.

19.   Airport Fastpark and Park & Shuttle began to operate as a single parking lot in 2001.

20.   CPAPA disclosed that it rented its vans and the rental expense would be transferred to the joint venture.

21.   The signing of the JVA was an afterthought. See Transcript at 690:3-6.

22.   The JVA was not signed by CPAPA or P&S until March 2001.

3

23.     The purpose of the joint venture was the continued operation of parking services for the Albuquerque airport by joining two competitors thus reducing overhead costs and increasing profits for the joint venture members.  See Transcript at 681:3-11.

24.     CPAPA invested approximately a quarter of a million dollars in capital improvements to facilitate and ease the merger of the two businesses into the joint venture.

**TERMS OF THE JVA**

25.     Proceeds from the joint venture were to be distributed 57% to CPAPA and 43% to P&S.  See JVA ¶ 1.04.

26.     The JVA states that it "shall terminate on December 31, 2009" and that it could be subject to renewal.  JVA ¶ 1.02.

27.     No other termination provisions are set forth in the JVA.  See JVA.

28.     If the PMA is terminated, the JVA could nonetheless continue to exist without a parking manager until a new one is appointed and a new PMA entered into.

29.     CPAPA and P&S appointed PCA as the parking manager of the joint venture property.  See JVA ¶ 1.06.

**TERMS OF THE PMA**

30.     On January 1, 2000, CPAPA, P&S and PCA entered into a Parking Management Agreement ("PMA").  See PMA at 1.

31.     Wesley Golden, who was PCA's lot manager since 1995 was assigned as manager of the joint venture lots.  See Transcript at 685:7 to 686:9.

32.     The PMA was entered into for a ten-year period and is also subject to renewal. See PMA ¶ 2 at 1.

33.     The PMA states that:  "[O]wners shall defend, indemnify and hold Manager harmless from and against any and all actions, costs, claims, losses, expenses and/or damages sustained by Manager attributable to the recklessness carelessness or negligence of Owners or of their servants or employees, other than Manager, its officers, directors, employees and agents, from any cause, including without litigation by specification, property damage and/or injury or death to any person or persons."  PMA ¶ at 13.

**PCA POLICIES**

34.     It is the policy of PCA that all contracts go through home office for approval.

35.     All PCA management was trained in PCA's policy requiring home office approval on all contracts.  See Transcript at 51:9-11 and 57:4-19.

36.     Wes Golden was trained in PCA's policy requiring home office approval on all contracts.

37.     Wes Golden understood PCA's policy with regard to his ability to enter into contracts.

38.     Wes Golden entered into contracts on behalf of PCA without prior approval from PCA.

39.     "Rental agreements of any type binding the company are considered contracts."  See Exhibit 116.

40.     It is the policy of PCA that the local manager is responsible for purchases for daily operations.  See Transcript at 114:15-18.

41.     It is the policy of PCA that invoices are sent directly to the local manager.  See Transcript at 115:4-5.

42.     It is the policy of PCA that the local manager established accounts with local vendors.  See Transcript at 114:19-25.

43.     The local manager is expected to send all invoices to PCA's home office on a weekly basis.  See Transcript at 115:12-17.

44.     The local manager is responsible for approving and verifying all invoices that are sent to home office.  See Transcript at 115:2-11.

45.     Home office, once they receive the weekly invoices, enter all of the relevant information to their data base.  See Transcript at 117:4-12.

46.     Once the invoice information is entered into the system the due date is calculated.  See id.

47.     It is the policy of PCA that checks are prepared three times a week on Monday, Wednesday and Friday.   See id.

48.     Once a check is cut the check is matched with the appropriate invoice and submitted for approval from Dale Losey or Toni Kennett.  See Transcript at 117:13-20.

49.     If the invoice is approved the check is submitted to the vendor.  See id.

50.     If the invoice is not approved the local manager is contacted for comment.  See Transcript at 118:12-22.

51.     It is the policy of PCA that investors and partners only receive a quarterly profit and loss statement.

52.     John Lorentzen received monthly profit and loss statements.  See Transcript at 123:2-20.

53.     It is the policy of PCA that revenues, summary reports, daily operating reports, monthly summaries of daily operating reports, and profit and loss notes are not provided to investors or partners.  See Transcript at 123-125.

54.     Investors and partners are welcome to review all financial documents at a mutually convenient time in Cincinnati, Ohio.  See id.

55.     Wes Golden was providing all financial information, including revenue summary reports, daily operating reports and profit and loss notes, to John Lorentzen without the knowledge of PCA.  See Transcript at 140:6 to 142:10.

**REPORTING PROBLEMS**

56.     Wes Golden failed to timely submit payroll information.  See Transcript at 135:5-6.

57.     Wes Golden had a problem with submitting account payable documents in a timely manner.  See Transcript at 127:2-3.

58.     PCA rectified all accounts payable problems created by Wes Golden.  See Transcript at 134:16-24.

59.     PCA did not lose a vendor due to account payable problems.

60.     Wes Golden failed to report the weekly DOR's in a timely manner.  See Transcript at 136:17 to 137:8.

61.     Wes Golden failed to submit insurance claims in a timely manner.

62.     Unbeknownst to PCA, utility expenses (i.e., telephone, electrical and gas bills) for the private offices of John Lorentzen were being improperly charged to and paid by PCA.

**SPECIAL EVENTS**

7

63.    Golden and Lorentzen were operating special events throughout the joint venture.

64.    Wes Golden and John Lorentzen increased the frequency of working together on special events throughout 2001.  See Transcript at 217:14-17.

65.    The special events should have been offered to CPAPA and/or PCA under the JVA.

66.    The events were not offered to either CPAPA or PCA.

67.    Revenue derived from the special events were not provided to the joint venture.

68.    All revenue received from special events operated by PCA during the period of the joint venture went to the joint venture.  See Transcript at 537:18-23.

69.    John Lorentzen failed to reimburse the joint venture for profits received from special events that were operated through the joint venture.

70.    Wes Golden moved his computer and desk to the office of John Lorentzen in 2001.

71.    Golden and Lorentzen kept and shared the revenue from the special events.

72.    Golden improperly used PCA employees and joint venture property to operate the special events.

### EVENTS LEADING TO TERMINATION OF JVA AND PMA

73.    In the Fall of 2001, PCA made the decision to transfer Wesley Golden from General Manager of the parking lot to a position in marketing.  See Transcript at 245:8 to 248:25.

74.     On December 29, 2001, Lorentzen, president of P&S, wrote to Robert Chavez, Vice-President of PCA and General Partner of CPAPA, that certain expenses incurred by PCA totaling $53,825 during the year 2000 and 2001 were not authorized by the JVA or the PMA.

75.     Lorentzen demanded that $23,144 (which is 43% of $53,825) be "paid on or before the 9th of January, 2002, or I shall consider our Management Agreement/Joint Venture null and void."   Exhibit AAA.

76.     Through several telephone conversations and messages, Robert Chavez responded to Lorentzen's demand.

77.     Robert Chavez justified all expenses and offered compromise in an effort to continue the successful operation of the joint venture.

78.     PCA removed over $20,000 of legitimate expenses from being charged to the joint venture even though the costs were regularly charged to managing operations, including costs for the Hummingbird Software.

79.     The costs were paid for entirely by CPAPA.

80.     The costs for the van leases was a legitimate cost of the joint venture that was disclosed before the signing of the JVA.

81.     On January 11, 2002, without any lawful authority, Lorentzen removed the joint venture credit card machines and unbeknownst to PCA or CPAPA, replaced them with Southwest Realty's credit card machines.

82.     Lorentzen improperly diverted using his credit card machines, approximately $70,000 from PCA and the joint venture.

83. Wes Golden allowed John Lorentzen to switch out the credit card machines and thereby betrayed his fiduciary duties and his duty of loyalty to PCA and the joint venture.

84. Wes Golden, as manager of PCA, failed to prevent or attempt to prevent John Lorentzen from switching out the credit card machines.

85. On January 15, 2001, unbeknownst to and without the authority of PCA, Defendant Wesley Golden, a PCA employee at that time, entered into a monthly rental agreement with Airport Shuttle, a company owned by Defendant John Lorentzen, for 18 spaces at $20 per month, well below the amount the joint venture charged to others.

86. Wesley Golden did not have the authority to enter into the monthly rental agreement with Airport Shuttle.

87. John Lorentzen negotiated, for Airport Shuttle, the terms of the Airport Shuttle contract with PCA, despite his obvious conflict of interest.

88. John Lorentzen breached his fiduciary duties to PCA, CPAPA and the joint venture by his wrongful acts.

89. Using the monthly rental agreement for 18 spaces, Airport Shuttle, under the direction of Defendant Golden and Lorentzen, cordoned off at least 50 spaces of the joint venture property for use.

90. The average monthly rental for a parking space was $80 per month.

91. Airport Shuttle did not pay any rental fees to the joint venture for its 50 spaces.

92. CPAPA was damaged by this unlawful contract with Airport Shuttle in the amount of $32,775 (57% of $57,500, that is, 50 spaces multiplied times $50 a month for 23 months -- January 2002 through November 2003).

93.     On January 15, 2002, Martin Chavez traveled to Albuquerque after being notified that credit card funds were being diverted.

94.     Robert Chavez offered that Lorentzen meet with him at PCA's corporate office in Cincinnati, Ohio on January 25, 2002 to continue discussions on cost issues raised by Lorentzen.

95.     Although Lorentzen agreed to a meeting with Robert Chavez, he did not go to Cincinnati.

96.     Instead, Lorentzen wrote and then faxed a letter to Robert Chavez notifying him that he was terminating the JVA and PMA for PCA's "failure to pay monies due after giving notice to pay[.]"  Exhibit 35.

97.     Golden resigned from his position with PCA on January 25, 2002.

98.     Lorentzen hired Golden, as an employee of P&S and Airport Shuttle, the same day as Golden's resignation.

99.     Wes Golden improperly used his PCA credit card following his date of resignation and termination.

100.    Wes Golden's charges to the PCA credit card account were unauthorized.

101.    Wes Golden was not a manager of PCA or an employee of PCA following January 25, 2002.

102.    Wes Golden must repay PCA for all unauthorized credit card charges incurred after January 25, 2002.

103.    Wes Golden was not entitled to his regular salary or other compensation from PCA following January 25, 2002.

104.    The Court takes judicial notice of the Complaint for breach of contract served upon Mr. Lorentzen and P&S on February 22, 2002 in civil number 02-0209.

105.    Paragraph 33 of the Complaint states, "On January 25, 2002, Golden informed PCA that he was resigning and would be working for Lorentzen." Complaint ¶ 33.

106.    The Court takes judicial notice of the Answer filed by Mr. Lorentzen and P&S by Mr. Michael Danoff, attorney for the Defendants filed March 12, 2002.  Paragraph A states, "The allegations of Paragraph 33 are admitted as to the resignation of Wes Golden on January 25, 2002, and denied as to the disclosure of his hiring on P&S on that date as the hiring did not occur until very late in that business day and there was no way to give notice until the following day of his new appointment."

107.    On January 27, 2002 Robert Chavez arrived in Albuquerque, New Mexico to discuss the situation with Lorentzen.

108.    Robert Chavez and Lorentzen discuss matters related to the joint venture for two days on January 28 and 29, 2002.

109.    The discussions were not fruitful and on January 30, 2002, Lorentzen request the removal of Robert Chavez and all other PCA employees from P&S property.

110.    Tim Chavez attempted to fire Mr. Golden for failing to allow or assist PCA in switching the credit card machines.

111.    Golden, for the first time, tells Tim Chavez that he resigned on January 25, 2002.

112.    Police officers arrive and escorts PCA personnel off the property.

113.    PCA obtains a restraining order and returns to the property on February 13, 2002.

114.   PCA finds that databases and equipment crucial to the operations of the parking lot are missing.

115.   John Lorentzen was not an employee of PCA.

116.   PCA operated the joint venture property until December 1, 2003.

117.   Lorentzen operated two other businesses on the property throughout the joint venture: Southwest Realty and Airport Shuttle.

118.   John Lorentzen took the credit card machines to his home and failed to return them for approximately 4-5 weeks.

119.   John Lorentzen unlawfully converted the credit cards machines of PCA.

120.   John Lorentzen said: "we were making good money." Transcript at 290:2.

**TEMPORARY RESTRAINING ORDER**

121.   On January 29, 2002 Lorentzen presented his property deed to the Albuquerque Police Department and requested that they escort all officers CPAPA and certain PCA officers off the property -- the property that under the PMA, PCA is required to manage.

122.   Lorentzen was in Florida at the time the TRO was secured. Lorentzen's employees were given access to the property immediately.

123.   PCA obtained a Temporary Restraining Order ("TRO") on February 8, 2002.

124.   PCA did not enforce the TRO until Monday, February 11, 2002.

125.   PCA did not enforce the TRO until after a hearing in the United States District Court, District of New Mexico.

126.   Lorentzen's counsel and Wes Golden appeared in court the day the TRO was issued. They informed the Court of the operation of Airport Shuttle and Southwest Realty on the joint venture property.

13

127.    The Court granted the TRO.

128.    There is no evidence that Plaintiffs acted with malice or intent to injure Defendants but instead intended to re-enter the parking lot to operate the parking lot.

## CONVERSION OF COMPUTERS

129..   Wes Golden stole two computers from the south office on February 11, 2002. See Transcript at 341:9 to 347:16.

130.    The computers stolen by Wes Golden contained information important to the operation of the parking lot, including frequent parker contact and contract parker information. See id.

## OPERATIONS AFTER FEBRUARY 13, 2002

131.    Wes Golden and John Lorentzen intentionally interfered the daily operations of the joint venture from January 25, 2002 through November 1, 2003.

132.    John Lorentzen and Wes Golden inappropriately attempted to control the work activities of all PCA employees. See id.

133.    John Lorentzen attempted to control the work and other activities of PCA mechanics. See Transcript at 511:11 to 512:4 and 687:11-17.

134.    John Lorentzen believes that the JVA and PMA only restricted him from opening a "hot dog stand" on the property. Transcript at 919:15-19.

135.    John Lorentzen and Wes Golden effected the ability of PCA employees' to do their job. See id.

136.    P&S employed persons that threatened PCA employees.

137.    John Lorentzen failed to address the problem of his employees harassing PCA employees.

14

138.    PCA was unable to install P&S logos to joint venture shuttle vans because John Lorentzen took all P&S logos.

139.    Brad Stevenson, as PCA manager, understood that his obligation was to the joint venture and to make the joint venture money.  <u>See</u> Transcript at 505:1-7.

140.    John Lorentzen and Wes Golden prohibited Brad Stevenson from operating the parking lot in an efficient and effective manner.  <u>See</u> Transcript at 508 to 510.

141.    The presence of John Lorentzen and Wes Golden on the parking lot was disruptive to the purpose of the joint venture.  <u>See id</u>.

142.    Due to the acts of John Lorentzen and Wes Golden, PCA was required to occur additional costs including the security personnel and additional staff.  <u>See</u> Transcript at 510:4 to 511:10.

143.    The presence of Park & Shuttle, Airport Shuttle and special events employees was a disruptive element within the parking lot.  <u>See</u> Transcript at 531 to 533.

144.    Southwest Airlines occupied fifty to sixty free parking spaces prior to June 2002.  <u>See</u> Transcript at 522:4 to 528:18.

145.    Brad Stevenson and PCA received no value for the free parking given to Southwest Airlines.

146.    Brad Stevenson and PCA terminated the free parking contract with Southwest Airlines for legitimate business reasons.  <u>See id</u>.

147.    John Lorentzen frequently provided free parking to his friends and other business acquaintances.  <u>See</u> Transcript at 528:20 to 529:21.

148.    John Lorentzen provided free parking coupons on an unauthorized basis.  <u>See id</u>.

149.    On December 23, 2001, Wes Golden terminated the valet contract with the Hyatt Tamaya for PCA and simultaneously offered that the contract be assumed by an entity owned and/or operated by John Lorentzen.

150.    John Lorentzen transferred PCA and Airport Fast Park phone lines to the account name of Southwest Realty, Inc., without the authority or knowledge of PCA.

151.    PCA paid, unbeknownst to it, all telephone utility bills, including numbers assigned to Southwest Realty, Inc., Airport Shuttle and Park & Shuttle.

152.    The phone lines remained in the name of Southwest Realty, Inc., until December 2003 or January 2004.

153.    Plaintiffs are entitled to $12,000 in utility bills of Lorentzen improperly charged to and paid by PCA.

154.    John Lorentzen and Park & Shuttle solicited exclusive rights to travel agent contracts, advertising contracts, company contracts, including New Mexico Business Weekly, Classic Travel and Sandia National Labs.

155.    All revenue generated from vehicles that exited either the P&S lot or Airport Fast Park lot before Monday, December 1, 2003 at 12:01 a.m., went to the joint venture.

156.    John Lorentzen received approximately $740,000 in income from the joint venture in 2001 and 2002.

157.    PCA had no interest in neglecting Park & Shuttle vans during the time of the joint venture because the joint venture was dependant on the operation of all vehicles.

158.    John Lorentzen prohibited PCA from advertising competitive rates and, thus, intentionally harming the joint venture.

159.    John Lorentzen failed to allow PCA to change its posted rate to a competitive rate.  See Transcript at 538:2 to 540:18.

**SUNQUEST MARKETING ACCOUNT**

160.    The matter of Sunquest Marketing v. John Lorentzen and Park & Shuttle, Inc., Civ-2003-05188 was filed in the State of New Mexico, County of Bernalillo, Second Judicial District on July 31, 2003.

161.    The United States District Court for the District of New Mexico defers jurisdiction over all matters related to Sunquest Marketing v. John Lorentzen and Park & Shuttle, Inc., Civ-2003-05188 to the State of New Mexico.

162.    John Lorentzen represented to Sunquest Marketing that he was authorized to bind PCA to a contract.

163.    On August 10, 2001 John Lorentzen signed an exclusive agreement with the Premium Shopping Guide for Park & Shuttle.

**INSURANCE**

164.    PCA had the authority to obtain insurance above certain limits as it deemed necessary.

165.    "Manager agrees to keep in affect liability insurance policy not less than 2 million dollars aggregate and 1 million dollars per occurrence.  Manager shall also retain fire, damage, theft and any other insurance deemed appropriate by Manager in its operation of the premises."  See Parking Management Agreement ¶ 15.

166.    "Owners acknowledge that all insurance coverage, except Workers' Compensation, subject to a deductible amount that amount of any deductible shall be

considered a direct operation expense of the Premises." <u>See</u> Parking Management Agreement ¶12.

167.    Parking Company of America deemed umbrella policy and garage keeper policy necessary for the operation of the parking lot. <u>See</u> Transcript at 68:14 to 69:3.

168.    Parking Company of America typically carries umbrella coverage and garage keeper coverage. <u>See</u> <u>id</u>.

169.    The claim for $10,000 of theft loss falls below the deductible was a proper expense charge to the joint venture. <u>See</u> Transcript at 92:22 to 93:10.

**CARL ALONGI**

170.    Carl Alongi's calculations and opinions are based on an arbitrary budget.

171.    The budget and methodology used by Mr. Alongi are neither sound nor reliable.

172.    The opinions of Mr. Alongi are not reliable or credible.

<u>**DEFENDANTS' BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTIES**</u>

**THE JOINT VENTURE AGREEMENT**

173.    The Joint Venture Agreement ("JVA") did not, by its own terms, terminate until December 2009.

174.    The JVA unambiguously provides for its termination in ¶ 4.01 of the JVA.

175.    The JVA is not so intrinsically intertwined with the PMA that the JVA would be absurd or meaningless without implying ¶ 17 of the PMA.

176.    This Court will not imply ¶17 of the PMA in the JVA.

**THE PARKING MANAGEMENT AGREEMENT.**

177.    The Parking Management Agreement ("PMA") can only terminate in December 2009.

178.    The PMA does not provide for unilateral termination.

179.    On December 29, 2001, Lorentzen made a written demand upon PCA for money he claims was due.

180.    Lorentzen claimed that certain expenses were improperly charged to the joint venture.

181.    He calculated that he was owed 43% of the alleged unauthorized or improper expenses.

182.    Lorentzen demanded a total amount of $23,144.

183.    Lorentzen claims that according to the PMA, he was entitled to payment within ten days.

184.    Lorentzen claimed that the failure to pay within ten days would allow him to terminate the PMA.

185.    If PCA commenced compliance during the ten-day period the PMA was not subject to termination.

186.    Lorentzen's power to terminate the contract was conditional on his duty to cooperate with PCA with regard to how payment was to be settled.

187.    Lorentzen failed to cooperate.

188.    Paragraph 17 of the PMA gave Lorentzen the option to terminate the contract.

189.    PCA and CPAPA worked with Lorentzen on many items throughout the duration of the joint venture.

190.    CPAPA made concessions to and exceptions for Lorentzen that it does not make to other business partners.

191.    CPAPA -- as an act of good faith -- credited the joint venture well over $20,000 of the expenses objected to by Lorentzen in his December 29, 2001 letter.

192.    These expenses were charged to all other PCA on-site operations.

193.    CPAPA's and P&S's course of conduct was to discuss and negotiate disputes over revenues and expenses.

194.    Lorentzen's claimed basis for attempting to terminate the PMA is not material to the PMA and can only be merely a technical breach, if it is considered a breach at all.

195.    An expense dispute of less than $20,000 does not go to the fundamental purpose of the JVA or PMA, nor is this amount material to the JVA or the PMA.

196.    There was no reasonable doubt that CPAPA and PCA would be dramatically harmed if the PMA or the joint venture were terminated.

197.    PCA acted in the utmost good faith.  In fact, PCA removed certain expenses charged to the joint venture in an attempt to continue operations.  The expense items removed were all appropriate expenses of the joint venture and similar expenses are charged to all PCA parking operations.

198.    The JVA states the following: "[T]he parties hereto covenant and agree that they shall cooperate and share with one another all business opportunities arising on or after the date hereof and . . . which may be directly competitive with the business operations of the Joint Venture Property."  JVA ¶ 3.02, of 3.


**AIRPORT SHUTTLE**

199.   Airport Shuttle is in the business of transporting travelers to and from the Albuquerque airport.

200.   Airport Shuttle's primary place of business is on joint venture property.

201.   John Lorentzen is the managing owner of Airport Shuttle.

202.   Lorentzen did not offer this business opportunity to CPAPA when he purchased Airport Shuttle.

203.   John Lorentzen requested that Jack Henderson sign the contract on behalf of Airport Shuttle because he had a conflict of interest.

204.   All the revenue from valet services and special events operated by PCA during the term of the joint venture went to the joint venture.

205.   The contract that places Airport Shuttle on joint venture property was signed on January 15, 2002 by Wes Golden, as manager of PCA, and Jack Henderson, as manager for Airport Shuttle.

206.   The contract called for Airport Shuttle to occupy thirteen parking spaces on joint venture property at a rate of $20 per month.

207.   The contract also states that **only** Airport Shuttle may terminate the contract.

208.   Golden did not have the authority to commit PCA to a contract for services.

209.   At the time he signed the contract Golden knew that he was being transferred to a marketing position instead of management.

210.   Ten days after he signed the contract, Golden was working for Airport Shuttle and John Lorentzen.

211.   Airport Shuttle took over between 48 and 52 parking spaces.

212.   Airport Shuttle has paid nothing for the parking spaces that it occupied.

21

## DEFENDANTS' TORTIOUS INTERFERENCE WITH CONTRACT

213.   Defendants intentionally and improperly induced PCA employees to terminate their employment with PCA.

214.   Defendants intentionally and improperly pursued business accounts historically held by the PCA or the joint venture.

215.   Defendants intentionally and improperly induced PCA customers to unknowingly sign new contracts with P&S.

## CIVIL CONSPIRACY AND AIDING AND ABETTING

216.   New Mexico has adopted Restatement (Second) of Torts Section 876, which recognizes the liability of third persons for the tort of another if the person knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.  See GCM, Inc. v. Kentucky Cent. Life Ins. Co., 1997-NMSC-52, ¶ 15, 124 N.M. 186, 947 P.2d 143.  The tort of aiding and abetting.

217.   New Mexico also recognizes the tort of civil conspiracy.

218.   For civil conspiracy, a plaintiff must demonstrate the following: "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts."  See Ettenson v. Burke, 2001 NMCA-3, ¶ 12, 130 N.M. 67, 17 P.3d 440 (internal quotation marks and citation omitted).

219.   The specified wrong may be a breach of contract or action in tort, such as conversion.  See id.

220.    The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members.  Id., 2001 NMCA-3, ¶ 12, 130 N.M. at 72, 17 P.3d at 445.

221.    A conspiracy existed between Lorentzen and Golden throughout 2001.

222.    Lorentzen and Golden carried out wrongful acts against Plaintiffs.

223.    The conspiracy proximately caused Plaintiffs' damages.

224.    John Lorentzen believes that Wes Golden is "trustworthy" and "honest."

225.    John Lorentzen describes Wes Golden's management abilities as "the best [he's] ever seen."

226.    John Lorentzen claims that it is "purely coincidental" that he confirmed the termination of the joint venture the same day Wes Golden resigned from PCA.

227.    Lorentzen and Golden worked together to take special events revenue from the joint venture.

228.    Lorentzen and Golden worked together to hinder PCA's ability to manage the joint venture.

229.    John Lorentzen knew that Wes Golden's conduct, including his conduct with regard to Airport Shuttle and special events, was a breach of his fiduciary duty and duty of loyalty to PCA and CPAPA.

230.    John Lorentzen gave substantial assistance and encouragement to Wes Golden's conduct.

231.    By aiding and abetting Wes Golden's breach of fiduciary duties and breach of loyalty to PCA and CPAPA, John Lorentzen is jointly and severally liable for damages to PCA or CPAPA.

23

232.    John Lorentzen and Wes Golden acted in concert to harm Plaintiffs through its use of the contract parker list, special events, advertising, harassment of PCA employees and Airport Shuttle.

233.    John Lorentzen and Wes Golden are jointly and severally liable for all damages resulting in their conspiracy.

<strong><u>BENEFIT OF THE BARGAIN</u></strong>

234.    Mr. Robert Chavez is Vice-President and Secretary of PCA and managing partner of CPAPA.

235.    Mr. Martin Chavez is the President of PCA and Managing Partner of CPAPA. owning a 5% interest.  See Transcript at 35:4.  He holds a Masters of Business Administration from the University of California at Berkley and is an experienced parking business and properly valuator.

236.    Mr. Dale Losey, CPA.  Mr. Losey is a Certified Public Accountant and Chief Financial Officer for PCA.

237.    Prior to the joint venture beginning, CPAPA and P&S were both operating side by side, two 24-hour-a-day seven-day-a-week operations.  See Transcript at 5:25 to 6:5.

238.    The number $1,683,544 on Exhibit 271 represents the total expenses prior to the joint venture for CPAPA and P&S combined for the year 1998.  See Transcript at 6:2-5 ("[T]he cost of those operations as reflected in that figure, the total costs, [CPAPA's] operation and [P&S's] operation added together total the 1-6-8-3-5-4-4 for that year.").

239.    The monthly average expense was $140,295.34.  See Transcript at 8:9-10.

240.   The actual expense for each year of the joint venture are as follows: $1,370,122 for 2000; $1,410,719 for 2001; $1,340,520 for 2002; and $1,144,876 for the first nine months of 2003. See Transcript at 8:7-17.

241.   The result is an average monthly expense of $117,027.54 for the period of the joint venture. See Transcript at 8:18-24.

242.   The difference from the average monthly expense during the joint venture and the average monthly expense prior to the joint venture is $23,276.88. See Transcript at 9:3.

243.   This translates to a difference of $279,313.56 yearly. See Transcript at 9:5-6.

244.   CPAPA's average yearly expense savings as being a member of the joint venture is thus $159,151.73. See Transcript at 9:7-13.

245.   Over the six years remaining on the joint venture, and CPAPA calculated lost expense savings of $954,910.38. See Transcript at 9:13.

246.   CPAPA and PCA also incurred additional costs as a result of the Defendants' breach of the JVA. See Transcript at 10:1-21.

247.   A proper estimated adjustment of $10,000 per month of exceptional expenses. Adding CPAPA's percentage share of these exceptional expenses totals $410,000. See Transcript at 10:18-19.

248.   Mr. Martin Chavez reviewed the profit and loss statement for the year 1998. See Transcript at 39:5.

249.   Mr. Martin Chavez reviewed the 1998 profit and loss statements because prior to the formation of the joint venture, CPAPA and P&S relied on 1998 financial records. See Transcript at 39:5.

250.     In valuing the business as a result of the termination of the joint venture contract, Mr. Martin Chavez used a capitalization rate of 9.5 percent.  See Transcript at 35:17.

251.     Robert Chavez is a competent witness to testify about damages.

252.     Dale Losey is a competent witness to testify about damages.

253.     Martin Chavez is a competent witness to testify about damages.

254.     CPAPA, thus, suffered $1,365,310 in lost expense savings as a result of the Defendants' breach of the JVA.  See Exhibit 271.

255.     The purpose of the joint venture was to decrease expenses and, thus, increase revenues and profits.

256.     Plaintiffs are entitled to recover "special" or consequential damages.

257.     Decreased fixed expenses, which directly result in increased profits, were the sole reason for the formation of the joint venture.

258.     The parties' intent at the time of contracting was to decrease expenses.

259.     Lost profits resulting from the breach of a contract may be based on historic revenues, profits or expenses.

260.     Here, profits were expected to be a direct result of consistent revenues and reduced fixed expenses.

261.     The revenue stream is consistent but overhead or fixed costs were drastically reduced during the joint venture -- thus the purpose of the joint venture.

262.     Lost profits are closely and directly tied to the savings on expenses.

263.     CPAPA will incur an operating profit decrease of $1,254,239.40 because of the breach of contract.

264.  The diminished value of CPAPA due to the dissolution of the joint venture may be used to calculate "benefit of the bargain" damages.

265.  The revenue stream is consistent because although there were additional revenues generated in the joint venture due to the additional parking spaces from the merger, CPAPA was only entitled to receive 57% of the profit from the merger.

266.  However, due to the reduced expenses, CPAPA made more in profits after the joint venture despite being compensated for only 57% of the spaces, which was a smaller percentage than CPAPA contributed to the joint venture (1700 (as a conservative estimate) CPAPA spaces of the total joint venture 2800 spaces is 60.71% of the total spaces).

267.  Defendants' breach of contract deprived the Plaintiffs of an "asset," i.e., participation in the joint venture.

268.  Plaintiffs, thus, should be compensated for the value of such asset at the time of the breach.

269.  CPAPA suffered lost profits in the amount of $1,254,239.40.  See Exhibit 301.

270.  CPAPA suffered a decrease in business value of $2,200,420.00.  See Exhibit 301.

## PUNITIVE DAMAGES

271.  John Lorentzen is not credible.

272.  John Lorentzen acted maliciously, intentionally and wantonly in damaging the Plaintiffs.

273.  Wes Golden is not credible.

274.  Wes Golden acted maliciously, intentionally and wantonly in damaging the Plaintiffs.

## ATTORNEY'S FEES

275.    The JVA states: "Either Party hereto acting or purporting to act for or on behalf of the other Party hereto in violation of the terms and provisions of this Agreement shall be acting without authority and the Party acting or purporting to act shall indemnify and hold the other Party harmless from and against any and all claims, loss, liability or expense, which might arise or result from any such act or acts, including, without limitation, **all attorneys' fees and expenses actually incurred**." JVA at 3 (emphasis added).

276.    The PMA states: "Any provision hereof to the contrary notwithstanding, Owners shall defend, indemnify and hold Manager harmless from and against any and all actions, costs, claims, losses, expenses and/or damages sustained by Manager attributable to the recklessness, carelessness or negligence of Owners or their servants or employees, other than Manager, its officers, directors, employees and agents, from any cause, including without litigation (sic) by specification, property damages and/or injury or death to any person or persons." PMA at 4 ¶ 13 (emphasis added).

277.    Pursuant to the JVA, CPAPA is entitled to recover its attorney's fees.

278.    Pursuant to the PMA, PCA is entitled to its attorney's fees.

## CONCLUSIONS OF LAW

I.    **PLAINTIFFS ARE ENTITLED TO THEIR BENEFIT OF THE BARGAIN AND OTHER DAMAGES FOR DEFENDANTS' BREACH OF CONTRACT WITH REGARD TO THE JVA AND THE PMA.**

   A.    **DEFENDANTS IMPROPERLY TERMINATED THE JVA.**

   1.    The JVA unambiguously provides for its termination in ¶ 4.01 of the JVA.

2.      The JVA is not so intrinsically intertwined with the PMA that the JVA would be absurd or meaningless without implying ¶ 17 of the PMA.   Paragraph 17 of the PMA will not be imputed in the JVA.

3.      By its own terms, the JVA should not have been terminated until December 2009.

4.      P&S and Lorentzen breached the JVA by pre-maturely terminating it.

5.      CPAPA suffered damages as a result of P&S's breach of contract.

6.      The breach by P&S and Lorentzen was willful and wanton.

**B.      DEFENDANTS PREMATURELY TERMINATED THE PMA.**

7.      When a contract is entered into a power of termination may be expressly reserved to either party, or to each of them.   13 A. L. Corbin, CORBIN ON CONTRACTS, § 1266, at 135 (Interim ed.1979, 2002).

8.      In the present case, ¶ 17 of the PMA gave Lorentzen the power to terminate the contract on the failure of the manager to pay the net revenue in the manner specified under ¶ 6(c) of the Agreement.

9.      Accordingly, Lorentzen has the burden to show that PCA actually failed to pay the net revenue as required by the PMA and that expenses charged to the joint venture were improper.

10.      That failure must have been actual -- not imagined or alleged or contrived.

11.      Lorentzen has failed to show that expenses charged to the joint venture, and specifically the items listed in his letter of December 29, 2001, were improper.

12.      The charge for the van rental, as reflected in Lorentzen's letter of December 29, 2001, is not a material breach.

13.     All charges related to the Hummingbird Software -- although proper expenses to the joint venture -- were reimbursed to John Lorentzen.

14.     The power to terminate is a conditional power. 13 A. L. Corbin, CORBIN ON CONTRACTS, § 1266, at 137 (Interim ed.1979, 2002).

15.     The power to terminate is conditional on the cooperation of the party who possesses that power. See Vanadium Corp. v. Fidelity & Deposit Co., 159 F.2d 105, 108 (2nd Cir. 1947).

16.     Lorentzen failed to cooperate with CPAPA or PCA and, thus, had no power to terminate the PMA.

17.     Moreover, paragraph 17 of the PMA gave Lorentzen the option to terminate the contract.

18.     The rule is well settled that "when a contract gives one party an option respecting performance, the contract will be interpreted most strongly in favor of the other party and against the party holding the option." 11 Richard A. Lord, WILLISTON ON CONTRACTS, § 32:11, at 465 (Fourth ed.1999).

19.     Forfeitures are not favored in the law, and a contract will be construed, if possible, so as to avoid a forfeiture. See Davies v. Boyd, 73 N.M. 85, 89, 385 P.2d 950, 952 (1963) (Moise, J., concurring specially); see also Patten v. Santa Fe Nat'l Life Ins. Co., 47 N.M. 202, 207, 138 P.2d 1019, 1022 (1943).

20.     The parties' course of performance is an important aid in the construction of the contract.

21.     The term "course of performance" refers to statements made by the parties themselves or their conduct in rendering or in receiving performance under the contract. 5 M. Kniffin, CORBIN ON CONTRACTS, § 24:16, at 135-36 (Perillo Rev.Ed. 1998).

22.     Restatement (Second) Contracts, § 202(4) (1979) provides: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."

23.     New Mexico courts have cited § 202 of the Restatement as an authoritative source for contract interpretation. See Crow v. Capitol Bankers Life Ins. Co., 119 N.M. 452, 457, 891 P.2d 1206, 1211 (1995).

24.     The provisions of an agreement with respect to how payments are to be made and accounts settled may be construed in light of the parties' course of performance. See Zehnder v. Michaud, 145 F.2d 713 (8th Cir. 1944).

25.     Practices that were engaged in prior to the signing of the agreement are binding on the parties.

26.     CPAPA's and P&S's course of conduct allowed for intended payments and expenses to be settled without termination of the PMA.

27.     A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.

28.     A "material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the

contract." See Niblock v. Mereceds Benz Credit Corp., 1998 U.S. App. LEXIS 1185 (4th Cir. Jan. 27, 1998).

29.    A material breach "is one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." See Ervin Constr. Co. v. Van Orden, 874 P.2d 506, 510 (Idaho 1993).

30.    New Mexico distinguishes between a "technical breach and one which goes to the substance of the agreement." See Yucca Mining & Petroleum Co. v. Howard C. Phillips Oil Co., 69 N.M. 281, 285, 365 P.2d 925, 927 (1961).

31.    The Restatement sets forth five factors that courts should consider when deciding the materiality of a breach of contract. See Restatement, supra, § 241.

32.    The first factor to examine is the extent to which the injured party will be deprived of the benefit he or she reasonably expected to receive from the contract.  The second factor considers the extent to which the breaching party will suffer forfeiture if the breach is deemed material.  Third, Courts should also explore whether the injured party can be adequately compensated in damages for the breach.  The fourth factor focuses on the likelihood that the breaching party will cure his or her failure to perform under the contract. The fifth factor evaluates whether the breaching party's conduct comported with the standards of good faith and fair dealing.  See Famiglietta v. Ivie-Miller Enters., Inc., 1998-NMCA-155, 126 N.M. 69, 966 P.2d 777.

33.    Applying the same test here, Defendants were not justified in terminating the contract.  First, an expense dispute of less than $20,000 does not go to the fundamental purpose of the JVA or PMA.  Second, CPAPA and PCA was dramatically harmed when the

PMA was terminated.  Third, PCA acted in the utmost good faith.  In fact, PCA removed certain expenses charged to the joint venture in an attempt to continue operations.

34.     The expense items removed from being charged to John Lorentzen or P&S were all appropriate expenses of the joint venture and similar expenses are charged to all PCA parking operations.

35.     Because Lorentzen could not prove a material or substantial breach of the PMA, the PMA should not have been terminated.

36.     The PMA by its own terms, could not be terminated until December 2009.

37.     P&S and Lorentzen breached the JVA by pre-maturely terminating it.

38.     P&S and Lorentzen's breach caused CPAPA and PCA to suffer damages.

39.     Defendant Wes Golden aided and abetted and/or conspired with his co-defendants in the breach.

40.     Defendants breach was willful and wanton.

41.     Plaintiffs are entitled to punitive damages against the Defendants for the breach of contract.

## II.     DEFENDANTS ARE LIABLE FOR BREACH OF CONTRACT WITH REGARD TO THE AIRPORT SHUTTLE CONTRACT.

42.     The contract entered into by Wes Golden, on behalf of PCA, and Airport Shuttle is a bogus contract and is rescinded and declared null and void.

43.     This competitive business is in direct violation of the JVA.

44.     Lorentzen instructed Henderson to execute the agreement for Airport Shuttle in bad faith and in breach of fiduciary duties.

45.     Lorentzen negotiated the agreement in bad faith.

46.     Lorentzen instructed Henderson to execute the agreement in bad faith.

47.     Lorentzen's actions were willful and wanton.

48.     Golden signed the agreement in bad faith.

49.     Golden's actions were willful and wanton.

50.     The Plaintiffs were proximately harmed by the bogus contract.

51.     Lorentzen's and Golden's acts and are awarded compensation and punitive damages for that harm.

## III.     DAMAGES FOR THE BENEFIT OF THE BARGAIN.

52.     Plaintiffs can present competent evidence to support an award of damages through its officers and partners.

53.     New Mexico has recognized the concept of consequential damages from breach of contract obligations as expressed in the seminal case of Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854).

54.     The amount of special damages is computed in the same manner regardless of the legal theory upon which it is based.  "The reason is that, in determining the amount of damages to be awarded, the focus shifts to the objective of such an award: to fully compensate the plaintiff and to put the plaintiff in as good as position as if the harm or injury had not occurred." See Central & Alarm Co. v. Mehler, 121 N.M. 840, 847, 918 P.2d 1340, 1347 (Ct. App. 1996).

55.     Plaintiffs are entitled to consequential damages based on two alternative calculations.

56.     In a claim for lost profits, the principle of compensatory damages requires that costs and expenses that the plaintiff would have incurred in making those profits be deducted

from the amount of lost gross profit.  See Central & Alarm Co. v. Mehler, 121 N.M. 840, 918 P.2d 1340 (Ct. App. 1996).

57.    "If, however, the plaintiff proves that it could have earned the lost gross profit without incurring any additional costs or expenses, the plaintiff should be awarded the entire amount of lost gross profit." Id. at 847, 918 P.2d at 1347.

58.    "When the plaintiff's overhead or expenses are fixed and no savings accrued to the plaintiff because of the defendant's breach, deducting a portion of these amounts to determine the plaintiff's award would not achieve the purpose of compensatory damages to place the plaintiff in as good a position as if there had been no breach." Id.

59.    Plaintiffs are entitled to damages for their lost profit.

60.    Lost profits are the proper measure of benefit of the bargain damages when profits were the purpose of the contract, as they were here.  See Stratus Production Co. v. Mercury Exploration Co., 121 N.M. 622, 632, 916 P.2d 822, 832 (1996).

61.    Lost profits resulting from the breach of a contract may be based on historic revenues, profits or expenses.  See Ranchers Exploration and Dev. Corp. v. Miles, 102 N.M. 387, 389, 696 P.2d 475, 477-78 (1985).

62.    Plaintiffs are entitled to damages for the diminished value of CPAPA as a result of the loss of the joint venture business structure.  See Duke City Lumber Co., Inc. v. Terred, 88 N.M. 299, 540 P.2d 229 (1975).

63.    The Federal Rules of Civil Procedure allow for laymen opinion testimony, including opinion testimony regarding damages to a business.  See Fed.R.Civ.P. 701 and 702.

64.     An award for lost profits can be based solely or primarily on the testimony of officers or owners of the injured business.  See Miami International Realty Co., v. Leff, 841 F.2d 348, 351 (10th Cir. 1988).

65.     An award for the diminution in the value of a business can be based solely or primarily on the testimony of officers or owners of the injured business.  See Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 738 (1st Cir. 1982).

66.     Owners, officers, and partners are qualified as a matter of law to testify about lost profits, diminution in value and other business damages sustained by their business entities.

67.     The damages suffered by Plaintiffs for the lost benefit of the bargain have been proven by competent evidence.

## IV.     PUNITIVE DAMAGES AND ATTORNEYS' FEES.

68.     Punitive damages are available when one party breaches its fiduciary duty to another, if the breaching behavior so unreasonable that a jury could conclude the breaching party acted with a culpable mental state.  See Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶¶ 56-57, 131 N.M. 544, 40 P.3d 449.

69.     Punitive damages are available in breach of contract cases when the breach shows a "wanton disregard for the nonbreaching party's rights or bad faith."  See Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 212, 880 P.2d 300, 309 (1994).

70.     Punitive damages are appropriate against a defendant that knowingly refused to comply with the terms of its contract with the plaintiff.  See Public Serv. Co. of N.M. v. Diamond D Constr. Co., 2001-NMCA-082, 131 N.M. 100, 33 P.3d 651.

71.    Plaintiffs, here, are entitled to an award of punitive damages based on the Defendants' willful breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duties and wanton disregard of Plaintiffs' rights.

72.    Defendants are jointly and severally liable to the Plaintiffs for the punitive damages awarded to Plaintiffs.

73.    Pursuant to the JVA, CPAPA is entitled to recover its attorney's fees.

74.    Pursuant to the PMA, PCA is entitled to its attorney's fees.

## V.    PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS' TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

75.    New Mexico describes interference with prospective contractual relations as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 453, 612 P.2d 241, 245 (Ct. App. 1980) (citations omitted).

76.    Defendants intentionally and improperly induced PCA employees to terminate their employment with PCA, pursued business accounts historically held by the PCA or the joint venture, and induced PCA customers to unknowingly sign new contracts with P&S.

## VI.    PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS' BREACHES OF FIDUCIARY DUTIES.

37

77.     "[P]artners occupy a fiduciary duty towards one another."  See GCM, Inc. v. Kentucky Central Life Ins. Co., 1997-NMSC-052, ¶ 21, 124 N.M. 186, 947 P.2d 143 (quoting Citizens Bank v. Williams, 96 N.M. 373, 375, 630 P.2d 1228, 1230 (1981).

78.     That duty extends to partners in a joint venture.  Id. (explaining that a joint venture is a "partnership for a single transaction.") (citation omitted).

79.     The fiduciary duty is the duty of "utmost good faith and loyalty."  See Walta v. Gallegos Law Firm, 2002-NMCA-015, ¶ 35, 131 N.M. 544, 40 P.3d 449 (citation omitted).

80.     Fiduciary duty is defined by "loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation."  Id. ¶ 41.

81.     The employment relationship is one of trust and confidence; the employee is bound to exercise the utmost good faith and loyalty in the performance of duty.  See Las Luminarias of New Mexico Council of the Blind v. Isengard, 92 N.M. 297, 302, 587 P.2d 444, 449 (Ct. App. 1978).

82.     The Supreme Court of New Mexico specifically recognized a cause of action for aiding and abetting a breach of fiduciary duty in GCM, Inc. v. Kentucky Cent. Life Ins. Co., 1997-NMSC-52, 124 N.M. 186, 947 P.2d 143.

83.     Lorentzen violated his fiduciary duties to his partners by taking actions to terminate the joint venture.

84.     Lorentzen violated his fiduciary duties to his partners by taking actions to hurt the management of PCA.

85.     Lorentzen violated his fiduciary duties to his partners by taking business away from the joint venture and operating -- on joint venture property -- a competing business.

86.     Lorentzen breached his fiduciary duties to his partners by allowing databases and other information crucial to the joint venture to be taken or destroyed.

87.     Plaintiffs were proximately harmed by this breach.

88.     Lorentzen breach of fiduciary duties was willful and wanton.

89.     Golden aided and abetted Lorentzen in his breach or, alternatively, conspired with Lorentzen.

90.     Golden is jointly and severally liable for damages to Plaintiffs from Lorentzen's breach.

91.     As the PCA City Manager for over five years, Golden owed a fiduciary duty to PCA.

92.     Golden violated his fiduciary duties to PCA by transferring business to competitors, neglecting his duties, converting property and taking actions to terminate the JVA and the PMA.

93.     Golden breached his fiduciary duties as a supervisor/manager to his employer PCA.

94.     Plaintiffs were proximately harmed by this breach.

95.     Golden's breach of fiduciary duties was willful and wanton.

96.     Lorentzen is jointly and severally liable for Golden's breach of fiduciary duty.

## VII.   PLAINTIFFS ARE ENTITLED TO DAMAGES FOR DEFENDANTS' CIVIL CONSPIRACY.

97.     To establish civil conspiracy, a plaintiff must demonstrate the following: "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was

damaged as a result of such acts." See Ettenson v. Burke, 2001 NMCA-3, ¶ 12, 130 N.M. 67,

17 P.3d 440 (internal quotation marks and citation omitted).

98.     The specified wrong may be a breach of contract or action in tort, such as

conversion. See id.

99.     The purpose of a civil conspiracy claim is to impute liability to make members

of the conspiracy jointly and severally liable for the torts of any of its members. Id., 2001

NMCA-3, ¶ 12, 130 N.M. at 72, 17 P.3d at 445.

100.    A conspiracy existed between Lorentzen and Golden throughout 2001.

101.    Lorentzen and Golden carried out wrongful acts against Plaintiffs.

102.    The conspiracy proximately caused Plaintiffs' damages.

103.    New Mexico has adopted Restatement (Second) of Torts Section 876, which

recognizes the liability of third persons for the tort of another if the person knows that the

other's conduct constitutes a breach of duty and gives substantial assistance or encouragement

to the other so to conduct himself.  See GCM, Inc. v. Kentucky Cent. Life Ins. Co., 1997-

NMSC-52, ¶ 15, 124 N.M. 186, 947 P.2d 143.

104.    The third party, who is liable for aiding and abetting, is jointly and severally

liable for damages there from.  Id.

105.    John Lorentzen knew that Wes Golden's conduct was a breach of his fiduciary

duty and duty of loyalty to PCA and CPAPA.

106.    John Lorentzen gave substantial assistance and encouragement to Wes

Golden's conduct.

107.    By aiding and abetting Wes Golden's breach of fiduciary duties and breach of loyalty to PCA and CPAPA, John Lorentzen is jointly and severally liable for damages to PCA or CPAPA.

## VIII. JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR ACTUAL OR CONSTRUCTIVE FRAUD AND CONSPIRACY TO DEFRAUD.

108.    Defendants' claim for fraud fails.

109.    The elements of the tort of fraud in New Mexico are: (i) a misrepresentation of fact; (ii) known by the maker to be false; (iii) made with the intent to deceive and to induce the other party to act in reliance; and (iv) actually relied upon the party to his detriment. See Lotspeich v. Golden Oil Company, 1998-NMCA-101, ¶ 9, 961 P.2d 790, 792 (citing Eoff v. Forrest, 109 N.M. 695, 699, 789 P.2d 1262, 1266 (1990).

110.    Each of these four elements is essential to a claim for fraud.

111.    Further, rule 9(b) requires the complaint to identify specifically which party made what statement. See DiVittorio v. Equidyne Extractive Indus. Inc., 822 F.2d 1242, 1247 (2nd Cir. 1987).

112.    Conspiracy to defraud is subject to rule 9(b) of the Federal Rules of Civil Procedure, which provides that "**all** averments of fraud . . . shall be stated with particularity."

113.    Lorentzen and P&S have failed to plead or prove conspiracy to defraud or conceal with the requisite specificity.

## IX.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS.

114.    One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference

41

consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.  Section 766B of the Restatement (Second) Torts.

115.    Interference with prospective contractual relations requires intentional and improper interference.  See Anderson v. Dairyland Insurance Co., 97 N.M. 155,159, 637 P.2d 837, 841 (1981).

116.    "[E]ither an improper motive (solely to harm plaintiff), or an improper means is required for liability."  Id.

117.    Plaintiff's temporary restraining order against Defendants was for a proper motive and a proper means.

## X.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR BREACH OF FIDUCIARY DUTIES.

118.    The traditional remedy for a breach of fiduciary duty is an action for accounting or dissolution, or both.  See Fate v. Owens, 2001-NMCA-040, ¶ 33, 130 N.M. 503, 27 P.3d 990.

119.    An action for accounting is an action in equity, not at law.  Id. ¶ 36.  An action for dissolution is an action in equity.  Id. ¶ 36.

120.    The claim for "waste and mismanagement" can only be heard as an action for accounting and dissolution, which are equitable claims.

121.    Defendants failed to prove their claim for accounting or for mismanagement.

## XI.    JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR DIVERSION OR CONVERSION OF CORPORATE FUNDS AND OPPORTUNITIES.

122.    "Diversion" is not a recognized cause of action and "conversion" requires the unlawful dominion over personal property, not business opportunity.

123.    "Conversion is defined as the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." See Nosker v. Trinity Land Co., 107 N.M. 333, 337-38, 757 P.2d 803, 807-08 (Ct. App.), cert. denied, 107 N.M. 267, 755 P.2d 605 (1988).

124.    Defendants' ninth claim fails as a matter of law.

## XII.   JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR MALICIOUS ABUSE OF PROCESS IN OBTAINING A TEMPORARY RESTRAINING ORDER.

125.    The elements of the torts of abuse of process and malicious prosecution defined as follows: (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages of Devaney v. Thriftway Mktg. Corp., 1998-NMSC-1, ¶ 17,124 N.M. 512, 518, 953 P.2d 277, 283.

126.    Plaintiffs had a legitimate and justified reason for securing a restraining order.

127.    Defendants suffered no damages as a result of the TRO.

128.    Defendants' claim for malicious abuse of process fails.

## XIII.  NEW MEXICO DOES NOT RECOGNIZE A CAUSE OF ACTION FOR DAMAGE TO CREDIT REPUTATION.

129.    New Mexico does not recognize a cause of action for damage to credit reputation.

130.    New Mexico requires the following elements for a defamation action, including slander: (i) a defamatory communication by the defendant to a third person, (ii) of an asserted fact, (iii) of and concerning the plaintiff, (iv) and proximately causing actual injury to the plaintiff.  See Newberry v. Allied Stores, 108 N.M. 424, 429, 773 P.2d 1231, 1236 (1989).

131.    Defendants' claim fails as a matter of law and is not supported by the evidence.

## XIV.   JOHN LORENTZEN AND PARK & SHUTTLE, INC.'S CLAIM FOR PRIMA FACIE TORT.

132.    The purpose of prima facie tort is to provide a remedy for intentional acts that "do not fit within the contours of accepted torts."  See Schmitz v. Smentowski, 109 N.M. 386, 396, 785 P.2d 726, 736 (1990).

133.    Prima facie tort should not be used to evade stringent requirements of other established doctrines of law.  See Yeitrakis v. Schering-Plough Corp., 804 F. Supp. 238, 249 (D.N.M. 1992).

134.    The conduct that Defendants allege both in Count XII and in the rest of the Complaint -- if actionable at all -- adequately and properly falls within the parameters of other doctrines.

135.    Defendants' claim for prima facie tort fails as a matter of law.

## XV.   NEW MEXICO DOES NOT RECOGNIZE A CAUSE OF ACTION FOR WASTE AND MISMANAGEMENT.

136.    New Mexico does not recognize an independent cause of action for "waste and mismanagement."

Respectfully submitted,

**PEIFER, HANSON & MULLINS, P.A.**

By: _____

Christopher T. Saucedo
20 First Plaza, Suite 725
Post Office Box 25245
Albuquerque, New Mexico 87125-5245
Telephone: (505) 247-4800
Facsimile: (505) 243-6458

--and--

**SILVA & ASSOCIATES, P.C.**

Benjamin Silva, Jr.
20 First Plaza, Suite 725
Post Office Box 100
Albuquerque, New Mexico 87103-0100
Telephone: (505) 246-8300
Facsimile: (505) 246-0707

**Attorneys for Plaintiffs Chavez-Properties-Airport
Parking Albuquerque and Parking Company of
America**

We hereby certify that a copy
of the foregoing was served
by hand delivery to the following:

Michael L. Danoff, Esq.
604 Chama Road, NE
Albuquerque, NM 87108
Telephone: (505) 262-2383
Facsimile: (505) 266-4330

this 2nd day of April, 2004.

PEIFER, HANSON & MULLINS, P.A.

By: _____
Christopher T. Saucedo