

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**CHAVEZ PROPERTIES-AIRPORT PARKING**
**ALBUQUERQUE, LP, a Georgia limited partnership,**
**and PCA, INC.,**
**a Georgia Corporation,**

04 APR -2 PM 4: 21

*[signature]*
CLERK-ALBUQUERQUE

                    **Plaintiffs,**

**vs.**

**NO. CIV 02-0145 JP/ACT (ACE)**
**(Consolidated)**

**LORENTZEN, individually, and PARK AND**
**SHUTTLE, INC., a New Mexico Corporation, and**
**GOLDEN, an individual.**

                    **Defendants.**

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

COME NOW, the Defendants/Counterclaimants, Lorentzen, individually and PSI

and Golden, by and through their attorney, Michael L. Danoff and for their Findings of

Fact and Conclusions of Law state the following:

For purposes of these Findings of Fact and Conclusions of Law , the parties will

be referred to as follows: Chavez-Properties – Airport Parking of Albuquerque, LLP, will

be hereinafter referred to as "CPAPA". PCA will hereinafter be referred to as "PCA".

PSI will hereinafter be referred to as "PSI". Lorentzen will hereinafter be referred to as

"Lorentzen", and Wesley Golden will hereinafter be referred to as "Golden".

**General**

1.      PCA used rotating members in a management capacity after Golden

resigned which included Bronwyn Williams, William Addy, Andrea Chavez, Tim

Chavez and Jim McCleaf. (Vol I, 11/12/03 Transcript, @ 90).



2.     Jim McCleaf, while he was in Albuquerque, had discussions with Val-Pak, which is an advertising pamphlet, and told them that he wanted do a mass mailing with Val-Pak (Vol. I, 11/12/ 03 Transcript, @98 and 100).

3.     When Jim McCleaf served as manager, he was aware of the concerns of Lorentzen relative to landscaping and he did not find them unreasonable.  (Vol. I, 11/12/03 Transcript, @107).

4.     Bronwyn Williams in her capacity to manage does give the okay to allow travel agents at her parking lot free parking.  (Vol. I, 11/12/03 Transcript, @140-141).

5.     Robert Chavez believed there was a decision made at the end of 1999 to merge the properties into the Joint Venture. (Vol. I, 11/12/03, Transcript, @167).

6.     The written agreement for the Joint Venture was signed on or about March of 2001.  (Vol. I, 11/12/03 Transcript, @170).

7.     The operations of Fast Park and PSI were separate before 2000. (Vol. I, 11/12/03 Transcript, @171).

8.     Marsden Avenue is the road that is between two parking lots.  (Vol. I, 11/12/03 Transcript, @173-174).

9.     There was no budget for the first year of operation of the Joint Venture. (Vol. I, 11/12/03 Transcript, @174).

10.     Robert Chavez testified that 2001 was the first year that the two parking lots actually operated together and they were thinking let's have 2001 under our belts, then we will start a budget because that was the first year they were going to be together. (Vol. I, 11/12/03 Transcript, @175).

11.     Golden was hired as a manager in 1995. (Vol. I, 11/12/03 Transcript, @177).

12.     Lorentzen registered constant concerns about the buses or vans put in the Joint Venture by PCA. (Vol. I, 11/12/03 Transcript, @189).

13.     Robert Chavez received several letters from Lorentzen questioning the expenses of the Joint Venture. (Vol. I, 11/12/03 Transcript, @192).

14.     It was not uncommon that after PCA gave a monthly statement to Lorentzen, that Lorentzen was questioning the expenses on the monthly statement. (Vol. I, 11/12/03 Transcript, @192-193).

15.     Lorentzen related to Robert Chavez that Golden was a key manager and he did not want him replaced. (Vol. I, 11/12/03 Transcript, @232)

16.     When Lorentzen complained to Robert Chavez about the software charges on the profit and lost statement of the Joint Venture which were approximately $20,000.00, he took this off of Lorentzen's statement. (Vol. II, 11/13/03 Transcript, @249).

17.     Lorentzen advised Robert Chavez early in 2002 that there were problems with CPAPA and PSI in the Joint Venture and that the lots should be split if they could not agree on a new deal. (Vol. II, 11/13/03 Transcript, @274).

18.     PCA presently has nine off-airport parking lots and has between 120-150 additional lots as well as between 900-1000 employees. (Vol. II, 11/13/03 Transcript, @341-342).

3

19. Robert Chavez did provide a copy of the operating budget of Fast Park as a part of the Joint Venture, and therefore, was aware of an operating budget. (Vol. II, 11/13/03 Transcript, @344).

20. Direct expenses would be the actual expenses for the parking lots of the Joint Venture. (Vol. II, 11/13/03 Transcript, @345).

21. Robert Chavez admitted that he had discussions with Lorentzen about Hummingbird software, and that this was not a direct expense of the Joint Venture. (Vol. II, 11/13/03 Transcript, @347).

22. Exhibit 32 and 33 which were the Parking Management Agreement and Joint Venture Agreement were created by David Cofrin, the attorney for the Joint Venture. (Vol. II, 11/13/03 Transcript, @354).

23. The purpose for the Joint Venture was to reduce operating costs and get increased profits. (Vol. II, 11/13/03 Transcript, @355).

24. The Joint Venture Agreement between the parties specifically says the purpose was "to share additional opportunities to service the commercial parking business generated by the public airport facilities in Albuquerque, New Mexico." (Exhibit 32)

25. Service is an important part of a parking lot business (Vol. III, 11/14/03 Transcript, @5).

26. The money involving the credit card machines diverted by PSI has been completely accounted for. (Vol. III, 11/14/03 Transcript, @14).

27.     The proceeds of the claim of van No. 23, which was destroyed, and closed the proceeds of the claim went into the insurance liability account to offset the purchase of a new vehicle. (Vol. III, 11/14/03 Transcript, @91).

28.     It was agreed between the parties that the lawyer for PCA and David Cofrin would do the initial draft of the agreements (Vol. I, 3/9/04 Transcript, @7).

29.     Martin Chavez, the President of PCA testified PCA is the operating company that operates all of Chavez Properties Investments and Chavez Properties Investments owns all of the facilities. (Vol. I, 3/9/04 Transcript, @17).

30.     The Court ruled that Martin Chavez is not an authorized expert and his conclusions are based on actual experiences. (Vol. I, 3/9/04 Transcript, @22).

31.     Martin Chavez has been involved with other agreements for the company when there was a budget involved and he was involved with a budget that was a guideline. (Vol. I, 3/9/04 Transcript, @70-71).

32.     Martin Chavez believes that any investor can come down to his office and go through documents that pertain to his investment. (Vol. I, 3/9/04 Transcript, @72).

33.     Martin Chavez has a 5% ownership in CPAPA. (Vol. I, 3/9/04 Transcript, @91).

34.     Martin Chavez and PCA do not treat an investor or owner any different. (Vol. I, 3/9/04 Transcript, @93-94)

35.     Mr. Losey said Mr. Lorentzen had contacted him at various times and had concerns about various expenses and he had an absolute right to do this as an owner. (Vol. I, 3/9/04 Transcript, @173).

5

36.    Mr. Lorentzen received all financial reports from PCA until the deal went sour. (Vol. I, 3/9/04 Transcript, @173).

37.    Juan Rodriguez was aware of the conversations with Lorentzen that they weren't working on the vehicles and vans of PSI and Fast Park and he advised the mechanic of his concerns. (Vol. II, 3/10/04 Transcript, @352).

38.    Tim Chavez remembers meeting with Lorentzen and he continued talking about splitting up the parking lots. (Vol. II, 3/10/04 Transcript, @383 and 384).

39.    Tim Chavez filed an assault and battery charge against Lorentzen, which was heard in Metropolitan Court and was dismissed. (Vol. II, 3/10/04 Transcript, @450 and 451).

40.    Tim Chavez talked to customers of PSI about soliciting their future relationship with PCA. (Vol. III, 3/11/04 Transcript, @481).

41.    Brad Stevenson was originally hired by Penni Adrian as an investigator in this case. (Vol. III, 3/11/04 Transcript, @499).

42.    Brad Stevenson was aware from the very time that he came on board for the Joint Venture in his capacity as manager that Mr. Lorentzen wanted the lots split. (Vol. III, 3/11/04 Transcript, @559).

43.    PSI was the closest parking lot to the airport aside from the airport parking facility at the airport, and they have had a built in clientele. (Vol. III, 3/11/04 Transcript, @563-564).

44.    When Brad Stevenson first got the job he did not have any problems with Mr. Golden or Mr. Lorentzen and went over to visit with him on occasions when he had

various questions because of their recognized expertise in the business. (Vol. III, 3/11/04 Transcript, @573).

45.    Brad Stevenson never consulted with Lorentzen relative to the Scorpions contract. (Vol. III, 3/11/04 Transcript, @578 and 579).

46.    Exhibit FFFFFF is a showing of a delinquent account with Alibi (NuCity Publications, Inc. (Vol. III, 3/11/04 Transcript, @596).

47.    Star Parking was used as an entity because PSI and Airport Parking were tainted bu litigation. (Vol. III, 3/11/04 Transcript, @597 and 598).

48.    Lorentzen is a licensed broker and started the company in 1976 known as Southwest Realty Investment Inc. (Vol. III, 3/11/04 Transcript, @661).

49.    Lorentzen is President and majority shareholder of PSI, which has been in business continually since 1983 (Vol. III, 3/11/04 Transcript, @669 and 675).

50.    The parking lot known as PSI and run by Lorentzen was profitable for the time Lorentzen operated it. (Vol. III, 3/11/04 Transcript, @678).

51.    PSI had contracts with various travel agencies, Honeywell, Sandia Labs and Los Alamos National Labs in place which contributed an established clientele. (Vol. III, 3/11/04 Transcript, @688).

52.    PCA sent a boilerplate draft of the Joint Venture Agreement and the Parking Management Agreement to PSI. (Vol. III, 3/11/04 Transcript, @689).

53.    Exhibit G is a letter that Lorentzen put together regarding the groundwork for combining the parking lots. (Vol. III, 3/11/04 Transcript, @703; see Exhibit G).

54.    Mr. Chavez agreed to share the expenses of Miles Road on behalf of PCA and this included legal expenses. (Vol. III, 3/11/04 Transcript, @704).

55.    PSI and Lorentzen, before going into the Joint Venture, was concerned about service for patrons. (Vol. III, 3/11/04 Transcript, @706).

56.    Lorentzen believes PSI and Airport Fast Park have the best location of all the airport offsite parking lots due to their proximity and the fact that they were at the doorsteps to the airport. (Vol. III, 3/11/04 Transcript, @707).

57.    Lorentzen expressed concerns that he had relative to the van leases in May of 2000 and never received a response to this from PCA. (Vol. III, 3/11/04 Transcript, @707 and 708; see Exhibit I).

58.    Lorentzen understood that each of the parties would put 6 to 8 vans in the Joint Venture. (Vol. III, 3/11/04 Transcript, @709-710).

59.    Lorentzen wrote Robert Chavez relative to his concerns about year end adjustments and Robert Chavez told him they would talk about it, but they never did talk about it. (Vol. III, 3/11/04 Transcript, @723).

60.    Lorentzen never received any responses from Robert Chavez to the letters he had written in the first 6 to 8 months after the Joint Venture was formed relative to any financial concerns he had. (Vol. III, 3/11/04 Transcript, @723).

61.    Lorentzen wrote a letter to Robert Chavez, Martin Chavez and Manuel Chavez on October 26, 2001 voicing his concerns about various problems with the Joint Venture to include van payments, problems with payments and various other problems. (Exhibit KK).

62.    Lorentzen wrote Exhibit RR, a letter to Alice Maggert, relative to accounting matters and he never got a response to this letter. (Vol. III, 3/11/04 Transcript, @727).

63.     Lorentzen never received a response to his letter of default to PCA dated December 29, 2001. (Vol. IV, 3/12/04 Transcript, @758; see Exhibit AAA. Default Letter).

64.     Lorentzen wrote a letter to Robert Chavez and the purpose of the letter was to see if the Joint Venture could be salvaged and concerns about Golden being taken out as the manager of the Joint Venture. (Vol. IV, 3/12/04 Transcript, @758; see Exhibit BBB).

65.     Lorentzen was concerned about poor communications and wrote in his letter that he didn't know how many letters, e-mails or phone calls he had made in the past that go unanswered, and that he never received a response to his correspondence. (Vol. IV, 3/12/04 Transcript, @759 and Exhibit BBB).

66.     Lorentzen expressed a concern that he was not getting any monies from the Joint Venture in view of the fact that the Joint Venture had provided him approximately $25,000.00 a month to meet his personal financial obligations. (Vol. IV, 3/12/04 Transcript, @760).

67.     PSI was supposed to be paid on the 20th day of each month from PCA for its share of the proceeds. The first year PSI received only one payment on time. (Vol. IV, 3/12/04 Transcript, @760).

68.     Lorentzen changed out the credit cards in January 2002 in desperation to get PCA's attention in order to get an explanation of what was happening in the Joint Venture in regard to financial matters. (Vol. IV, 3/12/04 Transcript, @760-761).

9

69.    The money from the credit card funds was put in the Compass Bank account and these funds stayed in the account until PCA deducted from his statement a like amount. (Vol. IV, 3/12/04 Transcript, @761 and 762).

70.    Lorentzen never touched the funds from the credit card machine until such time as he was allowed to take these funds after there was an offset of what was taken by PCA against the money he was to be paid. (Vol. IV, 3/12/04 Transcript, @762).

71.    Lorentzen was concerned that there were managers coming in every two weeks, in one month there were expenses for managers in excess $15,000.00, and he received no profit. (Vol. IV, 3/12/04 Transcript, @765).

72.    At the meeting in January 2002 with Robert Chavez, Lorentzen discussed dividing up the lots of the Joint Venture. (Vol. IV, 3/12/04 Transcript, @767).

73.    Exhibit JJJ is a letter dated January 25, 2002, terminating the Joint Venture Agreement. (Vol. IV, 3/12/04 Transcript, @767; see Exhibit35).

74.    Lorentzen met with Robert Chavez on January 28, 2002 and Tim Chavez on January 27, 2002 relative to various matters pertaining to the parking lots. (Vol. IV, 3/12/04 Transcript, @770).

75.    Lorentzen met with Manuel Chavez to see if they could resolve the problems with PCA. (Vol. IV, 3/12/04 Transcript, @771).

76.    Lorentzen met with Manuel Chavez during a lunch meeting when Mr. Chavez brought up the Los Banditos motorcycle gang and he said he would hate to see anything happen to Lorentzen's wife. (Vol. IV, 3/12/04 Transcript, @772).

77.    The next day after the meeting with Manuel Chavez Lorentzen left for Florida on a planned trip. (Vol. IV, 3/12/04 Transcript, @772 and 773).

10

78.    Lorentzen had concerns about the accounts that Tim Chavez was soliciting including travel agents such as Classic Travel. (Vol. IV, 3/12/04 Transcript, @775).

79.    Lorentzen put together various options to continue the operation of the Joint Venture, but he wanted an independent third party to handle the finances or in the alternative he suggested splitting up the lots. (Vol. IV, 3/12/04 Transcript, @779-781).

80.    Lorentzen believed that by virtue of his letter of December 31, 2001 and January 25, 2002, the contract was terminated; however, he was still trying to work at getting the parties back together. (Vol. IV, 3/12/04 Transcript, @781).

81.    Lorentzen submitted a proposal in the form of Exhibit LLL which was shown to Robert Chavez and he pushed it back to Lorentzen and gave it no consideration. (Vol. IV, 3/12/04 Transcript, @782 and 783).

82.    Lorentzen left for Florida the next day after he met with Manuel Chavez on or about February 6 or 7, 2002 to watch his daughter perform in a cheerleading competition although things were not good and there was no litigation pending. (Vol. IV, 3/12/04 Transcript, @784).

83.    Lorentzen received a phone call from Golden the day of the hearing on the temporary restraining order and informing him that there was a hearing that day while he was in Florida. The Temporary Restraining Order was issued that day. (Vol. IV, 3/12/04 Transcript, @785).

84.    Credit card money was kept and maintained at Compass Bank in the amount of approximately $67,069.00. (Vol. IV, 3/12/04 Transcript, @788; see Exhibit MMM).

85.     The first time Lorentzen knew Golden was terminating his job was when a draft of the resignation letter was put on his desk on January 25, 2002. (Vol. IV, 3/12/04 Transcript, @790 and 791).

86.     Until the problems arose with the Joint Venture in January 2002, Lorentzen and PSI were receiving Profit and Loss statements, getting average reports and all information that he wanted from Cincinnati or from Golden, to include the DORs. (Vol. IV, 3/12/04 Transcript, @793 and 794).

87.     Lorentzen understood that the Joint Venture agreement allowed him to receive all financial records of the Joint Venture which included any and all reports. (Vol. IV, 3/12/04 Transcript, @797).

88.     Prior to the Joint Venture, Southwest Airlines was on the lot and the Joint Venture allowed them to park 50 or 60 cars in the hopes of obtaining a data base from them for mail outs. (Vol. IV, 3/12/04 Transcript, @809 and 810).

89.     The purpose of the relationship with Southwest Airlines was to get a data base to use in marketing. (Vol. IV, 3/12/04 Transcript, @810).

90.     There was a criminal action filed by Tim Chavez for assault and battery against Lorentzen which was dismissed by the Court. (Vol. IV, 3/12/04 Transcript, @817).

91.     A budget was supposed to be prepared for the first year of operation of the Joint Venture; and if a budget was not prepared, a budget would be based on the prior year's operations. (Vol. IV, 3/12/04 Transcript, @877 and Exhibit 331).

92.     Lorentzen asked for a budget and never received one. (Vol. IV, 3/12/04 Transcript, @877).

93.     Robert Chavez recognizes that the Joint Venture hired Michael L. Danoff to work on the Miles Road matter for and on behalf of the Joint Venture so that Uncle Richard would not be able to use the spaces. (Vol. I, 11/12/03 Transcript, @162-164).

94.     Exhibit JJJJJJJJ is a list of bills paid prior to the suit prepared by Lorentzen. (Vol. IV, 3/12/04 Transcript, @873).

95.     David Cofrin, the attorney for PCA, drafted the Joint Venture Agreement and Parking Management Agreement. (Vol. VI, 3/16/2004 Transcript, @1330).

96.     Tim Chavez asked Golden not to mention the interest in another parking lot that he invested with Mr. Golden to representatives of PCA. (Vol. VI, 3/16/2004 Transcript, @1345).

97.     Robert Chavez advised Golden that he may be moved to marketing and not running the lot, but Martin Chavez subsequently told him he would stay right where he was and he remained in that position until his resignation of January 25, 2002. (Vol. VI, 3/16/2004 Transcript, @1348-1349).

98.     Lorentzen did question Golden throughout the Joint Venture about direct and indirect expenses and other matters in the financial statements. (Vol. VI, 3/16/2004 Transcript, @1350).

99.     Golden did special events prior to the formation of the Joint Venture and Robert and Martin Chavez knew this and were not interested in doing special events. (Vol. VI, 3/16/2004 Transcript, @1353-1354).

100.    Lois Lorentzen observed Golden working in the office and he did ethical things which were in the best interest of PCA. (Vol. VI, 3/16/2004 Transcript, @1444-1445).

101.   Lois Lorentzen helped write the letter marked Exhibit BBB in regard to the case and felt that she was doing everything she could to keep the Joint Venture together. (Vol. VI, 3/16/2004 Transcript, @1444-1445).

**Reports**

102.   The average rate report is the average rate charged at a parking lot which would reflect the fact that there are discounted posted rates and variations in rates. (Vol. I, 11/12/03 Transcript, @108).

103.   The daily operating report is computed every day along with the actual revenues, the car count, and breakdown of accounts payable. (Vol. I, 11/12/03 Transcript, @108).

104.   It is important for an owner to have the information on the daily operating report. (Vol. I, 11/12/03 Transcript, @109).

105.   The Daily Operating Report breaks down your financial data per shift for gross revenue and contains a daily car count of cars in and cars out, the deposits for the day and it gives you a synopsis for the day and a monthly total. (Vol. I, 11/12/03 Transcript, @136).

106.   The Daily Operating Report is important to show what you are doing in business on a particular day. (Vol. I, 11/12/03 Transcript, @136).

107.   The significance of the car count itself is that it tells how many cars are in the lot. (Vol. I, 11/12/03 Transcript, @137-138).

108.   Robert Chavez did testify that the Daily Operating Report is a fairly significant document and did not believe that Mr. Lorentzen should receive the Daily Operating Report. (Vol. II, 11/13/03 Transcript, @349).

109.    The agreements of the Joint Venture provide for a complete open book and anybody can come in and look at anything regarding the Joint Venture. (Vol. II, 11/13/03 Transcript, @351).

110.    The general manager gave the Daily Operating Reports to Lorentzen. (Vol. II, 3/10/04 Transcript, @251).

111.    Lorentzen defines the average report as the most critical piece of information in parking because it breaks down the rate and tells you right where your business is coming from.  (Vol. IV, 3/12/04 Transcript, @858).

112.    Lorentzen received the average report in 2001, received it in 2001 and did not receive in 2002 or 2003.  (Vol. IV, 3/12/04 Transcript, @858).

113.    Lorentzen said that the Arbiter directed that the financial reports of the Joint Venture would be furnished and they were not furnished.  (Vol. IV, 3/12/04 Transcript, @858).

**Problems with Payments**

114.    Lorentzen advised Bronwyn Williams, who was a manager, that there were problems with a lot of payments late to vendors. (Vol. I, 11/12/03 Transcript, @125).

115.    Bronwyn Williams had issues with Accounts Payable and had discussions with Golden concerning the problems with accounts payable.  (Vol. I, 11/12/03 Transcript, @134).

116.    Mr. Losey admitted that PCA was late in payments to vendors and he was late in paying Lorentzen his distribution from the Joint Venture profits.  (Vol. I, 3/9/04 Transcript, @164).

117.    Mr. Losey claimed that the problems that Mr. Losey had with vendors were with only two vendors out of 100 to 150 vendors and was not a huge problem. (Vol. I, 3/9/04 Transcript, @166).

118.    Tim Chavez was aware of the fact that PCA had problems in the past with vendors being paid on a timely basis.  (Vol. III, 3/11/04 Transcript, @478).

119.    Tim Heckler, who is comptroller of Rich Ford, wrote a letter to Lorentzen about the fact that payments were late and he had some concerns.  (Vol. III, 3/11/04 Transcript, @728; see Exhibit TT).

120.    Lorentzen wrote a letter to Southwest Tire to get his name off of the account because Fast Park continued to pay the bills late from PCA and he didn't want to have his credit jeopardized. (Vol. III, 3/11/04 Transcript, @729; see Exhibit UU).

121.    There were past due bills due from PCA to Devoe Publications.  (Vol. IV, 3/12/04 Transcript, @868; see Exhibit NNNNNNN).

122.    Exhibits NNNNNN and ZZZZZZ reflects the money spent for repairs to the vans of PCA as compared to PSI which shows a great disparity. (Vol. IV, 3/12/04 Transcript, @856 and 869).

123.    Russell Bouck is the Assistant manager for Cox American Car Care also known as Southwest General Tire. (Vol. VI, 3/16/2004 Transcript, @1245).

124.    Mr. Bouck on occasion delivered tires to the airport in 2001 to the Joint Ventures operation and the Joint Venture did not pay their bill.  (Vol. VI, 3/16/2004 Transcript, @1246).

125.    Mr. Bouck went over to the property to confiscate the tires. (Vol. VI, 3/16/2004 Transcript, @1247).

126.    Mr. Bouck testified that Cox American Car Care also d/b/a Southwest General Tire, had problems collecting from the corporate offices and put the account on delinquent status and future payment arrangements were on a C.O.D. basis.  (Vol. VI, 3/16/2004 Transcript, @1251).

127.    Golden submitted bills on a timely basis to the Joint Venture and bills were seldom paid on a timely basis.  (Vol. VI, 3/16/2004 Transcript, @1341-1342).

128.    Golden registered complaints about problems of payment to vendors to Tim, Robert and Martin Chavez.  (Vol. VI, 3/16/2004 Transcript, @1342).

## Uniforms

129.    Lorentzen did not hide his general concern about the uniforms, and purchased without his consent, and the fact that he was concerned about the logos on the uniforms.  (Vol. I, 11/12/03 Transcript, @127).

130.    Bronwyn Williams was present when Mr. Hunt ordered the uniforms be redone to appropriately reflect the PSI logo for them and Fast Park so the public would not be confused.  (Vol. I, 11/12/03 Transcript, @128) Ken Hunt, Exhibit FFFFFFFF.

131.    Bronwyn Williams believed that dress code is important.  (Vol. I, 11/12/03 Transcript, @138).

132.    Bronwyn Williams agreed that the uniforms were a priority and needed to be corrected.  (Vol. I, 11/12/03 Transcript, @139).

## Special Events

133.    Special events and the treatment of special events were not really covered in the Agreements.  See Exhibit 32 and 33. (Vol. II, 11/13/03 Transcript, @355).

17

134. PCA was aware of the fact that Golden was doing special events for Airport Shuttle/Special Events Parking because Golden advised him of that. (Vol. II, 3/10/04 Transcript, @257).

135. Lorentzen would define a special event as anything that is performed outside the scope of the airport parking. (Vol. III, 3/11/04 Transcript, @716).

136. Lorentzen wrote a letter January 31, 2001 with regard to special events and gave Robert Chavez as a representative of PCA regarding participation in special events and he would not respond to the letter. (Vol. III, 3/11/04 Transcript, @717-719; see Exhibit AA).

137. Lorentzen's reading of the contract for the Joint Venture special events were outside the scope of the Joint Venture. (Vol. III, 3/11/04 Transcript, @720; see Exhibit 33).

138. Clay Speakman worked at the Journal Pavillion, which is a music amphitheater (Vol. V, 3/15/2004 Transcript, @1059).

139. Clay met Golden and he was with him when they came up with the idea of him running the parking lot for the Journal Pavillion Center. (Vol. V, 3/15/2004 Transcript, @1060).

**Wes Golden**

140. Bronwyn Williams had respect for Golden in his capacity as a manager. (Vol. I, 11/12/03 Transcript, @136).

141. Robert Chavez never has written up Golden as an employee. (Vol. III, 11/14/03 Transcript, @7-8).

142.    The first two years of the Joint venture with Golden there was highly

profitable. (Vol. III, 11/14/03 Transcript, @8).

143.    Martin Chavez described Golden as a good employee and he never wrote

him or put him on probation even though he had terminated several managers in the past.

(Vol. I, 3/9/04 Transcript, @66-67).

144.    Martin Chavez testified that PCA never lost any vendors as a result of

Mr. Golden's actions. (Vol. I, 3/9/04 Transcript, @162-163).

145.    Golden stayed on the lot two weeks after he resigned, January 25, 2002

because there was no one present to operate the lots of the Joint Venture. (Vol. II,

3/10/04 Transcript, @307).

146.    Golden was still an employee of PCA after he tendered his resignation,

and he advised Toni Kennet of PCA about this. (Vol. II, 3/10/04 Transcript, @312 and

313).

147.    Golden had always signed contracts for PCA on their behalf and they

always honored these contracts and never raised an issue about them. (Vol. II, 3/10/04

Transcript, @327-328).

148.    Golden received normal pay raise in increments for pay and promotions.

(Vol. III, 3/11/04 Transcript, @478).

149.    Golden did register complaints about payments not being made on a

timely basis to vendors. (Vol. III, 3/11/04 Transcript, @478).

150.    Brad Stevenson told Golden to look over his shoulder, because someone

might be following him in a white van which was in essence his van. He testified that he

was trying to make Golden paranoid. (Vol. III, 3/11/04 Transcript, @606 and 609).

151.     Golden received normal pay increments, and was never suspended or disciplined. (Vol. VI, 3/16/2004 Transcript, @1323).

152.     Prior to the Joint Venture, Golden's relationship with Lorentzen was adversarial and Golden even called on various accounts that Lorentzen had as well. (Vol. VI, 3/16/2004 Transcript, @1324-1325).

153.     PCA often asked Golden to do training in other markets for PCA and he went to several cities to include Miami, Memphis, and Baltimore to do training. (Vol. VI, 3/16/2004 Transcript, @1327).

154.     Golden always provided Lorentzen with financial reports when he was a manager for PCA prior to the Joint Venture and corporate was aware that he was providing the financial reports to Mr. Lorentzen. (Vol. VI, 3/16/2004 Transcript, @1338-1339).

155.     Golden brought up the agreement with Airport Shuttle and did not feel it would be detrimental to PCA because in the past they had parked free. (Vol. VI, 3/16/2004 Transcript, @1359-1361).

156.     Golden resigned from PCA due to a conversation he had with Martin Chavez. (Vol. VI, 3/16/2004 Transcript, @1368).

157.     Lorentzen did not influence Golden of his decision to resign and it was his own decision based on what Martin Chavez had told him. (Vol. VI, 3/16/2004 Transcript, @1368-1369).

158.     Golden testified that Martin Chavez asked him to remove Lorentzen from his property for which he would be compensated and as a result of this conversation Golden resigned. (Vol. VI, 3/16/2004 Transcript, @1369-1370).

**Arbiter**

159.    Bronwyn Williams attended the meetings with the Arbiter where Lorentzen expressed his concern that the uniform did not display prominently the PSI on it nor did it have the appropriate colors (Vol. I, 11/12/03 Transcript, @127).

160.    Bronwyn Williams never had any issues with Lorentzen or Golden while she was managing. (Vol. I, 11/12/03 Transcript, @140).

161.    Ken Hunt was appointed arbiter during the proceeding to resolve the ongoing management issues that came up in the day-to-day operations of the business. (Vol. VI, 3/16/2004 Transcript, @1252).

162.    Mr. Hunt started his engagement late in May of 2002 and scheduled meetings once a month from June 2002 until early 2003 with occasional telephone conferences as well. (Vol. VI, 3/16/2004 Transcript, @1253-1254).

163.    The purpose of the first meeting was to establish a budget for the ongoing business so there would be a basis for the expenditure without having to go to PSI's representative and get consent on expenditures. (Vol. VI, 3/16/2004 Transcript, @1254).

164.    These meetings with the Arbiter typically were attended by counsel and at least one representative from PCA and typically Mr. Lorentzen and Mr. Golden. (Vol. VI, 3/16/2004 Transcript, @1258).

165.    There were five reports that Mr. Hunt said should be provided which financial reports included the following: 1) Profit and Lost Income Statement with notes to management, 2) wage reports, 3) daily operating reports, 4) average report/car days, and 5) car count analysis. (Vol. VI, 3/16/2004 Transcript, @1259-1260, Exhibit FFFFFFFF).

166.    Mr. Hunt found that the checks were not sent on a timely basis since they were supposed to be sent on the 20th day of each month to Lorentzen. (Vol. VI, 3/16/2004 Transcript, @1261).

167.    Premium Shopping Guide was an ongoing matter before Mr. Hunt and was used by both sides for advertising and he directed that the Premium Shopping Guide's payments be made by the Joint Venture. (Vol. VI, 3/16/2004 Transcript, @1262, Exhibit FFFFFFFF).

168.    Mr. Hunt directed the Joint Venture to continue paying legal expenses for the 2% suit on the commercial lane and other litigation that they had been involved in. (Vol. VI, 3/16/2004 Transcript, @1263, Exhibit FFFFFFFF).

169.    Ken Hunt testified that he does not remember Premium Shopping Guide being paid. (Vol. VI, 3/16/2004 Transcript, @1262, Exhibit FFFFFFFF).

170.    Ken Hunt stated that advertising was a reoccurring issue and he directed that Lorentzen participate in decisions involving advertising and discount coupons. (Vol. VI, 3/16/2004 Transcript, @1265-1266, Exhibit FFFFFFFF).

171.    Ken Hunt testified that insurance was a large issue and the money expended on insurance Mr. Hunt addressed. (Vol. VI, 3/16/2004 Transcript, @1267-1268, Exhibit FFFFFFFF).

172.    Uniforms were another issue that Mr. Hunt dealt with and there was some concerns about the colors and logos and he went on to recommend a neutral uniform. (Vol. VI, 3/16/2004 Transcript, @1269-1270, Exhibit FFFFFFFF).

173.    Lot maintenance was brought to the attention of Mr. Hunt several times to include the August 8, 2002 letter. (Vol. VI, 3/16/2004 Transcript, @1271, Exhibit FFFFFFFF).

174.    There was still a problem that Mr. Hunt noted in his letter of September 17, 2002 regarding PSI, and Lorentzen receiving the average report, car count, and other various reports that he previously ruled that they should received. (Vol. VI, 3/16/2004 Transcript, @1273-1274, Exhibit FFFFFFFF).

175.    Mr. Hunt wanted the sign at the Pit to be changed and reflect PSI and he observed, but he does not believe the sign was ever changed. (Vol. VI, 3/16/2004 Transcript, @1275-1276, Exhibit FFFFFFFF).

176.    There was a definitive issue brought before Mr. Hunt relative to Mr. Bundy receiving information on the insurance and the insurance issue was eventually withdrawn by PCA. (Vol. VI, 3/16/2004 Transcript, @1277-1289, Exhibit FFFFFFFF).

177.    As to the discount coupons, Mr. Hunt believed that Mr. Lorentzen and PSI should have a right to approve any of the form of the coupons. The second issue was what affect the coupons were having on the revenues, which was left to the Court to decide. (Vol. VI, 3/16/2004 Transcript, @1280-1281, Exhibit FFFFFFFF).

178.    Advertising was a constant issue before Mr. Hunt and his rulings were not any different that his earlier rulings that he wanted Mr. Lorentzen to have input and approve any advertising. (Vol. VI, 3/16/2004 Transcript, @1282-1283, Exhibit FFFFFFFF).

23

179.     The Scorpion Contract involved a contract that PCA signed that was not approved by Mr. Lorentzen, which violated Mr. Hunt's prior ruling on this. (Vol. VI, 3/16/2004 Transcript, @1287-1288, Exhibit FFFFFFFF).

180.     In the February 6, 2003 meeting, Mr. Hunt did determine from the profit and loss statements of the Joint Venture that there were four or five items on the profit and loss statements that were not Joint Venture expenses and should not be charged to Joint Venture. (Vol. VI, 3/16/2004 Transcript, @1289, Exhibit FFFFFFFF).

**Hyatt Regency Tamaya**

181.     Lorentzen did advise Robert Chavez that the Hyatt Regency Tamaya was not part of the Joint Venture. (Vol. II, 11/13/03 Transcript, @267).

182.     The first time PCA charged back the loss in the Hyatt Regency Tamaya was in the December 2001 statement to PSI. (Vol. I, 3/9/04 Transcript, @169-170).

183.     Mr. Losey admitted that he testified at his deposition that the Hyatt Regency Tamaya was not a part of the Joint Venture. (Vol. I, 3/9/04 Transcript, @170).

184.     Lorentzen tried to get involved in the Hyatt Regency Tamaya deal and in order to protect himself on the Hyatt Regency Tamaya when he saw the contract on Mr. Golden's desk he signed it and sent it back to Cincinnati to PCA. (Vol. IV, 3/12/04 Transcript, @751).

185.     In December 2001, Lorentzen had concerns about the Hyatt Regency Tamaya transaction and he was informed that he owed $43,000.00 in December even though he had not received any information about the Hyatt. (Vol. IV, 3/12/04 Transcript, @756).

186.    The Hyatt Regency Tamaya contract had nothing to do with the Joint Venture because it did not involve parking at the Albuquerque International Airport. (Vol. IV, 3/12/04 Transcript, @756).

187.    Lorentzen complained to Robert Chavez about the fact that PCA was taking $43,000.00 out of the monies that he was to receive in his accounting relative to the Hyatt Regency Tamaya contract. (Vol. IV, 3/12/04 Transcript, @757).

188.    Steve Dewire is the General Manager of the Hyatt Regency Tamaya and testified that he never received a fully executed contract relative to the valet parking to be done by PCA. (Vol. V, 3/15/2004 Transcript, @1071).

189.    The Hyatt was a 24-hour operation and ran separately for a separate accounting and financial reporting. (Vol. III, 11/14/03 Transcript, @11).

190.    The Hyatt contract was involved with Star Parking. (Vol. III, 11/14/03 Transcript, @36).

191.    Star Parking was involved with the Hyatt contract because it was a separate operation from the Airport Fast Park and PSI joint venture entity. (Vol. III, 11/14/03 Transcript, @36).

192.    Golden testified that Tim Chavez initially went into the Hyatt Regency Tamaya deal and Tim Chavez telling him that he does not need to be included. (Vol. VI, 3/16/2004 Transcript, @1382).

**Damages of the Plaintiffs**

193.    Robert Chavez did the calculation for Exhibit 271 which calculated for the benefit of the bargain for the remainder of the contract. (Vol. II, 11/13/03 Transcript, @282).

25

194.    Robert Chavez used 1998 financial figures in Exhibit 271. (Vol. II, 11/13/03 Transcript, @286-287).

195.    Robert Chavez remembers stating at his deposition which was taken on October 17, 2002 and December 17, 2002 that he was not prepared to answer any questions on damages. (Vol. III, 11/14/03 Transcript, @6).

196.    Martin Chavez did a damage computation based on a 9-1/2% capitalization rate for a stream of income and PSI and Lorentzen contests his damage calculations. (Vol. I, 3/9/04 Transcript, @35-37).

197.    In his calculations for damages, Martin Chavez did not do any future projections relative to income and did not look at the profits. (Vol. I, 3/9/04 Transcript, @60 and 62).

198.    Martin Chavez never read the Joint Venture Agreement or the Parking Management Agreement. (Vol. I, 3/9/04 Transcript, @64).

199.    Martin Chavez says his capitalization damages approach is used for business evaluations and real estate and he is not familiar with the norms of Albuquerque, New Mexico. (Vol. I, 3/9/04 Transcript, @97).

200.    Mr. Chavez did not use a growth rate or a small company risk premium in his calculations. (Vol. I, 3/9/04 Transcript, @98-99).

201.    Martin Chavez did no financial projections in his calculations. (Vol. I, 3/9/04 Transcript, @101).

202.    Martin Chavez used 1998 numbers instead of 1999 numbers which were available to him. (Vol. I, 3/9/04 Transcript, @101 and 102).

203. Carl Alongi stated that this Joint Venture is more akin to business than a real estate endeavor. (Vol. V, 3/15/2004 Transcript, @1180-1181)

204. The approach of the capitalization rate is more consistent with real estate and did not contain the components necessary to value a business under this approach. (Vol. V, 3/15/2004 Transcript, @1178).

205. Carl Alongi's testimony was that you should be looking at a cap rate of 20 percentile or higher in using the approach of Martin Chavez, in order to convert this to a stream of income into a value. (Vol. V, 3/15/2004 Transcript, @1179-1180).

206. According to Carl Along, this type of approach usually takes into account trend analysis and is weighted for the last year, which was not done in this particular methodology employed by Mr. Martin Chavez. (Vol. V, 3/15/2004 Transcript, @1181).

207. Mr. Alongi could not see the significance of using 1998 financial information a damage calculation and the more relevant data would be to use December 31, 1999 data. (Vol. V, 3/15/2004 Transcript, @1182).

208. In Mr. Alongi's opinion, the methodology employed to determine business damages used by Martin Chavez is not customarily used in his profession, and that is his professional opinion. (Vol. V, 3/15/2004 Transcript, @1183).

209. Mr. Alongi stated that Mr. Chavez and his methodology did not take into account any trend lines. He used a simple average which means he ignored trends. (Vol. V, 3/15/2004 Transcript, @1183).

210. Mr. Alongi felt that another flaw in the damage approach of Martin Chavez in his capitalization was that he ignored there was a downward trend in revenues. (Vol. V, 3/15/2004 Transcript, @1184).

27

211.    Carl Alongi reviewed Exhibit 271, the Expense Analysis approach of Robert Chavez and stated the methodology for this approach is missing a great deal. (Vol. V, 3/15/2004 Transcript, @1185-1186).

212.    Carl Alongi believes that Mr. Robert Chavez, in Exhibit 271, only considered expenses and did not take into account the revenue. (Vol. V, 3/15/2004 Transcript, @1186).

213.    Carl Along stated that the problem with Exhibit 271 is that the benchmark of 1998 is a period which is not immediately prior to the target period prior but was used for 1998 and further it ignores the budgetary process. (Vol. V, 3/15/2004 Transcript, @1186-1187).

214.    In Carl Alongi's opinion, the exercise used by Mr. Robert Chavez in Exhibit 271 is a limited exercise, is not conclusive or accurate and is missing the component of the income side. (Vol. V, 3/15/2004 Transcript, @1187)

215.    In Carl Alongi's opinion, there was no supporting data for the $10,000 extra per month due to activities described in the financial notes and you usually have more concrete underlying support for this type of adjustment. (Vol. V, 3/15/2004 Transcript, @1188).

216.    Carl Alongi believes that Exhibit 271 is speculative and is not related to the income associated with the expenses. (Vol. V, 3/15/2004 Transcript, @1188).

217.    Carl Along testified that the approach used by Robert Chavez in Exhibit 271 did not take into account traffic studies, account pricing, anticipated revenues, competition, additional security costs, inflation, and capital replacement requirements in splitting the lots. (Vol. V, 3/15/2004 Transcript, @1189).

218.     Carl Alongi acknowledged that the regular wages and the managers wages were reversed in his calculations; however, this did not affect the end results and would not change his opinion.  (Vol. V, 3/15/2004 Transcript, @1222-1227).

219.     Exhibit 271 was formulated by Robert Chavez one month prior to November 2003.  (Vol. VI, 3/16/2004 Transcript, @1306)

220.     Exhibit 271, is called Robert Chavez a Joint Venture Cost Savings Analysis.  (Vol. VI, 3/16/2004 Transcript, @1306).

221.     There was no revenue analysis in Exhibit 271 by the testimony of Mr. Chavez even though it involved a multi-million dollar company where revenues are always a concern.  (Vol. VI, 3/16/2004 Transcript, @1313).

222.     There was no projection of incomes done by Mr. Robert Chavez for Exhibit 271.  (Vol. VI, 3/16/2004 Transcript, @1314).

223.     Robert Chavez did not do any traffic studies, pricing studies, use anticipated revenues, and did not consider competition, inflation, security costs, or the effect of capital replacement requirements.  (Vol. VI, 3/16/2004 Transcript, @1315).

224.     Robert Chavez also did not consider what each lot would make when they were split.  (Vol. VI, 3/16/2004 Transcript, @1315).

225.     It is the goal of Airport Fast Park to be profitable entity and it was profitable before 2000.  (Vol. VI, 3/16/2004 Transcript, @1316).

**Rates**

226.     The discounted rate is a discount from the posted rate. (Vol. III, 11/14/03 Transcript, @7).

227.  Tim Chavez was aware of the posted rate being $6.00. (Vol. II, 3/10/04 Transcript, @442).

228.  Tim Chavez stated the coupon rate varied from the posted rate. (Vol. II. 3/10/04 Transcript, @444).

229.  Brad Stevenson stated that the posted rate is the rate of the parking lot at that given time and the posted rate for the Joint Venture parking lots was $6.00 per day. (Vol. III, 3/11/04 Transcript; @538).

230.  The airport parking facility charges rates of $8.00 and $10.00 per day for parking which are its posted rate. (Vol. III, 3/11/04 Transcript, @545; see also Exhibit 122-D).

231.  Brad Stevenson testified that he never advertised or been allowed to put the price up on signs of the parking lots; yet Exhibit 122-O is a photograph that he did put parking rates for the parking lot on a sign. (Vol. III, 3/11/04 Transcript, @560, see Exhibit 122-O).

232.  Brad Stevenson stated that he did not consult with Lorentzen relative to posting the rates. (Vol. III, 3/11/04 Transcript, @560-561).

233.  Brad Stevenson said at the beginning when he first came to the Joint Venture that 50-55% of the customers would pay the posted rate of $6.00. A coupon that says you can park for $4.00 when the posted rate is $6.00 constitutes a change from the posted rate. (Vol. III, 3/11/04 Transcript, @566).

234.  Brad Stevenson never consulted with Lorentzen as an owner or manager of the Joint Venture in order to secure his permission to put out certain coupons with discounts to the customer. (Vol. III, 3/11/04 Transcript, @567).

235.    The deposition testimony from his deposition of December 18, 2002 was read into the record in which Mr. Stevenson stated that 2% of all customers of the parking lot paid the posted rate. (Vol. III, 3/11/04 Transcript, @568 and 569)

236.    Exhibit IIIIIII is admitted which was a memo where Lorentzen was protesting the coupons.   See Exhibit IIIIII. (Vol. III, 3/11/04 Transcript, @607 and 608).

237.    Ralph Pena was marketing manager hired by Brad Stevenson for PCA and part of his position was generating new business. (Vol. III, 3/11/04 Transcript, @609).

238.    Ralph Pena went out and tried to get Sandia National Labs customers to pay $3.00 when they already had a contract to pay $3.50. (Vol. III, 3/11/04 Transcript, @610).

239.    An example of a discount coupon used by PCA is contained in WWWWWWW which only contained Airport Fast Park's name and not PCA is a discount coupon. See Exhibit WWWWWWW. (Vol. III, 3/11/04 Transcript, @612).

240.    Brad Stevenson stated that the discount rate is a price negotiated off of posted rate and a coupon rate is the same as the discount rate. (Vol. III, 3/11/04 Transcript, @627).

241.    PSI charged lower fees than the Albuquerque Sunport parking facility, but higher than off-airport parking lots because of the proximity and the service that was provided by PSI. (Vol. III, 3/11/04 Transcript, @707).

**Premium Shopping Guide**

242.    The Joint Venture reviewed the Premium Shopping Guide contract and decided they were not going to pay it. (Vol. III, 11/14/03 Transcript, @32).

243.    Toni Kennet was aware of the fact that Premium Shopping Guide was a benefit to the Joint Venture and is aware of the fact the Arbiter in the case wanted to maintain the status quo with regard to Premium Shopping Guide. (Vol. III, 11/14/03 Transcript, @40).

244.    Toni Kennet knew that the Arbiter had said that they had to make the payments on the Premium Shopping Guide. After Golden resigned she elected not to pay Premium Shopping Guide. (Vol. III, 11/14/03 Transcript, @40 and 42).

245.    CPAPA paid Premium Shopping Guide in the years 2000 and 2001. (Vol. I, 3/9/04 Transcript, @167).

246.    Premium Shopping Guide does a mailing to over 200,000 people to different areas. (Vol. IV, 3/12/04 Transcript, @776).

247.    Lorentzen had an exclusive account with Premium Shopping Guide which he had had for 7 or 8 years. (Vol. IV, 3/12/04 Transcript, @776 and 777).

248.    Premium Shopping Guide sued Lorentzen and got a judgment of $43,000.00 against him and PSI. (Vol. IV, 3/12/04 Transcript, @777).

249.    Lorentzen relied on the Joint Venture to make the payments to Premium Shopping Guide. (Vol. IV, 3/12/04 Transcript, @777).

250.    The Joint Venture realized the benefits of Premium Shopping Guide and continued to receive these benefits. (Vol. IV, 3/12/04 Transcript, @778).

251.    Exhibit EEEEEEEE is admitted which is the Amended Complaint from Sunquest against Lorentzen and PSI. (Vol. IV, 3/12/04 Transcript, @830).

252.    The Court ruled it won't adjudicate the Sunquest matter since it is in the New Mexico State District Court and this is a separate lawsuit. (Vol. IV, 3/12/04 Transcript, @871).

253.    Miriam Gagne testified that Premium Shopping Guide is a publication that is about 42 pages and it goes out to about 210,000 homes every six months. (Vol. V, 3/15/2004 Transcript, @1085).

254.    Premium Shopping Guide does charge a higher rate for the right to have exclusivity and PSI had an exclusive arrangement with Premium Shopping Guide. (Vol. V, 3/15/2004 Transcript, @1084).

255.    PSI's records for payment with Premium Shopping Guide between 1997 and 2000 were very good. (Vol. V, 3/15/2004 Transcript, @1088).

256.    Miriam Gagne had a right on behalf of Premium Shopping Guide to write a collection letter on this delinquent account. (Vol. V, 3/15/2004 Transcript, @1092; see Exhibit UUUUUU).

257.    Miriam Gagne was made various promises from Mr. Chavez relative to the account and he represented that he knew the money was owed and he would get a check in the mail. (Vol. V, 3/15/2004 Transcript, @1095).

258.    Miriam Gagne testified their representative from PCA contacted her in order to try and get the Premium Shopping Account for PCA. (Vol. V, 3/15/2004 Transcript, @1095).

259.    Golden thought the Premium Shopping Guide offered an advantage to the Joint Venture in that they had an exclusive contract with them and Wes had been trying to get them for two years. (Vol. VI, 3/16/2004 Transcript, @1387).

**Insurance**

260.    Brenda Edmonds is the insurance coordinator for PCA. (Vol. III, 11/14/03 Transcript, @44).

261.    Brenda Edmonds was told to review and consider Gail Bundy's proposal for insurance. (Vol. III, 11/14/03 Transcript, @59).

262.    Brenda Edmonds was not licensed nor has she ever sold insurance. (Vol. III, 11/14/03 Transcript, @69-70).

263.    Brenda Edmonds was aware that Mr. Lorentzen was concerned about the cost of insurance and wanted to get bids and estimates. (Vol. III, 11/14/03 Transcript, @70).

264.    Brenda Edmonds read the Joint Venture contract and was aware of the fact that the $20,000,000 umbrella was not required. (Vol. III, 11/14/03 Transcript, @70-71).

265.    There was nothing in the Joint Venture Agreement that required garage keeper insurance. Brenda Edmonds was aware that Gail Bundy was trying to get cheaper insurance. (Vol. III, 11/14/03 Transcript, @74).

266.    Brenda Edmonds believes that it would have been helpful for Mr. Bundy to see the various policies and cover sheets in order to assess the coverage for the parking lots in order to evaluate the insurance. (Vol. III, 11/14/03 Transcript, @75-76).

267.    Lorentzen believed that the Joint Venture was paying too much for insurance and providing insurance coverage not necessary. (Vol. IV, 3/12/04 Transcript, @804).

268.    Gail Bundy has been a licensed insurance agent for 40 years in all areas and has been an expert in the field of insurance and was qualified as an expert. (Vol. V. 3/15/2004 Transcript, @1103 and 1109).

269.    Gail Bundy makes recommendations as to the needs and usage of particular insurance for customers as well as determines what coverage they should have. (Vol. V, 3/15/2004 Transcript, @1110-1111).

270.    Gail Bundy is familiar with the business known as PSI and has been involved in procuring insurance for PSI during the earlier 90's. (Vol. V, 3/15/2004 Transcript, @1112-1113).

271.    The Court received Gail Bundy as an expert as it relates to insurance. (Vol. V, 3/15/2004 Transcript, @1115).

272.    Gail Bundy provided insurance for the Joint Venture for one year to include premise liability, automobile liability, property liability on buildings, workers' compensation and an umbrella policy and he had trouble getting paid for the insurance from the Joint Venture. (Vol. V, 3/15/2004 Transcript, @1116-1117).

273.    Gail Bundy was looking into competitive insurance to reduce the overhead of the Joint Venture and requested information from Brenda Evans of PCA and had difficulty getting the information. (Vol. V, 3/15/2004 Transcript, @1118 – 1119).

274.    Garage liability is appropriate for a firm that drives automobiles as part of their job such as auto sales and auto repair businesses and in this particular case Gail Bundy did not believe that garage liability was necessary insurance coverage for the Joint Venture. (Vol. V, 3/15/2004 Transcript, @1122).

275.    Gail Bundy never received the declaration sheets or cover sheets that he requested from Brenda Edmonds of PCA. (Vol. V, 3/15/2004 Transcript, @1123).

276.    Gail Bundy believed in his professional opinion that a $20 million umbrella policy was high and that only $5 million umbrella coverage was needed for the Joint Venture. (Vol. V, 3/15/2004 Transcript, @1127-1128).

277.    Gail Bundy testified that the difference he could have saved in insurance was $23,000 a year for three years, totaling $69,000, which constituted damages to PSI and Lorentzen. (Vol. V, 3/15/2004 Transcript, @1129).

278.    Gail Bundy felt that the garage liability insurance was not necessary and the payment for this was $5,800 for three years which was an unnecessary expense of $17,400, which constituted damages to PSI and Lorentzen. (Vol. V, 3/15/2004 Transcript, @1131).

**Damages of the Defendants**

279.    Mr. Losey admitted that PCA was late in payments to vendors and he was late in paying Lorentzen his distribution from the Joint Venture profits. (Vol. I, 3/9/04 Transcript, @164).

280.    Dale Losey was aware that the Parking Management Agreement provided for a budget and he never did prepare a budget. (Vol. I, 3/9/04 Transcript, @176; see Exhibit 33).

**Discount Coupons**

281.    Juan Rodriguez testified that he remembers that coupons were being passed out and that Lorentzen objected to them being passed out. (Vol. II, 3/10/04 Transcript, @348).

282.    Tim Chavez admitted that Airport Shuttle is where customers are brought to the airport, and the fact that Airport Shuttle picks up individuals and bring them to the airport similar to a taxi service. (Vol. III, 3/11/04 Transcript, @493 and 494).

**Commercial Lane**

283.    Lorentzen signed the Commercial Lane Agreement under protest and this was admitted as Exhibit A. (Vol. III, 3/11/04 Transcript, @693 and Exhibit A).

284.    PSI agreed to escrow the 2% fee for the commercial lane with the City of Albuquerque until the Court made a determination. (Vol. III, 3/11/04 Transcript, @694).

285.    The 2% lawsuit would benefit all of the commercial lane users and PCA agreed to pay for it. (Vol. III, 3/11/04 Transcript, @694).

286.    The Joint Venture did not pay for the Commercial Lane fee that was escrowed for the 2% in March 2000 and subsequently a demand letter was sent out for this. (Vol. III, 3/11/04 Transcript, @696; see Exhibit F).

287.    Prior to the demand letter, the Joint Venture through PCA was escrowing the 2% protested fee for the commercial lane. (Vol. III, 3/11/04 Transcript, @696).

288.    The present status of this 2% commercial lane case is that it is on a Writ of Certiorari to the New Mexico Supreme Court on all issues. See Exhibit 505. (Vol. III, 3/11/04 Transcript, @699).

289.    Robert Chavez on behalf of PCA agreed to pay for the commercial lane lawsuit. (Vol. III, 3/11/04 Transcript, @700).

290.    The Arbiter stated that the fees for the 2% lawsuit should be paid by PCA in behalf of the Joint Venture. (Vol. III, 3/11/04 Transcript, @701).

**Advertising**

37

291.    Lorentzen was concerned the different vendors including Yellow Pages Qwest Dex were not getting paid in a timely manner and it was effecting his credit. (Vol. IV, 3/12/04 Transcript, @816).

292.    Lorentzen had concerns about the advertising and the fact that a dozen different advertising meetings were used at the expense of the Joint Venture showing Fast Park as the advertiser. (Vol. IV, 3/12/04 Transcript, @828).

293.    Lorentzen never approved any advertising even though he requested a chance to approve the advertising. (Vol. IV, 3/12/04 Transcript, @828).

294.    Lorentzen had concerns over the Pit Sign, University Arena, and the fact that it did not have PSI on the sign when they were paying over $10,000.00 a year for this. (Vol. IV, 3/12/04 Transcript, @830).

295.    The coupons were an ongoing problem because he never had input into any coupon. (Vol. IV, 3/12/04 Transcript, @831).

296.    Lorentzen advised Brad Stevenson to not hand out various coupons but he continued to do this which included a VIP service coupon. (Vol. IV, 3/12/04 Transcript, @867).

**Damages of PSI and Lorentzen**

297.    The claim for the $10,000.00 theft from a PCA employee was never settled. (Vol. III, 11/14/03 Transcript, @92).

298.    Brenda Harman was terminated for theft. (Vol. III, 11/14/03 Transcript, @34).

299.    The Joint Venture has not paid all of the fees for the commercial lane and Lorentzen has paid over $20,000.00 on his own, which constitutes damages.  (Vol. III, 3/11/04 Transcript, @701 and 702).

300.    Lorentzen testified that he never discussed the Scorpion contract with PCA, never reviewed or received the contract and believes it was an expense of about $11,000.00 which he testified he were damages.  (Vol. IV, 3/12/04 Transcript, @837 and 838).

301.    Lorentzen testified that there were unauthorized expenses by the Joint Venture for 2002 by Lorentzen total $56,126.00. (Vol. IV, 3/12/04 Transcript, @879).

302.    The Hyatt deduction was $20,097.00 in 2002 and $14,248.00 in 2001. (Vol. IV, 3/12/2004 Transcript, @882).

303.    The Scorpions contract losses to the Joint Venture were as computed by Lorentzen 43% of $11,000.00 or $4,891.00. (Vol. IV, 3/12/2004 Transcript, @883).

304.    Lorentzen testified that disparity in treatment of the vans by PCA over PSI was $4,891.00 in 2002 and $9,854.00 in 2003, which constituted damages to PSI and Lorentzen. (Vol. IV, 3/12/2004 Transcript, @883)

305.    Damage for the Pit sign for payments that were made with no benefits to PSI and led to damages of $12,900.00 to PSI and Lorentzen. (Vol. IV, 3/12/2004 Transcript, @883).

306.    Lorentzen testified to damages for out-of-pocket expenses to PSI of $3,475.00 and a plumbing bill it had to pay in the sum of $2,366.00 for the Joint Venture and was not reimbursed damages. (Vol. IV, 3/12/2004 Transcript, @884-885).

39

307.    Lorentzen testified that there was a theft of money under the control of the Joint Venture which led to a loss of $10,000.00 and damages to PSI of $4,300.00. (Vol. IV, 3/12/2004 Transcript, @885).

308.    Lorentzen testified that recoupment for PSI to get the rate loss caused by PCA to an average rate was $4.29 per car per day would take 18 months and this would result in damages to PSI in the sum of $325,000.00. (Vol. IV, 3/12/2004 Transcript, @885).

309.    Lorentzen testified that PSI's attorney's fees in this case are approximately $190,000.00, fees for Ken Hunt are $5,590.00, court reporters cost are $7,857.00 and Carl Alongi is owed $35,000.00, all of which constitutes damages to PSI and Lorentzen. (Vol. IV, 3/12/2004 Transcript, @891-892).

310.    There was a stipulation that Carl Alongi was received as an expert. (Vol. V, 3/15/2004 Transcript, @1144-1145).

311.    Carl Alongi reviewed the Joint Venture Agreement, the Management Agreement, and the financial data from January 2000 through August 2003 for PCA, and the traffic data. (Vol. V, 3/15/2004 Transcript, @1146).

312.    Carl Alongi submitted a Second Supplemental Report dated August 2003, which in his report contains his opinion in this case to include damages. (See Exhibit AAAAAAAA).

313.    The Parking Management Agreement required the manager to produce a budget for the second year of commencement of the Joint Venture, which was 2000. Since there was no budget produced, the agreement stated there would be an implied

40

budget would be based on the first initial year of the joint venture. (Vol. V, 3/15/2004 Transcript, @1151; see Exhibit 33).

314.     The totals for expenses for PCA for 2000, 2001, 2002 were not under budget. (Vol. V, 3/15/2004 Transcript, @1152).

315.     Carl Alongi testified that deplaning of passengers was similar for the years of the Joint Venture and from a financial point of view there should have been an increase in revenues in the Joint Venture. (Vol. V, 3/15/2004 Transcript, @1162).

316.     Carl Alongi testified that the expenses of the Joint Venture were not managed according to the budgetary process and the revenues continued to go down there was not a reactive adjustment to the operating expenses to be in line with a decrease in revenues. (Vol. V, 3/15/2004 Transcript, @1164).

317.     Carl Alongi's professional opinion as a result of Exhibit AAAAAAAA and the various studies was that PSI and Lorentzen were damaged in the sum of $534,666.00 from the start of the Joint Venture until August 2002 by virtue of the actions of PCA and CPAPA. (Vol. V, 3/15/2004 Transcript, @1171).

318.     Carl Alongi did review the graphs of Golden which depicted graphically the raw data of the financial information and the graphs show there was a decrease in revenue for the four years and this information was in line with his opinion of damages. (Vol. V, 3/15/2004 Transcript, @1172-1175).

319.     In Carl Alongi's professional opinion, the damages he testified to are accepted under generally accepted accounting principles and were consistent with his review of the Joint Venture and Parking Management Agreement. (Vol. V, 3/15/2004 Transcript, @176).

320.    Carl Alongi reviewed Martin Chavez's testimony as to damages for the benefit of the bargain and is familiar with the capitalizations concept or approach he used.  (Vol. V, 3/15/2004 Transcript, @1176).

321.    Carl Alongi stated that the only recognized accepted accounting approach for acquiring a business was not properly used because it took into account six years in the future and this approach is generally for perpetuity.  (Vol. V, 3/15/2004 Transcript, @1177)

322.    Carl Alongi defined a budget under generally accepted accounting principles is based on a line item of income and expense items.  (Vol. V, 3/15/2004 Transcript, @1233).

323.    Golden did graphs of the actual financial historical aspects of the Joint Venture for the year 2000, see Exhibit Q, 2001, see Exhibit EE, and 2002 see Exhibit MMMMMM, and 2003 Exhibit YYYYYYY.  Golden included that the revenue loss over the four years from the graphs was approximately $543,000.00.  (See Exhibits Q, EE, MMMMMM, and YYYYYYY).

324.    Wes observed from the graphs that he did that the expenses were extremely high and the profits were continually going down.  (Vol. VI, 3/16/2004 Transcript, @1401).

325.    Golden looked at the Scorpion contract and evaluated it and in his opinion after analyzing it that there was a loss of $11,376.00 to the Joint Venture.  (Vol. VI, 3/16/2004 Transcript, @1405, Exhibit XXXXXXXX).

326.    Lois Lorentzen was constantly concerned and working at the premises about the bad credit report that her credit report would be affect with everything that was taking place.  (Vol. VI, 3/16/2004 Transcript, @1448).

327.    Lois Lorentzen was concerned about the decline of funds that PSI received from the Joint Venture which are as follows:  $408,000.00 in 2000, $324,000.00 in 2001, $239,000.00 in 2002 and $50,000.00 in 2003.  (Vol. VI, 3/16/2004 Transcript, @1453).

## CONCLUSIONS OF LAW

### General

1.    The Findings of Fact are adopted as part of the Conclusions of Law.

2.    The Court has jurisdiction over the subject matter and the parties to this cause of action.

3.    By Stipulation of the Parties entered into on November 10, 2003 as and between parties, the relationship between CPAPA, PSI and PCA was terminated effective December 1, 2003 and the lots were divided. (Stipulation of the parties on November 10, 2003).

4.    By Stipulation of the Parties entered into on November 10, 2003 all disputes regarding damages were heard in a bench trial and the Plaintiffs were entitled to present a claim for their alleged loss of benefit of the bargain.

5.    Lorentzen on December 29, 2001, on behalf of P&S, wrote a letter outlining problems which, under paragraph 17 of the Parking Management Agreement, would result in termination of the contract if not cured (Exhibit AAA).

6.    The litigation commenced by Plaintiffs on February 8, 2002, was inappropriate, and while they made a prima facie case at the time that they were entitled to a Temporary Restraining Order and to the status quo under which they operated the Joint Venture for another 18 months, Plaintiffs have failed to prove their claims or justify any grant of relief from the termination of the contract for cause on January 25, 2002.

7.    This action was initiated in February 8, 2002 with the filing of a request for Preliminary Injunction by the Plaintiffs herein, which was denied.

44

8.    Plaintiffs received a Temporary Restraining Order which was subsequently dissolved by the Court, and Defendants prevailed on this issue.

9.    On most of the motions that have been filed by the Plaintiffs herein, with the exception of a Motion for Summary Judgment, Defendants have prevailed (Court file).

10.    The drafter of the contracts was engaged by PCA as its attorney and therefore all matters in the contract should be construed against PCA and CPAPA as author of the contract. Knowles v. Unites Services Automobile ass'n., 113 N.M. 703,705,832 P.2d 394,396 (1992).

11.    Plaintiffs' attempt to get a Temporary Restraining Order against the Defendants was for an improper motive in that it was calculated to remove Lorentzen from his property.

12.    The Hyatt contract was not a joint venture expense and should not have been charged to PSI, as it was outside the scope of the Joint Venture Agreement. (See Joint Venture Agreement, Exhibit 32)

**_Joint Venture Agreement and Parking Management Agreement_**

13.    The parties entered into a written Joint Venture Agreement, backdated to January 1, 2000, fourteen (14) months after commencing business as a Joint Venture.

14.    The purpose of the Joint Venture Agreement was to conduct commercial parking and shuttle airline passengers between the airport and the Joint Venture property for profit, for any lawful purposes incident to such operations. See Exhibit 32, paragraph 1.02.

15.     The purpose of the Joint Venture Agreement was to increase profits on commercial business generated by public airport facilities in Albuquerque, New Mexico (See Exhibit 32).

16.     There were three managers for the Joint Venture, namely John Lorentzen, Robert Chavez and Manuel Chavez, and further decisions not contained in the parking manager's section of the Agreement were to be made by unanimous agreement of the Joint Venture managers (See Exhibit 32).

17.     Unanimous agreement of managers was required for all matters relating but not delegated to the parking manager, included but not limited to such matters as approval of the budget and approval of changes in the parking rates (See Exhibit 32).

18.     Simultaneously with the execution of the Joint Venture Agreement, the partners to the Joint Venture also executed a Parking Management Agreement which hired PCA to manage the parking lots of the Joint Venture for compensation. (See Exhibit 33).

19.     PCA violated the Parking Management Agreement by not operating the Joint Venture in the best interest of the Joint Venture partners under its fiduciary relationship to PSI and Lorentzen.

20.     The parties stipulated the Parking Management Agreement that PCA would operate the lots, pay expenses, collect all revenue, provide factual reports, make monthly reports and profit distributions to the JV partners, and that PCA's duties were contained entirely in the Parking Management Agreement which recognizes a fiduciary relationship. (See Pretrial Order, Stipulated Factual Contentions, page 5.)

46

21.    The Parking Management Agreement also provided that on the first anniversary of this Agreement, and on or before January 1 thereafter during the term of the Management Agreement, the Manager was to prepare and submit to the owners an annual budget for the next calendar year (See Exhibit 32).

22.    The Parking Management Agreement reflected that the total expenditures of a proposed budget may not vary more than ten percent (10%) per year without written approval of the owners (See Exhibit 33).

23.    The Parking Management Agreement provided that if the owners failed to approve a proposed budget for any year during the term of the budget for any year, the default budget would be the prior year's budget increased by a factor of three percent (3%), or the one-year increase in the Consumer Price Index, whichever was greater (Exhibit 33).

24.    The contract between the parties required a budget, and Lorentzen requested a budget which was never provided by PCA.  (Exhibit 32)

25.    The Parking Management Agreement required PCA to consult the owners before making any change to the posted parking rates, so that a posted rate change would have the consent of the owners, but this was not done by PCA, which constituted a violation of its fiduciary obligation to PSI and Lorentzen.  (See Parking Management Agreement, Exhibit 33).

26.    The contract was drafted by Plaintiffs, who were therefore aware of its provisions and the consequences of failure to respond to the December 29, 2001, demand. Rummer v. St. Paul Surplus Lines Ins. Co., 1997 NMSC 42, P.2d, 123 N.M. 767, 945 P.2d 985.

27.     Lorentzen on behalf of P&S properly terminated the PMA on January 25, 2002, in a letter outlining the failures of PCA under the contract (See Exhibit 35).

28.     Pursuant to paragraph 13 of the Parking Management Agreement, PSI and Lorentzen are entitled to attorney's fees and costs relative to this cause of action. (See Parking Manage Agreement, Exhibit 33).


**Fiduciary Duty**

29.     PCA unilaterally and in violation of its fiduciary obligation under the Agreement did not present a budget for approval and did not allow John Lorentzen to approve changes in the parking rates and discount rates.

30.     CPAPA and PCA had a fiduciary relationship with PSI and Lorentzen.

31.     CPAPA had a fiduciary duty to PSI in the Joint Venture as though they were partners.

32.     CPAPA abandoned its fiduciary duties to PSI early and prematurely and always acted as the alter ego of PCA and supported PCA fully in any disputes with PSI.

33.     PSI routinely had trouble in getting timely payments, operating reports, and payment of its' vendors.

34.     The defection of CPAPA from the Joint Venture in favor of total alliance with PCA was so blatant that throughout the conduct of this case, PCA and CPAPA shared legal counsel, filed joint pleadings and took the same legal positions.

35.     CPAPA never filed a single independent pleading in this case and never objected at any time to the mismanagement or poor performance of PCA in failing to pay Joint Venture vendors needed by the Joint Venture.

36. . PCA is the operating company that operates all of Chavez Properties' investments and Chavez Properties is merely an investment arm that owns all these properties, which proves the fact that the entities are clearly related. (Testimony of Martin Chavez, Vol. I, March 9, 2004 at page 17)

37. In accordance with the terms of the Joint Venture Agreement the Joint Venture partners entered into a Parking Management Agreement with PCA to manage the combined properties for the benefit of the Joint Venture partners, which is a fiduciary relationship. (See Pretrial Order, Stipulated Factual Contentions, page 5.)

38: CPAPA and PCA have commonality of ownership and are in very close relationship; they share offices, and principals in both businesses are blood relations. (See Vol. 1 Transcript, 3/9/04, at page 17).

39. Plaintiffs entirely failed to respond or cure any default items contained in the default letter sent by PSI through Lorentzen on December 29, 2001.

40: Plaintiffs systematically refused to account for revenue and expenses, distorting the financial allocations of the Joint Venture in favor of CPAPA over P&S, making untimely and insufficient remittance of earnings, and failing to pay creditors who then looked to Defendants for payment, which constituted a breach of their fiduciary obligations. Anderson v. Dairlyland Ins. Co., 97 N.M. 155, 637 P.2d 837 (1981)

41. Plaintiff PCA mismanaged the Joint Venture, and some of its acts were deliberate and done with intent to harm Defendants, which constituted a breach of fiduciary duty. Dun & Bradstreet Software Serves Inc., v. Grace Consulting, Inc., 307 F3.d 197 (3d Cir. 2002).

42. The partners have a fiduciary duty towards one another.

43. A fiduciary duty extends to partners in a joint venture.

44. Plaintiffs' waste and mismanagement claims are breaches of fiduciary duty and are part of the accounting analysis which is an equitable claim where the Court has wide latitude to grant relief.

45. *Ken Hunt in his capacity as Arbiter made certain rulings to maintain the status quo, and many of these rulings were not followed by PCA and CPAPA*, which constituted a direct breach of fiduciary duty and breach of the orders of the Arbiter. (Exhibit FFFFFFFF).

46. PCA through the use of its marketing representative Mr. Pena tried to undercut an existing contract with Sandia Corporation at $3.50 an hour, with a PCA contract at $3.00 an hour, which is a breach of fiduciary duty and was not in the best interest and welfare of the Joint Venture.

47. Established New Mexico law is that claims for breach of fiduciary duty, fraud, and constructive trust are adjudicated within claims for accounting and dissolution. Fate v. Owens, 2001 NMCA 40, P2-3, 130 N.M. 503, 504, 27 P.3d 990, 991 (2001).

48. The relationship of a partner to the partnership and to the other partners is a fiduciary relationship. GCM, Inc. v. Kentucky Central Life Ins. Co., 1997 NMSC 52. P21, 124 N.M. 186, 947 P.2d 143.

49. As fiduciaries, partners are required to deal with each other openly, fairly and honestly. C. B. & T Co. v. Hefner, 98 N.M. 594, 601, 651 P.2d 1029, 1036 (Ct. App. 1982).

50.     When an action concerns a partner's grievance resulting from an internal dispute with other partners or the partnership, the traditional remedy is an accounting. Fate v. Owens, 2001 NMCA 40, P16, 130 N.M. 503, 509, 27 P.3d 990, 996.

51.     A partner, as a fiduciary, is required to fully disclose material facts and information relating to partnership affairs to the other partners, even if the other partners have not asked for the information.   Rogers v. Stacy, 63 N.M. 317, 319, 318 P.2d 1116, 1117 (1957).

52.     As a result of PCA's action, PCA and CPAPA have damaged PSI and Lorentzen, as stated in the damages section of the brief.

53.     The acts of CPAPA and PCA which constituted a breach of their fiduciary duty include the following: (a) failure to disclose financial information; (b) failure to manage the Joint Venture properly; (c) failure to pay PSI and vendors timely; (d) misallocation of funds; (e) failure to address excessive expense issues; (f) favoritism of CPAPA over PSI in advertising and van maintenance; (g) prejudicial and selective non-payment of vendors so as to interfere with good financial relations brought to the Joint Venture by Lorentzen and PSI and harm to the credit reputations of Lorentzen and PSI; (h) changing parking rates without the consent of Lorentzen; and (i) failure to follow the terms of stipulations and the directions of the court-approved arbiter.

**Accounting**

54.     A claim for an accounting encompasses enforcement of rights and obligations between the partners.  2 Alan R. Bromberg & Larry E. Ribstein, Partnership

§ 6:169 (2000), cited in <u>Fate v. Owens</u>, 2001 NMCA 40, P16, 130 N.M. 503, 509, 27 P.3d 990, 996.

55.     A claim for accounting of a partnership may be brought by a partner as either a direct claim or a partnership claim.  4 Alan R. Bromberg & Larry E. Ribstein, Partnership § 15.04(f) and 15.39 (2000), cited in <u>Fate v. Owens</u>, 2001 NMCA 40, P25, 130 N.M. 503, 511, 27 P.3d 990, 998.

56.     An action for an accounting is not an action at law, but an action in equity.  <u>Levy v. Disharoon</u>, 106 N.M. 699, 704, 749 P.2d 84, 89 (1988).

57.     Under New Mexico law, the traditional remedy for a breach of the fiduciary duty of good faith, which includes disclosure, is an action for an accounting or for dissolution or both.  <u>GCM, Inc. v. Kentucky Central Life Ins. Co.</u>, 1997 NMSC 52, P21, 124 N.M. 186, 947 P.2d 143; <u>Levy v. Disharoon</u>, 106 N.M. 699, 702-04, 749 P.2d 84, 87-89 (1988).


**Golden**

58.     The PCA claims against Golden should be dismissed as unproven because there was no showing of liability or damages.

59.     Plaintiffs did not prove civil conspiracy against Golden and failed to establish the elements of a conspiracy, which requires two or more individuals working toward a common improper purpose.  <u>Las Luminarias of the New Mexico Council of the Blind v. Isengard</u>, 92 N.M. 297, 587 P.2d 444 (Ct. App 1978).

60.    Specific wrongful acts were carried out by the Plaintiffs pursuant to a conspiracy and the Defendants were damaged as a result of such acts. Etteson v. Burke, 130 NM 67, 17 P.3d 440 (Ct. App 2001).

**Defendants' Damages**

61.    Plaintiffs must disgorge any profits earned and pay restitution for any losses to Defendants resulting from (a) their mismanagement of the Joint Venture set out in the demand letter of December 29, 2001, (b) their mismanagement of the Joint Venture under the PMA between December 29, 2001, and February 8, 2002; and (c) their management or mismanagement of the Joint Venture under Court supervision from February 8, 2002, until dissolution of the Joint Venture on November 30, 2003 which constitutes damages in an amount in excess of $1,300,000.00, as proven at trial.

62.    The actions of the Plaintiffs PCA and CPAPA constituted tortious interference with beneficial business relationships with PSI vendors and customer. such that Defendants have been damaged. Quintana v. First Interstate Bank, 105 N.M. 784, 737 P2d 896 (Ct. App 1987).

63.    The actions of the Plaintiffs PCA and CPAPA have damaged the credit reputation of P&S and Lorentzen.

64.    Defendants should be awarded damages based on the testimony and reports of Carl Alongi, who was received as an expert in this proceeding. (Exhibit AAAAAAAA).

65.    Defendants should be awarded future damages of $350,000, as proven at trial, as a result of the Plaintiffs' actions, based on the testimony of Lorentzen and

corroborated by other witnesses, that it will take 18 months to restore P&S to economic

health after the damage done to it by Plaintiffs (Exhibit 508).

66.    The Plaintiffs' actions towards PSI and Lorentzen were willful, wanton

and reckless, such that the Defendants should receive punitive damages. <u>Aken v. Plains</u>

<u>Electric</u>, 2002 NMSC 21, 132 N.M. 401, 49 P.3d 662.

67.    The Defendants should be awarded attorney's fees and costs, having

prevailed in almost all of the Pretrial Motions, and attorney's fees for the case in chief.

68.    PCA tortiously interfered with the clients and vendors of PSI and

Lorentzen at Premium Shopping Guide and other vendors, and nonpayment of that bill in

the name of PSI is to be deemed tortuous interference. <u>M&M Rental Tools, Inc. v.</u>

<u>Milchem, Inc.</u>, 94 N.M. 449,612 P2d 241 (Ct. App. 1980).

69.    PCA contacting various travel agents to include Joyce Qualls, Classic

Travel and other agencies to try and secure their accounts, which was tortious

interference of exploiting relations of PSI.

70.    The elements of tortious interference of the business relationship include

interference with a perspective contractual relationship requires an intentional and

improper appearance. <u>Anderson v. Dairyland Insurance Company</u>, 97 NM 155, 637 P.2d

837 (1981).

71.    PSI and Lorentzen are seeking the following damages:

    a.   Damages as stated in the Carl Alongi report in the amount of $534,665.91

         (Exhibit AAAAAAAA).

    b.   Damages testified to by Gail Bundy for excessive insurance charged in the

         amount of $86,400.

54

c.   Damages Testified to by John Lorentzen (Exhibit 508):

   i.   Unauthorized expenses for the Joint Venture in 2002 $56,126,

   ii.   Unauthorized expenses for the Joint Venture in 2003 $42,507,

   iii.   Damages from the Hyatt in 2002 wrongfully charged to him of
          $20,097,

   iv.   Damages from the Hyatt in 2003 wrongfully charged to him of
         $14,248,

   v.   Damages as a result of the Scorpions contract $4,891,

   vi.   Damages as a result of the Pit sign at University Arena of $12,900,

   vii.   Out-of-pocket expenses for the Joint Venture for which Lorentzen
          was not reimbursed of $3,475.

   viii.   Plumbing bill for the Joint Venture and by Lorentzen of $2,336,

   ix.   Negligent loss of funds due to a theft of $4,300,

   x.   Damages to get the rates for parking back to where they were of
        $325,080,

   xi.   Accountants Fee of $35,000,

   xii.   2% Commercial Lane fees of $14,250,

   xiii.   Legal Fees of $190,000,

   xiv.   Fees for Ken Hunt of $5,900, and

   xv.   Court Reporter Costs of $7,857.

d.   Total damages testified by Lorentzen and PSI are $738,967.

e.   The 43% factor of PSI is factored into this total for damages.

**Plaintiffs' Damages**

72.　　　Plaintiff cannot support Plaintiffs' Exhibit 271, which relies on a Cost Analysis Approach presented by Robert Chavez, which should not be considered in that it is speculative, not persuasive and only takes into account one side of the ledger, the expense side, and does not take into account revenues.

73.　　　The testimony of Martin Chavez relative to his capitalization approach for damage to benefit of the bargain should be disregarded; it is not persuasive, was not properly supported and was flawed as a business evaluation in that it is supposed to be applied in perpetuity for a period of six year, and therefore should not be considered.

Respectfully Submitted:

MICHAEL DANOFF & ASSOCIATES, P.C.

MICHAEL L. DANOFF
Attorney for Defendants
604 Chama, NE
Albuquerque, NM 87108
(505) 262-2383
(505) 266-4330 Facsimile

I hereby certify that a true copy of the
foregoing pleading was mailed on this
2nd day of April 2004 to the following:

SILVA & ASSOCIATES, P.C.
Benjamin Silva, Jr., Esq.
20 First Plaza, Suite 725
Albuquerque, NM 87103

PEIFER, HANSON & MULINS, P.A.
Christopher T. Saucedo
20 First Plaza, Suite 725
Albuquerque, NM 87103

MICHAEL L. DANOFF