IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

NOV 12 2004

CLERK

| | | |
|---|---|---|
| CHAVEZ PROPERTIES-AIRPORT PARKING ALBUQUERQUE, LP a Georgia limited partnership, and PARKING COMPANY OF AMERICA, INC., a Georgia corporation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIV. 02-145 JP/ACT (ACE) |
| v. | ) ) | |
| JOHN LORENTZEN, individually and PARK AND SHUTTLE, INC., a New Mexico corporation, and WES GOLDEN, individually, | ) ) ) ) ) | MEMORANDUM OPINION |
| Defendants. | ) ) | |

This matter came on for trial without a jury on November 12, 2003. Opening statements and evidence was presented on November 12, 13 and 14, 2003, and on March 9, 10, 11, 12, 15, 16 and 17, 2004. The Court has received closing arguments, post-trial briefs and proposed findings of fact and conclusions of law. The evidence was presented through the testimony of twenty-seven (27) witnesses and two hundred thirty-eight (238) exhibits, together with several affidavits received after the conclusion of the trial. Subsequent to the trial, certain matters were referred to an appraiser for evaluation. That appraisal has now been completed and a report filed with the Court. The case is now ready for decision. Pursuant to Fed.R.Civ.P. 50(a), the Court makes the following findings of fact and conclusions of law.

## THE PARTIES

The plaintiffs in this action are Chavez Properties - Airport Parking, Albuquerque, LP, a Georgia limited partnership (herein after referred to as CPAPA) and Parking Company of America, Inc., a Georgia corporation (hereinafter referred to as PCA), and the defendants are John Lorentzen, Park and Shuttle, Inc., a New Mexico corporation (hereinafter referred to as PSI), and Wes Golden.

## STIPULATED FACTS

The parties have stipulated to the following facts in their pretrial conference order:

1) Chavez Properties Airport Parking Albuquerque, LP and Park & Shuttle, Inc., entered into a Joint Venture Agreement effective January 1, 2000 (Exhibit No. 32).

2) The managers of the Joint Venture (JV) are Manual Chavez, Jr., Robert Chavez and John Lorentzen, and their duties are specified in the contract.

3) The parties to the JV agreed that the profits of the JV would be split with CPAPA receiving 57% and P&S receiving 43%.

4) By the terms of the JV Agreement, each of the parties thereto placed control of certain real property into the JV for joint operation of an airport parking lot at 2801-2909 Yale Blvd., Albuquerque, New Mexico; ownership of the properties was not legally transferred.

5) In accordance with the terms of the JV Agreement, the JV entered into a Parking Management Agreement with Parking

-2-

Company of America, Inc. (PCA) to manage the combined properties for the benefit of the JV partners (Exhibit No. 33).

6) The Parking Manager was to operate the lot, pay all expenses, collect all revenue, provide financial reports and make monthly profit distributions to the JV partners, and their duties were contained in the Parking Management Agreement.

7) Wes Golden was employed by Parking Company of America, Inc., from approximately 1995 until January, 2001.

8) Wes Golden was the parking operation site manager at Airport Fast Park prior to the JV's inception and then became the site manager for the combined lots.

## CLAIMS OF THE PARTIES

Based on a review of the pretrial order, the Court finds that the following is a summary of the parties' respective claims:

### A. Plaintiffs' claims

1) Loss of benefit of bargain. The Joint Venture and Parking Management agreements have been terminated by mutual agreement of the parties. That stipulation resolution expressly reserves this claim of the plaintiffs for trial.

2) Conspiracy to divest funds, assets and customers.

3) Breach of fiduciary duties in that:

    a) Defendants ran special events for their own benefit.

    b) Defendants used PCA employees on PCA time.

    c) They used Joint Venture vehicles for their own use.

-3-

**B. Defendants' claims**

    1) Accounting - claim of waste and mismanagement.

    2) Actual or constructive fraud and conspiracy to defraud.

    3) Tortious interference with beneficial business relations.

    4) Breach of fiduciary duty.

    5) Conversion of corporate funds and opportunities.

    6) Damage to credit reputation.

    7) Attorney fees and costs.

## DISCUSSION

This lawsuit arises out of the parties' performance of the joint venture agreement and the parking management agreement. Robert Chavez testified that these agreements (Exhibit Nos. 32 and 33) were the result of discussion and input by both parties and their respective attorneys. This testimony (See Vol. 1, Transcript March 9, 2003, pp. 5-7) was not refuted by John Lorentzen. (Transcript March 11, 2003, Vol. 1, 689:1-21.) Thus, any ambiguities which may exist are the responsibility of both parties and their attorneys, and if any exist which need to be construed, they will not be construed against either party on the basis that such party is responsible for the language used.

Pursuant to these two agreements, two parking lots adjacent to Sunport Airport in Albuquerque were joined together to be managed as one parking lot by PCA for the benefit of the two owners, the parties to the joint venture agreement. The two agreements were not signed until March 1, 2001, although both

-4-

became effective January 1, 2000, and the two lots were managed by PCA from that date until terminated effective at 12:01 a.m., December 1, 2003 (See Joint Stipulation, Filing No. 192). According to the testimony of both Robert Chavez and John Lorentzen, the primary purpose of the joint venture was to consolidate expenses and thereby increase the profit to each of the owners of the two parking lots.

Almost from the commencement of the Joint Venture on January 1, 2000, John Lorentzen began to express dissatisfaction with the agreement (See Letter of March 15, 2000, Exhibit No. 41, and Letter of May 10, 2000, Exhibit No. 1). These two letters were sent within the first four and a half months after the inception of the Joint Venture and nearly one year before the parties signed the written agreements they had orally reached. Wes Golden also testified that Mr. Lorentzen had expressed these complaints to him during 2000-2002. One continuing complaint during 2000 was the van rental charge on two of the six vans contributed to the Joint Venture by CPAPA. Robert Chavez testified that he consistently advised Mr. Lorentzen this was a proper charge and that he would not consider Lorentzen's complaint.

There were some meetings between Lorentzen and Robert Chavez regarding expenses about which Lorentzen complained, and as to some of these, the parties agreed to adjustments giving Mr. Lorentzen the credit he requested, even though it appears from the evidence that the expenses probably were justified. Most notably was the charge for Hummingbird software (See Exhibit PP).

In spite of his continuing dissatisfaction with the Joint Venture and Parking Management agreements, Lorentzen signed both documents on March 1, 2001, without requiring any modification. The Court finds that he cannot now complain about those matters which arose before March 1, 2001, as the basis for any of his claims.

The Court finds from a review of all the testimony that by 2001, Lorentzen had decided to force either a modification or a termination of the Joint Venture.

The evidence reflects that Wes Golden, although an employee of PCA, joined forces with Mr. Lorentzen in the effort to terminate or modify the Joint Venture. As examples, he authorized Lorentzen to sign a contract for advertising (Exhibit No. 113) in breach of Paragraph 5 of the Parking Management Agreement and of his authority as a manager of the parking lot (Exhibit Nos. 115 and 116); in quietly standing by when Lorentzen removed the credit card machines installed by PCA and installed his own; and standing by while Lorentzen signed the Hyatt agreement without authorization from PCA. These are just a few of the actions taken by defendants as they continued to operate outside of the Joint Venture and management agreements, effectively bringing the relationship between the parties to an end.

The Court finds that plaintiffs and the defendants have a fiduciary duty to each other. This includes Mr. Golden, who owes a fiduciary duty to his employer.

-6-

A joint venture has been defined as "a partnership for a single transaction." *Hansler v. Bass*, 106 N.M. 382, 387, 743 P.2d 1031, 1036 (Ct. App. 1987). It is a well-settled principle of law that "partners occupy a fiduciary duty towards one another." *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 124 N.M. 186, 192, 947 P.2d 143, 149 (1997). Accordingly, it follows that "a fiduciary relationship exists between parties to a joint venture." *Dime Box Petroleum Corp. v. Louisiana Land & Exploration Co.*, 938 F.2d 1144, 1146 (10th Cir. 1991). For instance, the New Mexico Court of Appeals has stated:

> [B]ecause a joint venture is generally considered to be a partnership for a single transaction, the protections of a fiduciary relationship and the respective duties owed by one partner to another serve to ensure that venturers deal honestly and fairly with each other in accounting for profits and losses of the joint venture.

*Lightsey v. Marshall*, 128 N.M. 353, 357, 992 P.2d 904, 908 (Ct. App. 1999)(citations omitted).

In breach of these duties, Mr. Golden not only participated either actively or inactively in the above examples, he also was involved in pirating the hard drives and computer information maintained by PCA in the management of the joint venture in early 2002, thus depriving PCA of its use while the parties commenced over two years of litigation.

This brief summary of the conduct by the defendants satisfies the Court that they were in breach of their fiduciary

-7-

duties and that PSI and Lorentzen were in breach of the two agreements.

The defendants have raised a number of issues which they claim constitute a breach of the agreements or a breach of fiduciary duty of the plaintiffs to PSI and Lorentzen. These primarily involve the management of the Joint Venture. An example is the matter of insurance. Paragraph 12 of the Parking Management Agreement requires the manager to keep in effect at least Two Million Dollars in liability insurance. The manager carried Twenty Million Dollars and stated its reasons for doing so. The defendants disagreed with that amount of coverage. The Court finds that this is a management decision and not a breach of the agreement. Other issues involved payment for supplies. Reviewing the testimony of Tim Chavez, Dale Losey, Brenda Edmunds, Toni Kennett, John Lorentzen and Wes Golden, the Court finds that these issues were also essentially management issues and not a breach of trust or of contract. Other areas of dissension were over the handling of advertising and the maintenance of the vans. After review all of the evidence, the Court finds that defendants' complaints involve the management of the Joint Venture which was granted PCA by the Parking Management Agreement and are not breaches of trust or contract.

The plaintiffs' claim of a breach of fiduciary duty by defendants in the running of special events for their own benefit, the use of PCA employees while on PCA time and the use of the Joint Venture vehicles for their own use are not supported by the evidence, and in any event, have offered no evidence as to

-8-

what damages, if any, plaintiffs may have sustained by this conduct. Those claims will be denied.

The plaintiffs' claim that defendants conspired to divert funds, assets, and customers is essentially subsumed into their claim for loss of bargain as no separate evidence of damages was adduced as to this issue.

After a review of the exhibits and the testimony, the Court concludes that the defendant John Lorentzen embarked on a plan to either terminate or change the terms and conditions of the two agreements (Exhibit Nos. 32 and 33), and that this conduct, joined in by Wes Golden, breached the Joint Venture Agreement and the Parking Management Agreement. They achieved this goal when the parties entered into a joint stipulation on November 10, 2003 (Filing No. 192). Defendants' claims will be denied in their entirety. The Court further finds that plaintiffs' claim that the defendants' conduct breached the agreements and their fiduciary duty has been established.

## DAMAGES

Both parties seek recovery of damages premised primarily on breach of contract and breach of fiduciary duty. The Supreme Court of New Mexico has held, "In cases where profit is an inducement to making a contract, loss of profits as a result of the breach is generally considered to be within the contemplation of the parties and recovery for lost profits will be allowed as damages if causation is proven with reasonable certainty." *Camino Real Mobile Home Park Partnership v. Wolfe*,

-9-

119 N.M. 436, 446, 891 P.2d 1190, 1200 (1995). The Court has further held,

> Where a legal right to damages exists for breach of contract, the fact that lost profits may not be computed with exact mathematical certainty does not prevent the plaintiff from submitting the issue to the fact finder.

*Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 389, 696 P.2d 475, 477 (1985), citing *Acme Cigarette Services, Inc. v. Gallegos*, 91 N.M. 577, 577 P.2d 885 (Ct. App. 1978). Damages for lost profits "are defeated only where there is uncertainty as to the cause of damage rather than the amount of damage." *Id.* In other words, where it is certain that damage has occurred, mere uncertainty as to the amount of damages will not preclude recovery. However, "[e]ven though the amount of damages need not be proven with mathematical certainty, neither can it be based on surmise, conjecture, or speculation." *Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 447, 891 P.2d 1190, 1207 (1995), citing *Mascarenas v. Jaramillo*, 111 N.M. 410, 415, 806 P.2d 59, 64 (1991).

In determining how to measure lost profits, the Supreme Court of New Mexico has stated, "The pre-existing or historic profits of an established business, together with other facts and circumstances, may be considered in arriving at a just estimate of the profit lost as a result of the breach of contract." *Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 389, 696 P.2d 475, 477 (1985), citing *J.R. Watkins Co. v. Eaker*, 56 N.M. 385, 392, 244 P.2d 540, 544 (1952).

-10-

Both the joint venture and the management agreement contained no provisions for termination. Both provided they would continue for a period of ten years. Lorentzen's efforts to terminate these agreements by letter was neither justified nor provided for by the agreements. The plaintiffs have offered the testimony of Robert Chavez and Exhibit 271 which he prepared, and the testimony of Martin Chavez, as the basis for determining damages for the loss of bargain. However, neither Exhibit 271, the testimony of Robert Chavez or the testimony of Martin Chavez can properly be relied upon as the basis for determining whether plaintiffs sustained damages. Exhibit 271 is premised on a claimed loss based on lower expenses that would be incurred respectively by the parties to the joint venture agreement. However, this approach only considers the expenses that individually the two parties to the joint venture agreement have incurred prior to the creation of the joint venture, as compared with the expenses incurred by the joint venture during the first year of operation, and then projecting that "saving" for ten years. This calculation does not establish what loss of profit CPAPA experienced. He did not consider or try to calculate the future profits of the Company, nor did he determine the present value of the expense savings he calculated. His testimony fails to meet the requirement that the plaintiffs present evidence that is not merely "surmise, conjecture or speculation."

-11-

Martin Chavez also testified as to CPAPA's damages. The Court received his testimony as managing partner of CPAPA and president of PCA. He used a capitalization method for determining lost profit using a capitalization rate of 9 ½ per cent (See Exhibit No. 301). In calculating the value to CPAPA of the remaining six years, he used the total income and expenses of the Joint Venture for the forty-six (46) months (January 1, 2000 - October 31, 2003) and determined an average annual rate of income and expenses. But when determining his base, he used only income and expense figures for the year 1998, although not only 1999, but the years prior thereto were available to him. This discrepancy flaws his conclusions. In addition this does not represent loss profit but appears to represent what the witness claims is loss in value of the business. When the Joint Venture was terminated, each party received back the properties it had contributed to the Joint Venture and began operating as a separate entity as they had before the creation of the Joint Venture. If loss of value of the business was to be the measure used, evidence should have been offered as to its value on December 31, 1999, and its value on December 1, 2003, with the difference representing damages due to loss of business value. If the witness wishes to testify that this represents loss profits, then he has failed to establish the present value of such profits and has failed to show what portion of those profits CPAPA would have realized from its separate operation of the parking lot. The Court concludes this evidence is conjectural and speculative, and does not furnish the Court with a rational

-12-

basis to determine if the plaintiff CPAPA may have sustained damages.

While plaintiffs have established a breach of contract and trust, they have failed to present reliable evidence that they sustained any damages. Accordingly, the Court will award plaintiffs nominal damages, together with its costs.

### Defendants' Damage Testimony

With respect to defendants Lorentzen's and PSI's claim for damages, they offered the testimony of Carl Alongi. The Court has concluded that these defendants have failed to establish that plaintiffs breached either contract or breached their fiduciary duties to defendants. Other theories of recovery have been identified by defendants in the Pretrial Order, but the Court finds that the evidence is also insufficient to support these claims and the Court will dismiss all of defendant's claims.

However, the Court will briefly address defendants' evidence of damages. That evidence is based on pure conjecture and speculation. Paragraph 5 of the Parking Management Agreement called for creation of a budget for each year commencing in 2001. The budget was to be proposed by the Parking Company of America (PCA) and then addressed and adopted by the parties to the Joint Venture Agreement. This was never done, and neither party ever sought to have a budget presented. Mr. Alongi created his own budget for the 2001 calendar year, based on the calendar year 2000 profit and loss statement, and then simply projected that over the period to August 31, 2003, without consideration to any

actual changes in the Joint Venture operations in 2001 and 2002. All of his assumptions are premised on his "interpretation" of Paragraph 5 which he says allows the initial year to be an "implied budget." He then increases income and expenses for the ensuing years based on the three per cent (3%) or CPI growth. The Court rejects his interpretation and his conclusion that defendants PSA and John Lorentzen were accordingly damaged.

Plaintiffs have also requested punitive damages. This Joint Venture was an unhappy marriage which was probably doomed from the outset. However, the Court has concluded that the defendants' conduct does not justify an award of punitive damages, and this request will be denied.

### Thunborg - The Appraisal

On August 19, 2004, Phyllis Thunborg submitted her appraisal regarding the values of properties not yet divided by the parties. The plaintiffs submitted a letter dated September 17, 2004, raising objections to several portions of that appraisal. The Court has reviewed the objections and now finds:

1) The radios identified as Items 1-4 have now been divided between the parties and are no longer an issue.

2) Item 58 relates to nine abandoned vehicles. These were not an issue the Court understood would be resolved by this lawsuit. Ms. Thunborg's recommendation as to their disposition is rejected. This matter is left to the parties for resolution.

3) Mr. Thunborg references on Page 5 of her report a theft loss of $10,667.00 which she recommends the parties split. The Court rejects this recommendation. The theft loss would be

included in the operating statements and charged to each party per their respective percentage. This loss and its apparent resolution is unclear to the Court. If that loss has been recovered either by an insurance claim or otherwise, and Mr. Lorentzen was not credited for his 43% share, the plaintiffs should promptly pay that amount to Mr. Lorentzen.

4) Ms. Thunborg's report is accepted with the above modifications.

**CONCLUSION**

The Court finds that judgment should be entered for plaintiffs in the amount of $1.00 as nominal damages and that plaintiffs should recover their costs. The Court further finds that defendants' claims should be dismissed with prejudice. A separate order will be entered in accordance with this memorandum opinion.

DATED this 9th day of November, 2004.

BY THE COURT:

/s/ Lyle E. Strom
LYLE E. STROM, Senior Judge
United States District Court